**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID FINKELSTEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW FOX, LEAH SCHWELLER, CRAIG DENSON, KENNETH ORR, KORR ACQUISITIONS GROUP, INC., KORR VALUE, L.P., ARENA INVESTORS, LP, AI AMPED I, LLC, AI AMPED II, LLC, MT. WHITNEY SECURITIES, LLC, ARENA ORIGINATION CO., LLC, ARENA FINANCE MARKETS, LP, ARENA SPECIAL OPPORTUNITIES FUND, LP, ARENA SPECIAL OPPORTUNITIES PARTNERS, I, LP, ARENA STRUCTURED PRIVATE INVESTMENTS LLC, and ARENA INVESTORS GP, LLC,<br><br>Defendants. | Civil Action No.: 1:24-cv-04056 (JMF)<br><br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


Page

I. NATURE OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 7
III. PARTIES ..... 8
 A. Plaintiff ..... 8
 B. Defendants ..... 8
 C. Relevant Nonparties ..... 11
IV. FACTUAL ALLEGATIONS ..... 12
 A. Corporate History ..... 12
 C. Charge Seeks to Register Its Securities for Arena with the SEC and Pursues an Uplisting on NASDAQ, Causing Orr to "Depart" from the Company ..... 22
 D. Charge Ramps Up Operations and Portrays Itself as a Success Story ..... 28
 E. Charge Management Conceals the Nature and Extent of the Company's Relationship with Orr and the KORR Entities, and the Extent of Control They Exercised Over the Company's Cash Balances ..... 31
 F. Charge Encounters Liquidity Problems, and Hides It From Investors ..... 36
V. MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 52
 A. Misstatements Regarding Charge's Assets and Liquidity ..... 55
 B. Misstatements Regarding the Side Letter and Dispute with Arena ..... 57
 C. Misstatements Regarding Defendant Orr's Control of Charge Common Stock and the Side Letter ..... 58
 D. Misstatements Regarding Charge's Relationship and Investments with Defendant Orr and the KORR Entities ..... 61
 E. Misstatements Regarding Charge's Financial Condition, Liquidity, Business Prospects and Going Concern Risk ..... 65
 F. Certifications Pursuant to the Sarbanes-Oxley Act of 2002 ..... 68
VI. SUMMARY OF DEFENDANTS' SCIENTER ..... 73
 A. The Management Defendants ..... 73
 B. Orr and the KORR Entities ..... 75
 C. Arena Defendants ..... 76
VII. LOSS CAUSATION ..... 77
 A. March 24, 2022 ..... 79

B. June 22, 2022 .....80
C. November 21, 2023 .....80
D. December 6, 2023 .....81
E. January 25, 2024 .....81
F. February 28, 2024 .....82
G. February 29, 2024 .....82
H. March 7, 2024 .....82
VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ..... 82
IX. NO SAFE HARBOR ..... 84
X. CLASS ACTION ALLEGATIONS ..... 84
XI. CLAIMS FOR RELIEF ..... 86
XII. PRAYER FOR RELIEF ..... 94
XIII. JURY DEMAND ..... 95

Lead Plaintiff Timothy K. Klintworth ("Klintworth" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys which included a review and analysis of, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings by Charge Enterprises, Inc. ("Charge" or the "Company"), Charge's press releases and public statements, Charge's earnings call transcripts and presentations, media and analyst reports concerning Charge, documents publicly filed in *Charge Enterprises, Inc. v. Kenneth Adam Orr et al.*, Index No. 650109/2024 (Sup. Ct., N.Y. Co.), *In re Charge Enterprises, Inc.*, Bankr. Case No. 24-10349 (Bankr. D. Del.), prior complaints filed in this action, and other publicly available documents concerning Charge. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a securities fraud class action brought on behalf of all purchasers of Charge common stock, other than Defendants (defined below) during the period from October 28, 2021, through and including February 28, 2024 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act"), and common law claims of aiding and abetting fraud.

2. Charge is an electrical, broadband, and electric vehicle ("EV") charging infrastructure company. During the Class Period, Charge's business, including through its various subsidiaries, had two primary segments: infrastructure, with a focus on EV charging stations and wireless network communications; and telecommunications, with a focus on connections for voice calls and data to global carriers.

3. On August 23, 2023, Charge filed a Form 8-K with the SEC reporting that it had received a notice on August 22, 2023, from the SEC that the closing share price of its common stock had been below $1.00 per share for the previous 30 consecutive business days and therefore was at risk for delisting.

4. Charge then revealed in its third quarter 2023 quarterly report filed with the SEC on November 8, 2023, that it was involved in a dispute with Arena (defined below) who had provided substantial Company financing, with Arena arguing that the Company's guarantees of its subsidiaries' indebtedness could constitute a breach of the securities purchase agreements pursuant to which the holders purchased certain notes and an event of default under the notes.

5. On November 21, 2023, Charge filed a Form 8-K with the SEC reporting that it had received a default letter from Arena on November 15, 2023, claiming in addition to default notice that, *inter alia,* an additional $3,345,297.87 in interest (reflecting the difference in the default interest rate of 20% and the interest rate of 7.5% per annum commencing from October 25, 2022, on an aggregate principal amount of $25,847,409.00) and additional legal fees, expenses and other costs of at least $692,216.15 were immediately due and payable.

6. In the November 21, 2023 Form 8-K, Charge reported that "[b]ased on Arena's actions over the past several months, including its position that incurring additional indebtedness following repayment of the Notes is not permitted without their consent, which has prevented us from refinancing the Notes, the Company believes it has multiple potential claims against Arena for substantial damages."

7. On this news, Charge's stock price dropped over 27% from a closing price of $0.238 per share on November 21, 2023, to a closing price of $0.173 per share on November 22, 2023.

8. On December 6, 2023, Charge filed a Form 8-K with the SEC reporting that it had received an additional default letter from Arena on December 1, 2023, claiming additional events of default from alleged breaches of several representations, warranties and covenants relating to the Special Advisor Agreement (the "Special Advisor Agreement") with KORR Acquisitions Group, Inc. ("KORR Acquisitions") and the Company's investments managed by KORR Acquisitions and related matters. A second letter of the same date claimed events of default under a certain exchange agreement, dated June 30, 2022, by and between the Company and certain affiliates of Arena (the "Exchange Agreement").

9. On this news, Charge's stock price dropped 14.5% from a closing price of $0.172 per share on December 6, 2023, to a closing price of $0.147 per share on December 7, 2023.

10. On January 25, 2024, Charge filed a Form 8-K with the SEC reporting, among other things, that on January 19, 2024, the Company received a foreclosure notice (the "Notice") from an affiliate of Arena (the "Agent").

11. The Notice, which purported to be delivered pursuant to the New York Uniform Commercial Code, stated that, to satisfy the Company's outstanding secured indebtedness under the Notes, the Agent intended to sell 100% of the Company's equity interest in its subsidiaries Charge Investments, Inc., Charge Infrastructure Holdings, Inc., and Transworld Enterprises, Inc. and the assets (other than the equity interests) owned by Charge Communications, Inc., Go2Tel.com, Inc., and PTGi International Carrier Services, Inc. (the "Collateral") at an auction to begin on February 16, 2024, or such later date as the Agent may decide (the "Sale Date") at a minimum sale price of $23,333,180. The Notice also stated that the Agent disputes whether the Convertible Notes (defined below) were converted to equity interests pursuant to the Exchange

Agreement, that the Convertible Notes are not subject to the Notice and reserved all rights pursuant to the Convertible Notes.

12. On this news, Charge's stock price decreased 8.2%, from a closing price of $0.158 per share on January 25, 2024, to a closing price of $0.145 per share on January 26, 2024.

13. On February 13, 2024, Charge filed a Form 8-K with the SEC, reporting that it had received approval on February 12, 2024 to transfer from the NASDAQ to the Nasdaq Capital Market.

14. On February 22, 2024, after market close, the Company announced that it had received written notice that it would be delisted from the Nasdaq Capital Market as of February 29, 2024.

15. On this news, Charge's stock price dropped 26% from a closing price of $0.0728 per share on February 22, 2024, to a closing price of $0.0539 per share on February 23, 2024.

16. On February 28, 2024, Charge filed a report on Form 8-K with the SEC notifying the public that it had entered into a Restructuring and Plan Support Agreement, dated February 27, 2024, with AI Amped I, LLC, AI Amped II, LLC, Mt. Whitney Securities, LLC, Arena Special Opportunities Fund, LP, Arena Special Opportunities Partners I, LP, and Arena Finance Markets, LP (sometimes referred to herein collectively as "Arena", along with the Arena Defendants (defined below)) providing for a comprehensive restructuring of Charge to be implemented through the commencement of a voluntary Chapter 11 case (the "RSA"). The effect of the proposed RSA was the cancellation of all existing and preferred common stock of Charge and conversion of the existing indebtedness to Arena and its affiliates into new Charge common stock.

17. On this news, Charge's stock price plummeted 52% from a closing price of $0.0600 per share on February 27, 2024, to a closing price of $0.0288 per share on February 28, 2024.

18. On March 7, 2024, Charge filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code.

19. In filings with the bankruptcy court, it was disclosed for the first time that in connection with its December 2021 purchase of Charge's securities, as part of its inducement to enter into the agreement, Arena had secretly entered into agreements with Charge's Chief Executive Officer ("CEO"), Defendant Andrew Fox ("Fox") and KORR Value, L.P. ("KORR Value") to purchase from Fox and KORR Value 9,000,000 shares (4.5 million shares each) of Charge common stock for $2.0 million dollars, or a price of $0.22 per share (the "Side Letter"). Despite extensive disclosures regarding its investments in Charge, neither Arena nor Charge ever disclosed that Charge's insiders had agreed to sell 9.0 million shares to Arena as part of the inducement for Arena to enter into the securities purchase agreement.

20. Similarly, in the course of the bankruptcy, Charge was forced to disclose that long before the bankruptcy was filed, Charge had retained Cravath Swain & Moore, LLP ("Cravath") to investigate and ultimately prepare a draft complaint against Arena based upon Arena's alleged misconduct. According to Charge, economics prohibited it from filing the complaint and Charge was forced to resolve its claims with Arena as part of the RSA, and pre- and post-petition financing.

21. At the same time, in the course of the bankruptcy, Charge disclosed that Arena had asserted claims against Charge's officers and employees, the details of which were largely undisclosed in the bankruptcy filings. Arena subsequently sued Charge's officers and directors in a complaint filed in the Supreme Court, New York County, titled *AI Amped I LLC et al. v. Amy Hanson et al.*, Index No. 653261/2024 (June 26, 2024).

22. Also, shortly before the bankruptcy case was filed, Charge filed a complaint against Kenneth Orr ("Orr"), KORR Acquisitions and KORR Value (collectively "KORR") accusing

KORR of breaching its fiduciary duties to Charge by claiming that funds Charge had invested with KORR were unavailable because they were invested in a limited partnership that limited withdrawals.

23. Documents released by Charge in the bankruptcy also disclosed that Charge's financial statements consistently reported that Charge would continue as a going concern without qualification, despite its disputes with Arena, and liquidity restrictions imposed by its investment with KORR.

24. Throughout the Class Period the Defendants (identified below) made materially false and misleading statements and/or failed to disclose, *inter alia*: (i) the nature and extent of Charge's relationship and investments with Defendant Orr and the KORR Entities (defined below); (ii) that in connection with subordinated convertible financing, Arena had entered into an agreement to purchase 9,000,000 shares from Charge's insiders, Defendant Fox and KORR Value (4.5 million shares from each) at a price of about $0.22 per share at a time when Charge's market price was approximately $3.50 per share; (iii) that, according to KORR, in connection with that agreement, KORR caused an additional 4.5 million shares of Charge common stock to be transferred to Arena to fulfill Fox's pledge under the Side Letter, based on Charge's promise to make the transferor whole on the anticipated date of Charge's common stock listing on the Russell 2000 Index; (iv) Charge's unrestricted cash actually represented an investment in a private equity fund that required advance notice of withdrawals before the cash could be available; (v) Charge's current assets, including cash balances and investments in marketable securities, and Charge's total liquidity were misstated; (vi) Charge had considered Arena's actions in interfering with Charge's efforts to refinance its debt as sufficiently egregious that it retained counsel at the law firm of Cravath to prepare a complaint against Arena asserting claims of lender liability, among other

claims; (vii) Charge's fundamental financial condition, liquidity, business prospects and going concern risk were undisclosed; and (viii) that the operation and adequacy of Charge's internal controls were misstated.

25. Ultimately, through the bankruptcy process, Arena acquired full control of Charge, Charge's claims against Arena were released, any claims by Arena against the directors and officers were expressly capped at any available directors and officers' insurance coverage, and Charge, KORR and Arena resolved all claims and released one another from any existing claims. The remaining shareholders of Charge, including members of the Class, on the other hand, received nothing.

26. Plaintiff brings this action under the federal securities laws and related common law claims to recover the investment losses he, and other members of the Class, suffered as a result of Defendants' fraudulent scheme and unlawful course of conduct, and materially false and misleading statements and omissions of material fact in connection therewith.

## II. JURISDICTION AND VENUE

27. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

28. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

29. This Court has supplemental jurisdiction over the common law claims asserted herein pursuant to 28 U.S.C. § 1337.

30. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the

dissemination of false and misleading information, occurred in this District. Charge has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

31. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## III. PARTIES

### A. Plaintiff

32. Plaintiff Klintworth, as set forth in his certification previously filed in this action (ECF No. 20-2), purchased Charge common stock during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

33. Defendant Andrew Fox served as Charge's CEO between October 2020 and August 2023. Fox served as a Strategic Advisor thereafter. Fox served as a member of Charge's Board of Directors between October 2020 and May 2024, and as its Chairman between September 2021 and August 2023. Fox was a central figure in the Company, participating in the review, approval, and making of the statements throughout the Class Period, including signing SEC filings.

34. Defendant Leah Schweller served as Charge's Chief Financial Officer ("CFO") between September 2021 and May 2024. Schweller was a central figure in the Company, participating in the review, approval, and making of the statements throughout the Class Period, including signing SEC filings.

35. Defendant Craig Denson served as Charge's Interim CEO between August 2023 and May 2024, and as a member of Charge's Board of Directors between October 2020 and May 2024. Denson previously served as the Company's Chief Operating Officer between October 2020 and August 2023, as Chief Compliance Officer from November 2021 to August 2023, and as Secretary from December 2021 to October 2022. Denson was a central figure in the Company, participating in the review, approval, and making of the statements throughout the Class Period, including signing SEC filings.

36. Defendants Fox, Schweller, and Denson are referred to hereinafter as the "Management Defendants."

37. Defendant Kenneth Orr served as the Chairman of Charge's Board of Directors between May 2020 and September 2021, and was a significant, controlling shareholder of Charge throughout the Class Period. Orr is the principal operating officer of Defendant KORR Acquisitions and had the sole and dispositive power over Charge shares held by KORR Acquisitions. Through his direct ownership of, and/or indirect control of, shares of Charge common stock, his control over the KORR Entities, and other means, Orr exercised control over Charge throughout much of the Class Period.

38. Defendant KORR Acquisitions Group, Inc. is a registered investment advisor incorporated under the laws of the State of New York and with its principal place of business located in Westbury, New York. KORR Acquisitions is controlled by Defendant Orr.

39. Defendant KORR Value, L.P. is a limited partnership formed under the laws of the State of Delaware, with a principal place of business at the same Westbury, New York address as KORR Acquisitions. Defendant Orr had the sole and dispositive power over shares of Charge

common stock held by KORR Value. Defendant KORR Acquisitions is the general partner of KORR Value.

40. KORR Acquisitions and KORR Value are referred together herein as the "KORR Entities." The KORR Entities, together with Defendant Orr, are referred to herein as "KORR" or the "KORR Defendants."

41. Defendant Arena Investors, LP ("Arena Investors") is the investment advisor of and was deemed to beneficially own the securities owned by the following defendants (the "Arena Entities"): Mt. Whitney Securities, LLC ("Mt. Whitney"), Arena Origination Co., LLC ("Arena Origination"), Arena Finance Markets, LP ("Arena Finance"), Arena Special Opportunities Fund, LP ("Arena SOF"), Arena Special Opportunities Partners I, LP ("Arena SOP"), and Arena Structured Private Investments LLC ("Arena Structured"). Defendant Arena Investors GP, LLC ("Arena GP") is the general partner of and was deemed to beneficially own securities owned by the Arena Entities.

42. Defendant AI Amped I, LLC ("Amped I") is a Delaware limited liability company with its principal place of business at 2500 Westchester Avenue, Suite 401, Purchase, New York 10577. Amped I is the current holder of the December 2021 Non-Convertible Notes (as defined below) and is the largest secured lender of the Company. Purportedly, the December 2021 Non-Convertible Notes were assigned from Arena Origination, Arena SOF, Arena SOP, and Mt. Whitney to Amped I as of December 28, 2023.

43. Defendant AI Amped II, LLC ("Amped II") is a Delaware limited liability company with its principal place of business at 2500 Westchester Avenue, Suite 401, Purchase, New York 10577. Amped II is the current holder of the Convertible Notes (as defined below). The

Convertible Notes were assigned from Arena Origination, Arena SOF, Arena SOP, and Mt. Whitney to Amped II pursuant to an Assignment Agreement dated as of December 28, 2023.

44. Defendants Arena Origination, Arena SOF, Arena SOP, and Mt. Whitney are each Delaware limited liability companies, with their principal place of business at 405 Lexington Avenue, New York, New York 10174. Arena Origination, Arena SOF, Arena SOP, and Mt. Whitney hold the Series C, Series E, Warrants, and common shares of the Company.

45. Arena Investors, the Arena Entities, Arena GP, Amped I and Amped II are collectively referred to herein as "Arena" or the "Arena Defendants."

46. Throughout the Class Period, Arena controlled Charge through Arena ownership of 9.99% of the Company's outstanding shares of common stock, with, pursuant to various agreements described herein, the right to acquire additional shares at all times purportedly subject to the foregoing limit.

47. The Arena Defendants exercised control over Charge through their equity and debt securities, including the rights and conditions provided for in those agreements. As controllers, the Arena Defendants effectively forced the Company into bankruptcy, by exercising undue and unreasonable financial pressure on Charge, resulting in the Company entering into the RSA which cancelled all existing shares of preferred and common stock and converted the indebtedness to Arena into new common stock.

48. The Management Defendants, KORR Defendants and Arena Defendants are referred to herein collectively as the "Defendants".

**C. <u>Relevant Nonparties</u>**

49. Nonparty Charge is an electrical, broadband, and EV charging infrastructure company. Charge is a Delaware corporation with its principal place of business in New York,

New York. Before its delisting, Charge common stock traded on the NASDAQ stock exchange under the ticker symbol "CRGE." Charge common stock was effectively cancelled by the confirmation of its bankruptcy plan. As a result of Charge's bankruptcy, Charge cannot be named as a defendant in this lawsuit.

50. Nonparty Philip Scala ("Scala") served as a member of Charge's Board of Directors between May 2020 and December 2023. Scala previously served as the Company's Interim CEO between May 2020 and October 2020.

51. Nonparty James Biehl ("Biehl") served as Charge's Chief Legal Officer between October 2022 and May 2024, and as its Chief Compliance Officer between August 2023 and May 2024.

## IV. FACTUAL ALLEGATIONS

### A. Corporate History

52. The corporate entity that would eventually become Charge Enterprises was incorporated in Nevada on May 8, 2003, under the name "E-Education Network, Inc." On August 10, 2005, E-Education Network, Inc. changed its name to "GoIP Global, Inc." ("GoIP Global").

53. As of May 2020, Defendant Orr held various positions at GoIP Global, including CFO, President, and Chairman of the Board of Directors. Orr was also GoIP Global's single largest stockholder, controlling more than eighty (80) percent of the company's voting securities.

54. On May 8, 2020, Scala was appointed as the Interim CEO of GoIP Global. The following day, on May 9, 2020, Scala caused GoIP Global to enter into the KORR Value LPA. The KORR Value LPA made GoIP Global a limited partner in KORR Value, and granted to KORR Acquisitions, as general partner of KORR Value, not only the power to direct the investment of limited partners' capital, but also the "sole and absolute discretion to limit or halt redemptions by

any and all investors" (*i.e.*, withdrawals of capital invested by limited partners) "at any time for any reason." In other words, the KORR Value LPA gave KORR Acquisitions unfettered authority to deny requests by GoIP Global to withdraw its invested capital.

55. Also on May 8, 2020, GoIP Global acquired a company known as "Transworld Enterprises, Inc." Several months later, on October 1, 2020, GoIP Global again redomiciled from Colorado to Delaware and, in connection with that redomiciling, again changed its name to "Transworld Holdings, Inc." ("Transworld Holdings").

56. During this early period, the Company was not involved in the electrical, broadband, or EV charging infrastructure businesses it would later enter. According to its SEC filings, before October 2020, the Company was "a 'shell company' as defined in Rule 405 of the Securities Act [of 1933]." As Orr stated in May 2020, the Company's goal was to "build market cap through a series of accretive acquisitions, building real and sustainable shareholder value. . . . We will remain industry agnostic while seeking opportunity for our company and expect to close several transactions this year."

57. In connection with this goal, the Company made two acquisitions in October 2020. First, on October 12, 2020, it acquired a company known as "GetCharged, Inc." Defendant Fox was the founder and CEO of GetCharged. Upon completion of this transaction, Scala resigned as the Interim CEO of the Company and was replaced by Fox.

58. Second, on October 31, 2020, the Company acquired "PTGi International Carrier Services, Inc." Defendant Denson had served as the President and CEO of PTGi since 2012.

59. On January 26, 2021, Transworld Holdings again changed its name to "Charge Enterprises, Inc."

60. Charge was uplisted to the NASDAQ on April 12, 2022, and traded on the NASDAQ until February 20, 2024.

61. During the Class Period, Charge was the parent company and indirect owner of several subsidiaries, including: (a) Go2Tel.com, Inc. ("Go2Tel"); (b) PTGi International Carrier Services, Inc. ("PTGi"); (c) ANS Advance Network Services, LLC ("ANS"); (d) B W Electrical Services, LLC ("BW"); (e) EVDepot, LLC ("EVDepot"); and (f) Greenspeed Energy Solutions, LLC ("Greenspeed").

**B. Arena's Ownership and Financing**

62. Since 2020, Arena has provided financing to the Company, with Charge first issuing promissory notes to Arena in the amount of $3 million in May of 2020. On June 30, 2022, Arena agreed to convert the May 2020 notes and subsequent November 2020 notes into shares of Charge Series D Convertible Preferred Stock.

63. In August 2020, Charge filed a draft registration statement "registering shares of common stock in order to permit [Arena] to offer the shares of common stock from time to time. A registration statement on Form S-1 was subsequently filed with the SEC on February 12, 2021, with numerous amendments filed before December 2021. The December 2021 registration statement and prospectus registered 42,357,784 shares of Charge common stock for sale by Arena.

64. In May of 2021, Charge entered into a securities purchase agreement with Arena pursuant to which it issued (i) an aggregate principal amount of $5,610,000 of original issue discount senior secured convertible promissory notes due May 19, 2024 (the "May 2021 Convertible Notes"), and (ii) an aggregate principal amount of $11,032,609 of original issue discount senior secured non-convertible promissory notes due November 19, 2022 (the "May 2021 Non-Convertible Notes" and together with the May 2021 Convertible Notes, the "May 2021

Notes"). On November 26, 2021, Arena agreed to extend the maturity date of the May 2021 Non-Convertible Notes to November 19, 2023. As discussed below, on June 30, 2022, Arena agreed to convert the May 2021 Convertible Notes and 2020 notes (collectively, the "Convertible Notes") into shares of Charge's Series D Convertible Preferred Stock.

65. On December 17, 2021, Charge entered into a securities purchase agreement (the "December 2021 SPA") with four funds affiliated with Arena pursuant to which Charge issued and sold notes payable in an aggregate face value of $15.9 million for an aggregate purchase price of $13.3 million (the "December 2021 Non-Convertible Notes"). The notes had a coupon of 7.5% and a 23-month term and matured on November 19, 2023. In addition, as part of the securities purchase agreement, Charge issued (i) 2,370,370 shares of Series C Preferred Stock to the investors at an aggregate purchase price of $6.7 million and (ii) warrants to purchase up to 2,370,370 shares of Charge's common stock at $4.00 per share.

66. The press release attached as Exhibit 99.1 to a Form 8-K filed with the SEC (the "December 2021 Form 8-K") and signed by defendant Schweller, reporting that Charge had entered into the December 2021 SPA with Arena, stated *inter alia*, that:

> On December 17, 2021, Charge Enterprises, Inc. (sometimes referred to herein as "we," "us," "our" or similar terms) entered into a Securities Purchase Agreement (the "Purchase Agreement") with funds affiliated with Arena Investors LP (the "Arena Investors") pursuant to which we issued original issue discount, senior secured, non-convertible promissory notes in the aggregate principal amount of $14,814,814 (the "December 2021 Notes") and $7,407,407 aggregate stated value of our newly-designated Series C Convertible Preferred Stock, par value $0.0001 per share (the "Series C Preferred"). In connection with the issuance of the December 2021 Notes, we issued to the Arena Investors warrants (the "December 2021 Warrants") to purchase an aggregate of 2,370,370 shares of our Common Stock, $0.0001 par value per share (our "Common Stock").
>
> The securities sold pursuant to the Purchase Agreement are issued in reliance on an exemption from registration under Section 4(a)(2) the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506(b) of Regulation D promulgated thereunder.

The following description of the Purchase Agreement, the December 2021 Notes, the Series C Preferred, and the December 2021 Warrants, and the transactions contemplated thereby are qualified in their entirety by reference to the Purchase Agreement, the Form of December 2021 Note, the Certificate of Designation (as defined herein) of the Series C Preferred, the Form of December 2021 Warrants, the Amended and Restated Security Agreement, dated as of December 17, 2021 (the "Security Agreement"), the Guaranty Agreement (the "Guaranty") dated as of December 17, 2021, and the Registration Rights Agreement (the "Registration Rights Agreement") dated December 17, 2021 (collectively, the "Transaction Documents"), copies of which are filed as Exhibits to this Current Report on Form 8-K.

The representations, warranties and covenants contained in the Transaction Documents were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to the Transaction Documents, and may be subject to limitations agreed upon by the contracting parties. Accordingly, the Transaction Documents are incorporated herein by reference only to provide information regarding the terms of the Transaction Documents, and not to provide any other factual information regarding us or our business, and should be read in conjunction with the disclosures in our periodic reports and other filings with the SEC.

*The Purchase Agreement*

On December 17, 2021, we entered into the Purchase Agreement to raise aggregate gross proceeds of $20,000,000 from the Arena Investors to, in part, fund the anticipated acquisitions by us of BW Electrical Services LLC (the "BW Acquisition") and EV Holdings Group, LLC and affiliates (the "EV Acquisition"). Without the consent of the Arena Investors, we are required to consummate the BW Acquisition and EV Acquisition not later than January 17, 2022.

*The December 2021 Notes*

On December 17, 2021, the Arena Investors purchased aggregate principal amount of $14,814,814 December 2021 Notes, for an aggregate purchase price of the December 2021 Notes of $133,333,184. The December 2021 Notes are due November 19, 2023. We are obligated to pay interest to the holders on the outstanding principal amount at the rate of 7.5% per annum, subject to increase to 20% per annum upon and during the occurrence of an event of default. At any time before maturity, as long as no event of default has occurred, we may redeem each December 2021 Note at the price of 107.5% of the then outstanding principal amount of the Note plus accrued but unpaid interest. Upon an event of default, at the holder's option, all outstanding principal, accrued but unpaid interest and other amounts described in the December 2021 Note, shall become immediately due and payable by us.

67. The December 2021 Form 8-K also attached the December 2021 SPA and a guaranty agreement dated December 17, 2021, among other things.

68. On June 30, 2022, Charge entered into the Exchange Agreement with certain funds affiliated with Arena pursuant to which Charge issued 1,177,023 shares of newly-designated Series D Convertible Preferred Stock, par value $0.0001 per share. The Series D Convertible Preferred Stock was issued in exchange for the May 2020 convertible notes, the November 2020 convertible notes, and the May 2021 Convertible Notes.

69. On September 9, 2022, Charge filed a prospectus with the SEC pursuant to Rule 424(b)(4), commencing the public offering of 28.7 million shares of Charge common stock owned by Arena and certain other entities who acquired shares in previous private placement transactions. A supplement was filed with the SEC on December 28, 2022.

70. The registration statement and prospectus described the securities offering as follows:

> This prospectus relates to the disposition from time to time by the selling stockholders named in this prospectus (the "Selling Stockholders") of Charge Enterprises, Inc. ("Charge," "we," "our" or "us") of up to 28,697,543 shares (the "Shares") of our common stock, par value $0.0001 per share (our "Common Stock"), which includes up to 8,630,803 shares of our Common Stock, up to 13,840,370 shares of our Common Stock issuable upon the exercise of outstanding warrants (the "Warrants") and up to 6,226,370 shares of our Common Stock issuable upon the conversion of our Series C Preferred Stock (the "Series C Preferred Stock") which are held by the Selling Stockholders identified in this prospectus, including their transferees, pledgees or donees or their respective successors. The Shares issued or issuable by us to the Selling Stockholders were sold in five separate private placement transactions that were completed on May 8, 2020, May 19, 2021, December 17, 2021, February 25, 2022 and April 26, 2022.

71. The registration statement and prospectus disclosed that Arena Investors beneficially owned 24,954,415 common shares explaining the ownership as follows:

> Arena Investors, LP (the "Arena Investment Advisor") is the investment adviser of, and may be deemed to beneficially own securities owned by the following entities (the "Arena Entities"): (a) Mt. Whitney Securities, LLC which directly owns (i)

> 7,032,284 shares of Common Stock, (ii) warrants to purchase 5,291,408 shares of Common Stock, (iii) 7,231,495 shares of Common Stock issuable upon conversion of Series D Preferred Stock, and (iv) 711,465 shares of Common Stock issuable upon conversion of Series C Preferred Stock; (b) Arena Origination Co., LLC which directly owns 126,000 shares of Common Stock; (c) Arena Finance Markets LP which directly owns (i) 529,324 shares of Common Stock, (ii) warrants to purchase 487,137 shares of Common Stock, (iii) 664,375 shares of Common Stock issuable upon conversion of Series D Preferred Stock, and (iv) 66,371 shares of Common Stock issuable upon conversion of Series C Preferred Stock; (d) Arena Special Opportunities Fund, LP which directly owns (i) 2,923,988 shares of Common Stock, (ii) warrants to purchase 2,201,227 shares of Common Stock, (iii) 2,765,973 shares of Common Stock issuable upon conversion of Series D Preferred Stock, and (iv) 367,965 shares of Common Stock issuable upon conversion of Series C Preferred Stock; (e) Arena Special Opportunities Partners I, LP which directly owns (i) 5,590,632 shares of Common Stock, (ii) warrants to purchase 3,860,598 shares of Common Stock, (iii) 3,208,173 shares of Common Stock issuable upon conversion of Series D Preferred Stock, and (iv) 1,224,569 shares of Common Stock issuable upon conversion of Series C Preferred Stock; and (f) Arena Structured Private Investments LLC which directly owns 15,555,540 shares of Common Stock issuable upon conversion of Series D Preferred Stock. Arena Investors GP, LLC (the "Arena General Partner") is the general partner of and may be deemed to beneficially own securities owned by the Arena Investment Advisor. By virtue of his position as the chief executive officer of the Arena General Partner and the Arena Investment Manager, Daniel Zwirn may be deemed to beneficially own securities owned by each of the Arena Entities. It is our understanding that each of Mr. Zwirn, the Arena Investment Advisor and the Arena General Partner share voting and disposal power over the shares held by the Arena Entities described above. Each of the warrants, Series D Preferred Stock and Series C Preferred Stock described above provide for limitations on exercise and conversion, respectively, such that the holder along with its affiliates may not beneficially own more than 9.99% of our Common Stock, except upon not less than 61 days' prior written notice to us. The address for the entities set forth above is 405 Lexington Avenue, 59th Floor, New York, New York 10174.[1]

72. The registration statement and prospectus also included the following disclosure regarding the December 2021 financing:

> **December 2021 Financing**
>
> On December 17, 2021, we entered into a securities purchase agreement with certain funds affiliated with Arena Investors LP (the "December 2021 Investors") pursuant to which we issued (i) original issue discount, senior secured, non-convertible promissory notes in the aggregate principal amount of $14,814,814 (the "December 2021 Notes") and (ii) $7,407,407 aggregate stated value of our Series

[1] Thus, in total, Arena beneficially owned 44,156,984 shares of common stock prior to the offering.

C Convertible Preferred Stock, par value $0.0001 per share (the "Series C Preferred Stock"), or an aggregate of 2,370,370 shares of Series C Preferred Stock.

In connection with the issuance of the December 2021 Notes, we issued to the December 2021 Investors warrants to purchase 2,370,370 shares of Common Stock at an exercise price of $4.00 per share (the "December 2021 Warrants"). Each December 2021 Warrant is exercisable for a period of two years from the date of issuance at an initial exercise price of $4.00 per share, subject to certain beneficial ownership limitations (with a maximum ownership limit of 9.99%). The exercise price is also subject to adjustment due to certain events, including stock dividends, stock splits and in connection with the issuance by us of Common Stock or Common Stock equivalents at an effective price per share lower than the exercise price then in effect. The December 2021 Investors may exercise the December 2021 Warrants on a cashless basis if the shares of Common Stock underlying the December 2021 Warrants are not then registered pursuant to an effective registration statement. In the event the December 2021 Investors exercise the December 2021 Warrants on a cashless basis, then we will not receive any proceeds. On June 30, 2022, the Company entered into an amendment to the December 2021 Warrants pursuant to which the Company agreed to allow each holder of such warrants the option to require the Company to issue to such holder, upon exercise, in lieu of issuing Common Stock, such number of shares of New Preferred Stock as shall be convertible into the same number of shares of Common Stock as would have been issued upon exercise of such warrants. On June 30, 2022, the Company entered into the Registration Rights Agreement - New Preferred Stock which granted the holders of New Preferred Stock demand rights to require the Company to file up to two demand registration statements for the offer and resale of the shares of Common Stock issuable upon conversion of the New Preferred Stock no later than 90 days after the date of such demand. The December 2021 Notes accrue interest at a rate of 7.5% per annum, subject to increase to 20% per annum upon and during the occurrence of an event of default and are to be redeemed at 107.5% of face value on the maturity date.

The December 2021 Notes rank *pari passu* with the notes issued to the investors in the Company's May 2021 private placements and senior to all of our current and future indebtedness and are secured by substantially all of our assets. In addition, some of our subsidiaries entered into a subsidiary guaranty agreement and guaranteed the obligations owed to the December 2021 Investors under the December 2021 Notes.

Except as otherwise provided in our Amended and Restated Certificate of Incorporation, the Certificate of Designation or as otherwise required bylaw, holders of the Series C Preferred Stock shall have no voting rights, however, we shall not, without the affirmative vote of the holders of all the then outstanding shares of Series C Preferred Stock (a) alter or change adversely the powers, preferences or rights given to the Series C Preferred Stock or alter or amend the Certificate of Designation, (b) amend our Certificate of Incorporation or other charter documents in any manner that materially adversely affects any rights of any

> holder, or (c) enter into any agreement with respect to any of the foregoing. In the event of any liquidation, dissolution or winding up of our affairs, holders of the Series C Preferred Stock will be entitled to receive a liquidation distribution (the "Liquidation Preference"), equal to $3.125 per share (the "Stated Value"), plus all accrued but unpaid dividends. The Liquidation Preference is senior in liquidation rights to the holders of our Common Stock. Holders of our Series C Preferred Stock will receive a monthly dividend at a fixed annual rate of 6.00% of the Liquidation Preference, or $0.1875 per share of Series C Preferred Stock per year, payable, at our option, in cash or in shares of our Common Stock valued at the conversion price (as described herein).
>
> Each share of Series C Preferred Stock is convertible, at the option of the holder, into such number of shares of our Common Stock equal to the Stated Value divided by the conversion price of $3.125 per share. Therefore, each share of Series C Preferred Stock is convertible into one share of Common Stock (subject to adjustment as provided in the Certificate of Designation). The holder may convert Series C Preferred Stock at any time after the shares issuable upon conversion satisfy the holding period under Rule 144. The holder is prohibited from converting the Series C Preferred Stock into shares of Common Stock if, as a result of such conversion, the holder, together with its affiliates, would own more than 9.99% of the total number of shares of our Common Stock then issued and outstanding.
>
> If the closing price of our Common Stock exceeds $3.125 (subject to adjustment), we may, on ten trading days' notice, cause each holder to convert all or part of such holder's Series C Preferred Stock plus all accrued but unpaid dividends. On ten trading days' notice to the holders, we may redeem the Series C Preferred Stock in whole or, from time to time, in part at our option, at the sum of $3.125 per share of Series C Preferred Stock(subject to adjustment), plus accrued but unpaid dividends. Holders may elect to convert the Series C Preferred Stock during such notice period.
>
> On December 17, 2024, we shall, subject to ten days' prior notice from a holder, convert all of the then outstanding Series C Preferred Stock into our Common Stock, or at our option redeem such Series C Preferred Stock for cash, in the aggregate redemption amount of $3.125 per share of Series C Preferred Stock (subject to adjustment), plus accrued but unpaid dividends, plus additional cash consideration in order for the holder to achieve a 20% IRR. If we elect to convert the Series C Preferred Stock, the conversion price is based on the lower of the conversion price then in effect or the volume.

73. Unbeknownst to public investors, and undisclosed by Defendants in Charge's SEC filings, according to a Proof of Claim filed by KORR Acquisitions on April 7, 2024, in Charge's bankruptcy, as an "additional inducement" for Arena to enter into the SPA, Defendant Fox and KORR Value entered into the Side Letter with Arena pursuant to which Fox and KORR Value

collectively agreed to sell to the Arena purchasers 9 million shares for an aggregate purchase price of $2.0 million, or $0.22 per share. Per the Side Letter, KORR Value and Fox each pledged to transfer to Arena 4.5 million shares of Charge common stock for an aggregate purchase price of $2.0 million (split evenly between Fox and KORR Value).

74. Also unbeknownst to public investors, on or about June 2, 2022, KORR Value caused KORR Acquisitions to tender the 4.5 million shares owed by KORR Value to Arena. Fox was either unwilling or unable to tender the other 4.5 million shares.

75. Fox allegedly requested that KORR cause an additional 4.5 million shares of Charge common stock to be transferred to Arena to fulfill Fox's pledge under the Side Letter.

76. According to KORR Value, Charge promised to make the transferor whole by paying to the transferor the value of the additional 4.5 million shares on the anticipated date of Charge's common stock listing on the Russell 2000 Index. In response, KORR Value effectuated the transfer of the 4.5 million shares of Charge common stock to Arena on or about June 2, 2022, through an arrangement with an affiliated family trust (the "Gabriel 613 Trust"), to satisfy Fox's obligation under the Side Letter.

77. The Russell 2000 Index listing occurred on June 24, 2022. According to a Proof of Claim filed by KORR Value in Charge's bankruptcy, the value of the 4.5 million shares of Charge's common stock on that date was $24,570,000 (4.5 million x $5.46/share). As such, KORR Value asserted a claim for that amount against Charge in the bankruptcy.

78. The foregoing events regarding the Side Letter were first disclosed in Charge's bankruptcy proceedings after Charge filed for bankruptcy on March 7, 2024. In each of the public disclosures discussed herein, Defendants failed to disclose the Side Letter agreement or the potential claim by KORR Value of up to $24.5 million dollars.

### C. **Charge Seeks to Register Its Securities for Arena with the SEC and Pursues an Uplisting on NASDAQ, Causing Orr to "Depart" from the Company**

79. As mentioned above, beginning on August 7, 2020, the Company worked to register its securities to sell shares issued or to be issued to Arena as selling shareholders with the SEC and, accordingly, filed numerous draft registration statements on Form S-1 thereafter.

80. The August 7, 2020, draft registration statement for the sale of 20,555,600 shares (then named GoIP Global, Inc.) disclosed that on May 8, 2020, Charge entered into a securities purchase agreement with Arena (Mt. Whitney, Arena Originating, Arena SOF and Arena SOP) as selling shareholders, pursuant to which Charge issued convertible notes in an aggregate principal amount of $3 million for an aggregate purchase price of $2.7 million (collectively, the "Notes"). Charge disclosed that in connection with the issuance of the Notes, it issued to the selling stockholders warrants to purchase an aggregate of 7,600,000 shares of Common Stock (collectively, the "Warrants") and 7.5 shares of series G convertible preferred stock (the "Series G Preferred Stock"). The shares registered in the registration statement were shares of common stock issuable upon conversion of the Notes and the Series G Preferred Stock, and upon exercise of the Warrants.

81. On February 2, 2021, Charge filed a draft registration statement for the sale of 42,357,784 shares, of which included 27,555,556 shares issuable upon the conversion of convertible promissory notes (the "Notes"), 7,600,000 shares issuable upon the exercise of warrants (the "Warrants") and 7,202,228 shares held by the selling stockholders identified in the prospectus (principally Arena again), including their transferees, pledgees or donees or their respective successors. The shares issued or issuable to the selling stockholders were sold in two separate private placement transactions that were completed on May 8, 2020 and November 3, 2020.

82. At some point in the summer of 2021 while Charge was preparing its registration statement, NASDAQ and the SEC raised a number of questions regarding Orr's involvement with Charge, including the "informal" arrangement with KORR Acquisitions for investment advisory services (the "Informal Arrangement").[2]

83. Orr thereafter stepped down as Chairman of the Company's Board of Directors, effective September 14, 2021. Fox assumed Orr's role as Chairman. Schweller was named as the Company's CFO the following day.

84. Orr also divested a significant portion of his holdings in Charge common stock. On October 28, 2021, Charge informed the market that Orr had sold his holdings of Charge common stock down to roughly ten (10) percent of the Company's public float.

85. On October 6, 2020, the Company effected a reverse stock split. Prior to the reverse split, the Company's Series D Preferred Stock was "entitled to vote on any matter and . . . collectively represent[s] 80% of the votes eligible to be cast in any manner."

86. The following chart contains the number of shares of common stock, and the percentage of the Company's outstanding common stock, that Orr purported to own on various dates following the reverse split:

[2] Orr was the subject of prior disciplinary action by the SEC. Specifically, on November 10, 1999, the SEC commenced an action against Orr and several other defendants in the Eastern District of New York for participation in a kickback scheme involving the sale of fraudulent shares of stock. A parallel criminal case was filed against Orr, and on January 3, 2002, Orr pleaded guilty to one count of conspiracy to commit money laundering and was sentenced to three years of probation and ordered to pay a $3,000 fine. On September 13, 2002, a judge in the Eastern District of New York entered an injunction against Orr permanently enjoining him from future violations; in connection therewith, Orr was forced to pay a disgorgement penalty of $55,000, $44,000 in interest, and a further civil penalty of $55,000. Finally, in September 2004, SEC administrative proceedings led to the entry of an order ***permanently barring*** Orr from associating with a securities broker or dealer.

| Table 1: Orr's Ownership of Charge Common Stock[3] | | |
|---|---|---|
| Date | Shares of Common Stock Beneficially Owned | Percentage of Outstanding Common Stock |
| 2/12/2021 | 56,782,934 | 37.78 |
| 5/14/2021 | 81,138,627 | 45.84 |
| 6/11/2021 | 92,571,948 | 41.97 |
| 8/4/2021 | 78,181,242 | 42.50 |
| 10/28/2021 | 18,325,848 | 10.20 |
| 12/10/2021 | 18,225,848 | 9.96 |

87. In sum: before October 2021, Orr controlled slightly less than half of the Company's voting securities; and following his purported divestiture in September 2021, Orr purported to control roughly 10 percent of the Company's voting securities.

88. Apparently, none of the Company's registration statements filed during this period disclosed what became of the roughly 60,000,000 shares that Orr purported to divest in September 2021.

89. However, on the Company's first draft registration statement following Orr's purported divestiture (filed on October 28, 2021), another considerable owner of Charge common stock appeared on the list of individuals and entities holding more than 5% of Charge's outstanding common stock: Gabriel 613 Trust. Specifically, on October 28, 2021, Charge disclosed that Gabriel 613 Trust was the beneficial owner of 35,593,906 shares of Charge common stock, representing 19.45% of the Company's outstanding common stock.

90. Neither the October 28, 2021 registration statement, nor those filed subsequent thereto before it ultimately became effective on December 15, 2021, disclosed anything substantive about Gabriel 613 Trust, except that "Greg Goldberg, as trustee of the trust, ha[d] ***sole***

[3] The number and percentage of shares of common stock reflected in this chart includes shares beneficially owned by KORR Acquisitions and KORR Value. According to the Company's public filings, Orr had "sole and dispositive power over the shares held by" KORR Acquisitions and KORR Value.

***voting and dispositive power*** over the shares held by Gabriel 613 Trust," and that the trust's address was a P.O. Box in Puerto Rico. None of the registration statements indicated that Orr had any personal connection to Gabriel 613 Trust, nor did they mention that "Greg Goldberg" is a limited partner in KORR Value.

91. Charge's December 10, 2021 registration statement was approved by the SEC on December 15, 2021, and became effective on that date. Neither it nor any of the prior draft registration statements disclosed the existence of the KORR Value LPA.

92. In connection with its efforts to register securities for sale by the selling shareholders, principally Arena, Charge also pursued its uplisting with NASDAQ. Charge was uplisted to NASDAQ on April 12, 2022.

93. Orr formally confirmed his personal connection to Gabriel 613 Trust after Charge was uplisted. Specifically, on June 22, 2022, Orr and the KORR Entities filed a Schedule 13G with the SEC, which stated that Orr "may be deemed to own 18,395,848 shares of Charge common stock" (roughly consistent with his holdings as stated on the Company's December 10, 2021 registration statement). However, in a footnote thereto, Orr and the KORR Entities stated that this number *specifically excluded*:

> 35,593,906 shares of [Charge] Common Stock held by Gabriel 613 Trust. . . . The ***beneficiaries of Gabriel 613 [Trust] are Mr. Orr's children*** and Greg Goldberg, as trustee of Gabriel 613, has ***sole voting and dispositive power*** over the shared [sic.] held by Gabriel 613 [Trust]. Mr. Orr ***disclaims beneficial ownership*** of the [Charge securities] owned directly by Gabriel 613 [Trust] and the filing of this Schedule 13G shall not be deemed an admission that Mr. Orr is the beneficial owner of such securities for purposes of Section 13 or for any other purpose.

94. As set forth above, on or about April 7, 2024, KORR Acquisitions filed a Proof of Claim in connection with Charge's Chapter 11 bankruptcy proceeding, in which KORR Acquisitions asserted "a general unsecured claim in the amount of $24,570,000 . . . against

[Charge] on account of monies owed by [Charge] to [KORR Acquisitions] based on breach of contract or alternative theories of liability, including, but not limited to, unjust enrichment, fraudulent inducement, and common law indemnification[.]"

95. KORR Acquisitions' general unsecured claim against Charge arose out of what KORR Acquisitions described as a "Side Letter" – an "additional inducement" – "for Arena to enter into" the December 2021 SPA, which Charge entered into *after* Orr had stepped down as the Company's Chairman, and after his purported divestment. Specifically, as set forth above, "as an additional inducement for Arena to enter into" the December 2021 SPA, KORR Value, Fox, and Arena entered into a "Side Letter" under which "KORR Value and Mr. Fox each pledged to transfer to [Arena] 4.5 million shares of Charge common stock (totaling 9 million shares), for an aggregate purchase price of $2 million (split evenly between KORR Value and Mr. Fox)."

96. Evidently, KORR Value kept its promise under the Side Letter, but Fox did not. Accordingly, Fox, "***in his capacity as [Charge's] Chief Executive Officer***[,] requested that Orr cause an additional 4.5 million shares of Charge common stock to be transferred to [Arena] to fulfill Mr. Fox's pledge under the Side Letter. In connection therewith, ***[Charge] promised to make [Orr] whole by paying to [Orr] the value of the additional 4.5 million shares***."

97. Orr agreed to this request from Fox and Charge. As Orr has admitted: "In reliance ***on [Charge's] promise***, [Orr] ***effectuated the transfer*** of the additional 4.5 million shares of Charge common stock to [Arena] on or about June 2, 2022 – through a contractual arrangement ***at Orr's direction with Orr's family trust, The Gabriel 613 Trust*** – in full satisfaction of Mr. Fox's obligation under the Side Letter."

98. Neither Charge nor Mr. Fox disclosed the existence of the "Side Letter" to investors, nor did they otherwise reveal the extent of Orr's continued involvement in Charge's

operations. Instead, the Side Letter's existence and terms remained non-public at all times until Charge's bankruptcy proceedings.

99. However, in its Preliminary Proxy Statement filed on July 13, 2022, Charge did disclose that the amount of shares owned by Gabriel 613 Trust had decreased by 4.5 million. According to the Preliminary Proxy Statement, Gabriel 613 Trust owned 31,093,906 shares of Charge common stock as of June 30, 2022 (down from 35,593,906 shares as reported in Charge's 2022 Form 10-K, and as (erroneously) reported by Orr and the KORR Entities in the June 22, 2022 Schedule 13G).

100. Although the Preliminary Proxy Statement noted that Gabriel 613 Trust's 31,093,906 shares "excludes 4,500,000 shares of Common Stock that were sold but have not been transferred out of the name of Gabriel 613 Trust," it did not inform the market that the shares were sold pursuant to a "Side Letter" between Orr, Fox, Charge, and Arena to induce Arena to enter into the December 2021 SPA, which Charge would later default on. The Preliminary Proxy Statement did not disclose that Charge was technically indebted to Orr for the value of the 4.5 million shares.

101. Orr's divestment from Charge – like the investment funds he managed on Charge's behalf – was a mirage created by Orr to placate regulators, conceal the extent to which he controlled the Company, and artificially inflate the value of Charge common stock. In reality, Orr remained highly active at the Company and indirectly controlled it from behind the scenes, including by, among other things, (1) directly retaining control of roughly 10% of the Company's common stock, (2) indirectly retaining control of Gabriel 613 Trust's holdings in Charge common stock, (3) having control over the investment capital that Charge entrusted to the KORR Entities "with no independent oversight," (4) controlling a bank account in the name of the Company, and

(5) enjoying status as a creditor of Charge for the value of 4.5 million shares of Charge common stock pursuant to the undisclosed "Side Letter."

## D. Charge Ramps Up Operations and Portrays Itself as a Success Story

102. For the next several years, Fox portrayed Charge as a profitable company with a bright future in the emerging landscape of EV technology. As Fox would repeatedly state, his goal was to make Charge "the most trusted infrastructure company in the world."

103. Similarly, Fox repeatedly emphasized the strength of the Company's balance sheet, stating in April 2021 that the Company had "a tremendous amount of cash on the balance sheet," and that the Company did not need to raise additional capital because "from an operational standpoint, we're generating operational profits." According to Fox, management was "doing the best to obviously be great stewards of [investors'] capital."

104. The chart below sets out various financial metrics as reported by Charge in its SEC filings the beginning of the Class Period to November 2023:

| Table 2: Reported Financial Condition of Charge Between 2021 and 2023 | | | | |
|---|---|---|---|---|
| Reporting Date | Annual Revenue | Total Current Assets | Cash and Cash Equivalents | Investments in Marketable Securities |
| 12/31/2021 | 516,302,000 | 107,935,965 | 18,238,264 | 9,618,743 |
| 03/31/2022 | N/A | 128,083,474 | 26,381,238 | 23,721,546 |
| 06/30/2022 | N/A | 149,536,367 | 46,581,305 | 16,325,152 |
| 09/30/2022 | N/A | 130,349,585 | 36,235,710 | 6,404,567 |
| 12/31/2022 | 697,833,000 | 116,509,000 | 26,837,000 | 6,757,000 |
| 03/31/2023 | N/A | 132,793,000 | 36,493,000 | 6,548,000 |
| 06/30/2023 | N/A | 146,603,000 | 50,142,000 | 11,597,000 |
| 09/30/2023 | N/A | 126,035,000 | 51,359,000 | 5,868,000 |

105. Throughout this period, Charge reported consistently sizeable amounts of current assets, at all times exceeding $100 million, including substantial amounts of assets purportedly providing immediate liquidity (*i.e.*, cash and cash equivalents, and investments in marketable

securities) in amounts that fluctuated between approximately $30 and $60 million. Notably, between year-end 2022 and September 30, 2023, Charge's purported holdings of such 'immediate liquidity' assets had ***nearly doubled***.

106. Throughout this period, Charge management also repeatedly emphasized the importance of internal controls, corporate responsibility, and strong relationships with investors.

107. Defendant Schweller was hired by Charge in September 2021 (at around the same time as Orr's departure as Chairman and purported divestment). In connection with her hiring, Schweller stated that her "***immediate focus*** will be on ***ensuring resilience in accounting and robust internal controls over financial reporting***, as well as effective financial integration of acquisitions, to drive value to shareholders over the long term and support a NASDAQ listing in the short term."

108. One month later, on October 21, 2021, Fox spoke at the Dawson James Securities Small Cap Growth Conference. He began by noting, once again, his "strategy, simply put, . . . to be the most trusted infrastructure company in the world for EV." He further stated:

> We are we are in growth mode, so we are adding pretty senior management. But like I said before, I'm very old fashioned in terms of my approach to this. . . . ***But I don't want to vaporize my investor money***. And so I'll take my profits and I will invest in EV. . . . And so the way that I look at it is, is the future for us is ***being great stewards of capital*** where we take the profits from our telecommunication and continue to invest it in EV. And I think EV is two years away from its real bell curve. And so right now, everything I'm doing is laying the foundation to build on these things.

109. Three months later, on January 14, 2022, Fox spoke at the Needham Growth Conference. In response to a question about the profitability of Charge and its various subsidiaries, Fox responded:

> Yeah. They all run profitable. Everything that – every business line that we're in runs profitable. ***We have [Sarbanes-Oxley] compliance in all of the ancillary expenses to stand up a public entity and build a***

> ***infrastructure worthy of a 50-year run***. And so recruiting from American Express your CFO requires real discipline. And so, what I've done is, I've told our teams that I'm committed to making the investment. ***I think you guys know this better than I do, a lot of these companies that went SPAC or went public, have got tripped up by the SEC and so I'm going to invest in our back office***. It's going to cost us some money, but it's a de minimis burn compared to any of our peers and it's all investment capital. Every business that we acquire is immediately accretive. I'm not – I'm a little old fashioned in that respect.

110. The associated slide deck to Fox's presentation at the Needham Growth Conference listed, as an "Investment Highlight," that Charge had a "Sustainable business strategy in an accelerated growth sector."

111. Two months later, on March 9, 2022, Fox spoke at the Investor Summit Group Virtual Investor Summit. He was asked by an attendee: "What keeps you up at night?" Fox responded:

> There are a lot of things that keep me up at night. The business stuff, we have such strong tailwinds in the business that I just got this excitement that's kind of a halo around us. But there are geopolitical things that are outside of everybody's control that I think are keeping a lot of us up at night. And so, I believe the foundation that we're building and the team that we're building will mitigate the downside risks. I also come from the school of thought that ***when there is a mistake made, don't cover it up***. ***Just be open and honest and disclose it***. And I think that's where companies get themselves in trouble. And so, one of the things I've ***hammered home to our compliance department, our [Sarbanes-Oxley] team, our CFO, is that I'm not going to ever be upset at somebody making a mistake. I'm going to be upset if somebody tries to cover something up.*** And so, I think the thing that keeps me up at night is . . . growing so fast, you got to protect, you got to watch your flank. ***And so, we have kind of a zero tolerance policy***. We are overtraining our team on the Reg FD stuff. We are making sure that we learn from the mistakes that other companies have made.

112. Before, during, and after Fox was making these statements emphasizing the importance of "[Sarbanes-Oxley] compliance," being "open and honest," and the Company's "zero tolerance" policy, Charge management, including Fox, Schweller, and later Denson, repeatedly certified the effectiveness of the Company's internal disclosure controls and internal controls over

financial reporting in filings with the SEC. None of these filings disclosed that a considerable portion of Charge's current assets, represented publicly as cash and cash equivalents and/or investments in marketable securities, were in fact neither, but rather comprised an illiquid partnership interest controlled by an individual who had purportedly stepped away and divested from the Company.

### E. Charge Management Conceals the Nature and Extent of the Company's Relationship with Orr and the KORR Entities, and the Extent of Control They Exercised Over the Company's Cash Balances

113. Although the corporation that became Charge was officially formed in 2005, it does not appear to have had any significant operations until 2020 (at which time, its name was GoIP Global). As GoIP Global's former CEO, Isaac Sutton, stated on February 15, 2019, the Company had been "dormant for about seven years," and its stock had just begun trading again "because of the lifting of the DTC chill." During 2018 and 2019, GoIP Global "had no revenue during the fiscal years," and the Company stated, in response to a comment from the SEC, that it was a "shell company" under Rule 405 of the Securities Act of 1933 until October 2020.

114. Beginning in May 2020, GoIP Global began to ramp up operations. Specifically: (1) Sutton resigned as CEO on April 30, 2020, and was replaced by Scala as Interim CEO shortly thereafter; (2) Scala and Orr were appointed to the Board of Directors on May 21, 2020; and (3) the Company began an aggressive acquisition spree.

115. GoIP Global's goal, according to Orr, was to "build market cap through a series of accretive acquisitions, building real and sustainable shareholder value. . . . We will remain industry agnostic while seeking opportunity for our company and expect to close several transactions this year." In accordance with this goal, the Company made several acquisitions in 2020, including PTGi and GetCharged.

116. On May 9, 2020, Scala, as Interim CEO, caused GoIP Global to enter into the KORR Value LPA with KORR Value. GoIP Global did not inform the market that it had entered into the KORR Value LPA.

117. On June 19, 2020, GoIP Global disclosed its intention to "engage KORR Acquisitions Group, Inc. as a consultant to provide certain consulting and advisory services to GoIP [Global] for fees to be agreed upon."

118. According to Charge, GoIP Global and KORR Acquisitions formally entered into an investment advisory relationship "[d]uring the fourth quarter of 2020," presumably at around the same time that GoIP Global acquired GetCharged and Fox became CEO. As Charge has admitted, by having GoIP Global and KORR Acquisitions enter into this Informal Arrangement, Orr "effectively hired himself as a financial consultant and advisor ***with no independent oversight***," and "controlled a bank account in the name of the Company" in connection therewith. The Management Defendants took no steps to enforce any oversight in subsequent years.

119. Charge first disclosed its relationship with KORR Acquisitions on February 12, 2021, in a draft registration statement, where the Company stated: "In addition to investing in marketable securities, under the advisory of KORR Acquisition Group, Inc. (a related party and shareholder), Charge Investments invests in limited private investments in certain businesses that it finds to be oportunistic [sic.]." Charge did not disclose the existence of the KORR Value LPA at this time.

120. On May 28, 2021, Charge received SEC comments to its draft registration statement. As relevant here, the SEC asked Charge to "please describe the nature of the advisory arrangement you have with KORR Acquisitions Group, Inc."

121. Accordingly, on June 11, 2021, Charge filed an amended draft registration statement in which it described the Informal Arrangement in further detail:

> We aim to invest in opportunities that would ***complement*** our two operating divisions in addition to ***marketable securities, including money markets funds and other listed securities***. Our Investment services are aimed at offsetting the overall cost of capital. . . .
>
> In addition to investing in ***marketable securities***, under the advisory of KORR Acquisition Group, Inc. (a related party and shareholder), Charge Investments invests in ***limited private investments*** in certain businesses that it finds to be opportunistic. . . . Our ***arrangement with KORR [Acquisitions] is at will***, and any compensation that we may determine to pay to KORR for its advisory services will be made based upon the approval of such arrangements by the independent members on our board of directors, subject to approval by the entire board, and not more than industry standards.
>
> We currently intend to keep our investment opportunities to ***less than 20% of our assets, and of that, less than 5% in illiquid assets***. We ***continuously monitor and review the value of our investments***, including, but not limited to conducting a mark-to-market valuation of our investments ***on a weekly basis***, and, if ever we exceed 20%, we will liquidate marketable securities to stay within our intended maximum investment of 20% of our total assets.

122. Charge did not disclose the existence of the KORR Value LPA at this time.

123. Two weeks later, on June 25, 2021, the SEC again commented on Charge's draft registration statement: "We note that you have an 'at will' arrangement with KORR [Acquisitions] for its advisory services. Please file any agreement with KORR [Acquisitions] for its advisory services as an exhibit or tell us why you are not required to do so."

124. Accordingly, on July 19, 2021, Charge filed an amended draft registration statement. In an exhibit thereto, Charge described the Informal Arrangement as follows:

> Charge Enterprises, Inc. . . . has entered into an ***informal at-will arrangement*** with KORR Acquisitions Group, Inc., an entity controlled by Kenneth Orr, the Company's chairman of the board of directors . . . .
>
> Pursuant to the terms of the arrangement, KORR [Acquisitions] will provide investment advisory services ***on an as-needed basis*** as requested

> by the Company. In connection with such services, KORR [Acquisitions] shall be responsible for the investment and reinvestment of certain assets of the Company, ***as may be designated by Company, from time to time***, to be subject to [KORR Acquisitions'] management (the "Assets"). In connection with such services, KORR [Acquisitions] shall be granted discretionary authority, without prior consultation with the Company, to buy, sell, trade and allocate in and among ***stocks, bonds and other securities and/or contracts relating to the same***, or otherwise, and to provide instructions in furtherance of such authority, provided the value of the Assets shall not exceed 20% of the Company's total assets.
>
> The Company's arrangement with KORR [Acquisitions] is ***at will and may be terminated at any time***. Any compensation that the Company may determine to pay to KORR [Acquisitions] for its advisory services will be made based upon the approval of such arrangements by the independent members of the Company's board of directors, subject to approval by the entire board, and not more than industry standards.

125. Charge did not disclose the existence of the KORR Value LPA at this time.

126. Several months prior, on April 22, 2021, Defendant Denson emailed Orr (who was still the Company's Chairman at this time), copying Fox on the email chain, and asked Orr to send the Company's brokerage account statements from January and February of 2021, which the Company evidently had not yet seen (despite informing the market that it monitored its investments "on a weekly basis"). As Denson stated, "[w]e are trying to get the Q numbers together for the press release Andrew [Fox] desires ASAP." Orr responded, providing the account statements. As demonstrated by the "Account Information" section of those account statements, Charge's investments with Orr were, consistent with the KORR Value LPA, in the manner of a "Partnership" whose "Master Name" was "Korr Value, LP" at Interactive Brokers, Inc.:

InteractiveBrokers

Activity Statement

January 1, 2021 - January 31, 2021

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

Account Information

| | |
|---|---|
| Name | Korr Value, LP |
| Account Alias | Charge Investments - TRWO Account |
| Account | U4631009 |
| Master Name | Korr Value, LP |
| Account Type | Institution Client |
| Customer Type | Partnership |
| Account Capabilities | Portfolio Margin |
| Base Currency | USD |

127. Accordingly, Fox and Denson knew, as early April 22, 2021, that Charge's investments were locked up in a "Partnership" interest that invested in marketable securities *on Charge's behalf*; and that Charge's interest in that partnership did not make Charge a beneficiary of those securities.

128. Fox spoke to investors that same day and reiterated that the Company had "a tremendous amount of cash on the balance sheet right now."

129. Fox, Denson, and Charge did not disclose that Charge's investments were locked up in a "Partnership" interest, or the existence of the KORR Value LPA, at this time, or at any other time prior to November 21, 2023.

130. Charge was uplisted to NASDAQ on April 12, 2022 with the ticker symbol "CRGE."

131. On August 15, 2022, Charge filed a quarterly report on Form 10-Q for the second quarter of 2022 in which it disclosed that it had entered into a "Special Advisor Agreement" with KORR Acquisitions for "an upfront payment of $500,000 and a monthly advisory fee." Charge did not disclose the material terms of the Special Advisor Agreement, and did not explain if it supplanted or differed from the Informal Arrangement.

132. On March 15, 2023, Charge filed its annual report on Form 10-K, which still did not identify the substantive terms of the Special Advisor Agreement, but noted that it entailed an "annual advisory fee" of $300,000 (*i.e.*, $25,000 per month).

133. On April 25, 2023 – nearly a year after entering into the Special Advisor Agreement – Charge stated that, under the Special Advisor Agreement, KORR Acquisitions provided "capital markets advisory work, introduction to open market investors, strategic investment advice, corporate governance, investor relations strategy, strategic planning, financial analysis, among other[]" things.

134. Charge did not disclose the existence of the KORR Value LPA at these times.

**F. <u>Charge Encounters Liquidity Problems, and Hides It from Investors</u>**

135. As noted above, between the time of Orr's purported divestment from Charge and 2023, Charge operated as an ostensibly profitable company with considerable revenues and current asset balances. In its 2022 Annual Report filed on Form 10-K, Charge reported "total liquidity" of $39.6 million, comprised of $6.0 million available under two lines of credit, and "$26.8 million in cash and cash equivalents and $6.8 million of marketable securities."

136. Despite this considerable reported liquidity, and total revenue of $697,833,000 in 2022, Charge began to experience a liquidity crunch in late 2022.

137. On December 3, 2022, Denson emailed Orr, copying Fox, Schweller, and other members of Charge's finance team, and informed Orr of some "Good news" and "Not so good news" concerning the Company's performance and the amount of money that Charge had invested with Orr and the KORR Entities that Orr would need to return. Specifically, Denson stated that while Charge would not need any money returned before the end of the year – "thus the $14.1M [invested with Orr] will be ***part of the cash balance on the year end BS*** [balance sheet]" – Charge was "unable to generate enough business in November [2022] . . . to roll the entire $14.1M intact

in Q1 2023 and will require $8M back from the investment account in order to pay the AP liabilities that will be due in January 2023." Orr replied: "Ok. Keep me posted. A lot can change between now and then, but we will be prepared. We are not only doing better than the overall market, but up a decent amount of money."

138. Five days later, Denson again emailed Orr in the same email chain with "Not so good news: instead of $8M required back the week of January 16th, 2023, we now require a total of $7M – $2M the week of December 19th, 2022, and $5M back the week of January 16th. This will leave $7.1M in the investment account once the $7M is returned to look after AP commitments."

139. A few hours later, Schweller replied to the group, stating that she was "curious if we have an estimated return balance by 3/31/23? ***getting questions from analysts on cash balance***."

140. Denson replied to Schweller: "for PTGi end – the goal is back to the $14M available by the end of Q1 and hold for remainder of the year. ***A goal with many, many moving parts.*** ROI – that is Mr. Orr's end."

141. Accordingly, by December 2022, Fox, Schweller, and Denson were aware (1) that Charge's ability to repay certain liabilities was contingent upon Orr's ability to return the Company's invested capital in a timely fashion, and (2) that analysts (and therefore investors) were beginning to ask questions about the status of the Company's cash balance and overall financial condition. At no point did the Company disclose, prior to November 2023, that its cash balances were in Mr. Orr's hands, or that Orr could deny return of these funds "at any time for any reason" under the KORR Value LPA.

142. Several months later, in April 2023, Denson informed Orr that the Company would require the complete return of its invested funds by November 1, 2023 to address (1) certain accounts payable of PTGi and (2) the outstanding debt due to Arena, the Company's senior lender, under the Arena SPAs, which was to become due and payable on November 19, 2023.

143. Between May and November of 2023, Charge executives, including the Management Defendants, engaged in frequent, private communications with Orr about the need for Orr to return the Company's invested capital.

144. Beginning in May 2023, Charge management and Orr privately agreed to several "drawdown schedules," *i.e.*, a series of dates by which Orr would return specified amounts of Charge's invested capital. The Management Defendants did not disclose any of these drawdown schedules to investors.

145. Under the first of these drawdown schedules, Orr agreed to return $10 million by July 2023.

146. At or around the time that this first drawdown schedule was established, on May 22, 2023, Denson emailed Orr, Fox, and Schweller, stating that the plan going forward, which Fox and Orr had "agreed to," was (1) to "Leave all existing funds K. Orr is managing in place through to the end of the year," (2) not send Orr any "excess cash generated by PTGi now through end of the program in July" (and to "look at ***safe / liquid places for these funds***"), and (3) have all of Charge's funds returned by "October / November."

147. Schweller replied several minutes later, writing that she "respectfully disagree[d] with keeping the funds at Interactive [Brokers]" (the brokerage through which Orr purportedly held the funds) because "[w]e continue to lose money and we cannot guarantee the future. But it is Andrew's call as CEO."

148. Denson then replied, generally agreeing with Schweller, stating that "Sometimes exiting is your best outcome as it only gets worse, but Leah is right, its your call Andrew, hope Leah and I are wrong." Orr replied: "I respectfully disagree with you, Craig and with Leah."

149. Despite Orr's prior agreement to return $10 million of Charge's invested capital by July 2023, this did not happen. Instead, Orr only returned $5 million in July 2023. The Management Defendants did not disclose Orr's failure to return the Company's invested capital to investors.

150. On July 25, 2023, Schweller emailed Orr, stating that the Company needed $10 million returned immediately to service upcoming liabilities. Denson followed up on this email to Orr, writing "as discussed[,] I will provide a schedule in a week or so on the timing of the remaining funds coming back to [Charge] to satisfy [certain Company] obligations."

151. In August 2023, Denson and Orr agreed to another drawdown schedule by which Orr was to return the remaining $14 million of Company funds under Orr's control. On August 22, 2023, Denson confirmed the updated drawdown schedule via email, as follows: (1) $3 million by the first week of September 2023; (2) $3 million between September 15-30, 2023; (3) $6 million between October 15-30, 2023; and (4) the remainder between November 1-10, 2023. The Management Defendants did not disclose this second drawdown schedule to investors, or that Orr had not abided by the terms of the first drawdown schedule.

152. On August 23, 2023, Charge filed a Form 8-K with the SEC reporting that it had received a notice on August 22, 2023 from the SEC that the closing share price of its common stock had been below $1.00 per share for the previous 30 consecutive business days and therefore was at risk for delisting.

153. On August 29, 2023, Charge announced the resignation of Fox as CEO effective August 31, 2023. Charge also announced that Fox would step down as Chairman of the Board on August 31, 2023, but would remain as a director. No reason was given for Fox's departure.

154. Charge also announced that Fox and the Company entered into a Separation and Consulting Agreement pursuant to which Fox would act as a strategic advisor reporting to the Board of Directors. The agreement provided for monthly payments of $45,000 in the first year, and $30,000 per month thereafter.

155. At around the same time that Denson and Orr agreed to the second drawdown schedule, Charge also entered a Securities Purchase Agreement with KORR Value (the "KORR Value SPA"), "pursuant to which, beginning on October 15, 2023 and through March 31, 2024, the Company has the right, but not the obligation, to sell to [KORR Value], and to require [KORR Value] to purchase, up to $5.0 million of common stock, at a purchase price of $1.00 per share."

156. Under the second drawdown schedule, Orr was scheduled to return $3 million by the first week of September. This did not happen, and Schweller and Denson did not disclose this to investors.

157. On September 11, 2023, Schweller emailed Orr, asking: "Kenny – when can we expect the first $3m?" Orr responded: "This week."

158. Despite agreeing to return a total of $6 million in September, Orr and KORR Acquisitions had only returned $2.25 million by the end of that month. Schweller and Denson did not disclose this to investors.

159. Further, and despite his agreement to return $6 million in October, Orr only returned $1.75 million of Company funds in October 2023. Thus, by the end of October, and

despite previously agreeing to return $12 million of Company funds by October end, Orr had only returned $4 million. Schweller and Denson did not disclose this to investors.

160. On November 1, 2023, Denson emailed Orr, reminding him that Charge's "loan with Arena is due this month and we are starting the pay back our PTGI suppliers [sic.] now that we are in November – we need the Charge money returned ASAP this week." Denson further stated that: "We have communicated to [Ernst & Young] and our board the schedule which was agreed to [in August 2023] which is now causing issues / difficult conversations as to why the funds have not be [sic.] returned. I will call you this am as well but in the interim your [sic.] would please arrange the return of the Charge funds it would be most appreciated." Orr did not respond to this email in writing. Schweller and Denson did not disclose any of these "difficult conversations" to investors.

161. On November 2, 2023, Denson and Orr spoke on the phone to discuss Orr's failure to adhere to the drawdown schedule. On that call, Orr proposed a third drawdown schedule, offering to return (1) $1 million by the end of the day; (2) $3 million on November 6; (3) $3 million on November 14; and (4) the remainder by the "end of 2023, or perhaps in 2024." Schweller and Denson did not disclose this to investors.

162. Thus, under this third drawdown schedule, Orr was to return $7 million by November 14. Had Orr abided by this drawdown schedule, Charge would have received a total of $11 million from Orr by November 14 (having already received $4 million by the end of October) – five days before the Company's $27.8 million obligations under the Arena SPAs were to become due and payable.

163. Orr did not return $1 million by the end of the day on November 2. Schweller and Denson did not disclose this to investors.

164. On November 3, 2023, Denson reiterated to Orr the need for an expeditious return of the funds, emphasizing that Charge was experiencing financial harm as a result of Orr's failure to return the funds and that that ongoing failure to return the funds could impact the Company's ability to continue as a going concern. That same day, Denson and Orr discussed a fourth drawdown schedule: (1) $1 million on November 3; (2) $3 million early in the week of November 6; and (3) $6.75 million by November 13 or 14. Schweller and Denson did not disclose this to investors.

165. Despite the various drawdown agreements, Orr only returned ***$800,000*** on November 3, and ***$200,000*** on November 6. Schweller and Denson did not disclose this to investors.

166. Thus, likely by the summer of 2023 but *at the very latest* on November 3, 2023, after months of failing to receive the requested funds from Orr, Schweller and Denson knew that the Company was facing serious liquidity problems that remained concealed from investors. As Denson would later remind Orr, these funds were "***critical to [Charge's] liquidity***." Management therefore knew and understood that, if Orr failed to return the Company funds as requested, a default on the Arena SPAs was nearly certain, and that this would lead to an "imminent cascade of negative consequences," namely, the invocation of cross-default provisions in the Company's other debt instruments.

167. Yet, at the same time the Company was frantically communicating with Orr *in private* about the need for an expeditious return of the funds and having "difficult conversations," Denson and Schweller continued to paint a rosy public picture of Charge's financial condition.

168. On November 8, 2023, Charge released its quarterly report on Form 10-Q for the third quarter of 2023, and an accompanying press release. Neither document mentioned the

difficulties the Company faced in seeking the return of its funds from Orr, nor any possibility of default on the Arena Notes.

169. In the Company's press release, filed with the SEC on Form 8-K, Denson stated that the Company was "well underway in strategic planning for the future." Schweller was quoted as saying: "We remain committed to executing our forthcoming comprehensive strategic plan, which will focus on nurturing organic growth, integrating our subsidiaries, ***optimizing capital allocation***, and elevating cost synergies across our entire organization."

170. In its Form 10-Q, Charge reported total current assets of $126,035,000 including ***$51,359,000 in cash and cash equivalents*** and a further ***$5,868,000 in marketable securities*** – ***nearly double*** the $33.6 million in cash and cash equivalents and marketable securities that the Company reported at year end 2022 in its 2022 Form 10-K.

171. The "Management Discussion and Analysis" ("MD&A") stated: "based on our current and available future liquidity, we expect to have ***sufficient resources to meet our current operating liquidity*** and capital requirements ***for the next 12 months***, including ***after accounting for the repayment of the $27.8 million*** that comes due and payable under the [Arena SPAs] on November 19, 2023." According to the Company, its ability to meet current operating liquidity was due in largest part to its "existing cash and cash equivalents" and its investments in marketable securities. Concerning the Company's "excess liquidity," the MD&A stated that it invests "excess liquidity in money market funds or other interest-bearing accounts," and that "***we do not believe we have any material exposure with respect to these assets***."

172. The same day that Charge released its third quarter financial results, Denson and Schweller spoke to investors on Charge's third quarter 2023 earnings call. In response to a question from an H.C. Wainwright analyst about the Company's balance sheet, Schweller stated

that the Company was "managing [its] balance sheets and . . . [has] the ***proper liquidity to meet [its] operational needs and service [its] debt***." Additionally, in response to a question from an Alliance Global Partners analyst about the Company's near-term debt maturity, Denson stated that Charge was "***on track to fully pay*** the outstanding [Arena SPAs]."

173. On Sunday, November 12, Denson again emailed Orr stating: "After the $3M coming in Monday from you (that was missed last week) it will leave us with some $28M at PTGi and about $1M at corporate as free cash. With the $27.8M going out this Thursday to Arena, payroll and PTGi intangibles, the remaining (approx.) 6.5M as originally scheduled on or before Wednesday this coming week is ***critical to our liquidity***."

174. The situation came to a head on November 13, 2023, when Orr definitively advised Biehl, the Company's Chief Legal Officer, that he would not be returning the funds as promised. According to Orr, the parties' relationship was governed by the KORR Value LPA, the terms of which provided that KORR Acquisitions, as general partner of KORR Value, had the "sole and absolute" right to limit redemptions of limited partnership interests "at any time for any reason." Orr stated that KORR Acquisitions would be invoking this right to limit redemptions because the requested funds were "cross-collateralized" with other accounts and that those accounts were "under water."

175. Charge first informed the market of the "imminent cascade of negative consequences" it faced in a November 21, 2023 Form 8-K filed with the SEC. Notwithstanding its November 8, 2023 representations that it had more than $57 million in cash and marketable securities, the Company stated that it had received a default notice from Arena, admitted that its prior representation that it had "approximately $9.9 million of Company assets . . . in the form of cash, cash equivalents, marketable securities or similar readily liquid assets" was false, and

revealed instead that these sums had actually been invested in KORR Value and were thus "not immediately able to be liquidated or readily accessible."

176. The November 21, 2023 Form 8-K further warned that if the Company "continues not to have sufficient liquidity to pay the principal and interest on the [Arena] Notes . . . these circumstances could result in a default under other of the Company's debt instruments and agreements that contain cross-default provisions." As the Company explained, this situation would likely "have a material adverse effect on the Company's liquidity, financial condition and results of operations, and may render the Company insolvent and unable to sustain its operations and continue as a going concern."

177. According to the November 21, 2023 Form 8-K, on November 15, the Company "delivered a notice to [KORR Value] exercising our rights under the [KORR Value SPA] to require the purchase of five million shares of our common stock no later than the third business day following delivery of the notice, which was November 20, 2023. [KORR Value] provided the Company with notice that it did not believe that the Company satisfied the necessary conditions to require [KORR Value] to purchase the [5 million shares for $1 per share], and therefore, did not deliver the purchase price for the [shares] on such date. The Company disagrees that it did not satisfy the necessary conditions . . . ."

178. While the full truth concerning the Company's liquidity remained concealed from the market, the price of Charge common stock declined upon disclosure of this information, falling approximately 19.7%, or $0.047 per share, to close at $0.238 per share on November 21, 2023 (from a closing price of $0.285 per share on November 20, 2023, the trading day immediately prior).

## G. At the Same Time Charge Encounters Liquidity Problems, Charge and Arena Dispute Default and Charge Files for Bankruptcy Soon After

179. As set forth above, through a series of agreements with Arena, Charge disclosed that as of April 25, 2023, Arena owned 25,183.349 shares of Charge Common Stock representing a 9.99% interest in Charge. However, Arena's potential interest was much greater as disclosed at that time in the DEF 14A filed on that date:

> Arena Investors, LP (the "*Arena Investment Advisor*") is the investment adviser of, and may be deemed to beneficially own securities owned by the following entities (the "*Arena Entities*"): (a) Mt. Whitney Securities, LLC directly owns (i) 9,683,830 shares of Common Stock, (ii) warrants to purchase 711,465 shares of Common Stock, (iii) 7,231,495 shares of Common Stock issuable upon conversion of Series D Preferred Stock, (iv) 711,465 shares of Common Stock issuable upon conversion of Series C Preferred Stock and (v) 1,928,397 shares of Common Stock issuable upon conversion of Series E Preferred Stock; (b) Arena Finance Markets LP directly owns (i) 898,925 shares of Common Stock, (ii) warrants to purchase 66,371 shares of Common Stock, (iii) 664,375 shares of Common Stock issuable upon conversion of Series D Preferred Stock, (iv) 66,371 shares of Common Stock issuable upon conversion of Series C Preferred Stock and (v) 177,165 shares of Common Stock issuable upon conversion of Series E Preferred Stock; (c) Arena Special Opportunities Fund, LP directly owns (i) 3,856,697 shares of Common Stock, (ii) warrants to purchase 590,184 shares of Common Stock, (iii) 2,765,973 shares of Common Stock issuable upon conversion of Series D Preferred Stock, (iv) 367,965 shares of Common Stock issuable upon conversion of Series C Preferred Stock and (v) 678,334 shares of Common Stock issuable upon conversion of Series E Preferred Stock; (d) Arena Special Opportunities Partners I, LP directly owns (i) 6,162,776 shares of Common Stock, (ii) warrants to purchase 2,872,350 shares of Common Stock, (iii) 3,208,173 shares of Common Stock issuable upon conversion of Series D Preferred Stock, (iv) 1,224,569 shares of Common Stock issuable upon conversion of Series C Preferred Stock and (v) 416,104 shares of Common Stock issuable upon conversion of Series E Preferred Stock; and (e) Arena Structured Private Investments LLC directly owns 15,555,540 shares of Common Stock issuable upon conversion of Series D Preferred Stock. Arena Investors GP, LLC (the "*Arena General Partner*") is the general partner of, and may be deemed to beneficially own securities owned by, the Arena Investment Advisor. By virtue of his position as the chief executive officer of the Arena General Partner and the Arena Investment Manager, Daniel Zwirn may be deemed to beneficially own securities owned by each of the Arena Entities. It is our understanding that each of Mr. Zwirn, the Arena Investment Advisor and the Arena General Partner share voting and disposal power over the shares held by the Arena Entities described above. Each of the warrants, Series D Preferred Stock and Series C Preferred Stock described above provide for limitations on exercise and conversion, respectively, such that the holder along with its affiliates may not beneficially own more than 9.99% of our Common Stock, except upon not less than 61

days' prior written notice to us. The address for the entities set forth above is 405 Lexington Avenue, 59th Floor, New York, New York 10174.

180. In its third quarter 2023 quarterly report filed with the SEC on November 8, 2023, Charge revealed that it was involved in a dispute with Arena with Arena arguing that the Company's guarantees of its subsidiaries' indebtedness could constitute a breach of the securities purchase agreements pursuant to which the holders purchased the notes and an event of default under the notes.

181. On November 21, 2023, Charge filed the November 21, 2023 Form 8-K with the SEC reporting that it had received a default letter from Arena on November 15, 2023, claiming in addition to the default notice that, *inter alia*, an additional $3,345,297.87 in interest (reflecting the difference in the default interest rate of 20% and the interest rate of 7.5% per annum commencing from October 25, 2022 on an aggregate principal amount of $25,847,409.00) and additional legal fees, expenses and other costs of at least $692,216.15 were immediately due and payable.

182. On this news, Charge's stock price dropped over 27% from a closing price of $0.238 per share on November 21, 2023, to a closing price of $0.173 per share on November 22, 2023.

183. On December 6, 2023, Charge filed a Form 8-K with the SEC reporting that it had received an additional default letter from Arena on December 1, 2023, claiming additional events of default from alleged breaches of several representations, warranties and covenants relating to the Special Advisor Agreement with Korr Acquisitions and the Company's investments managed by KORR and related matters. A second letter of the same date claimed events of default under the Exchange Agreement. The December 6, 2023 Form 8-K further disclosed that the Company was ceasing the operations of certain of its telecommunications subsidiaries in an effort to preserve liquidity.

184. On this news, Charge's stock price dropped 14.5% from a closing price of $0.172 per share on December 6, 2023, to a closing price of $0.147 per share on December 7, 2023.

185. On January 25, 2024, in a Form 8-K filed with the SEC, Charge informed the market that the Company had received a foreclosure notice from Arena stating that, to satisfy the Company's outstanding indebtedness, Arena would be holding an auction, pursuant to the Uniform Commercial Code, to liquidate 100 percent of the equity interests in certain Charge subsidiaries at auction.

186. On this news, Charge's stock price decreased 8.2% from a closing price of $0.158 per share on January 25, 2024, to a closing price of $0.145 per share on January 26, 2024.

187. On February 13, 2024, Charge filed a Form 8-K with the SEC, reporting that it had received approval on February 12, 2024, to transfer from the NASDAQ to the Nasdaq Capital Market.

188. On February 22, 2024, after market close, the Company announced that it had received written notice that it would be delisted from the Nasdaq Capital Market as of February 29, 2024. On this news, Charge's stock price dropped 26% from a closing price of $0.0728 per share on February 22, 2024, to a closing price of $0.0539 per share on February 23, 2024.

189. On February 28, 2024, Charge filed a report on Form 8-K with the SEC notifying the public that it had entered into the RSA with Arena providing for a comprehensive restructuring of Charge to be implemented through the commencement of a voluntary Chapter 11 case.

190. On this news, Charge's stock price plummeted 52% from a closing price of $0.0600 per share on February 27, 2024, to a closing price of $0.0288 per share on February 28, 2024.

191. On February 29, 2024, NASDAQ suspended trading of Charge common stock.

192. While the full truth remained concealed from the market, the price of Charge common stock declined upon disclosure of this information, falling approximately 50%, or $0.014 per share, to close at $0.014 per share on February 29, 2024 (from a closing price of $0.028 per share on February 28, 2024, the trading day immediately prior).

193. On March 7, 2024, Charge filed its voluntary petition for bankruptcy under Chapter 11.

194. With the full truth finally revealed to the market, the price of Charge common stock declined by approximately 29.9%, or $0.009 per share, to close at $0.021 per share on March 7, 2024 (from a closing price of $0.03 per share on March 6, 2024, the trading day immediately prior).

**H. Filings In Charge's Bankruptcy Reveal Previously Undisclosed Material Information**

195. Charge filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on March 7, 2024. According to the Proposed Plan of Reorganization, Charge's assets and liabilities can be summarized as follows: Charge represented that according to the most recent set of unaudited financial statements, there were assets with a book value of approximately $198,495,000 and liabilities totaling $119,667,000 as of January 31, 2024, a positive net worth of approximately $80,000,000.

196. In reality, Charge was insolvent. Charge disclosed that Arena's pre-petition secured claim was carried on the Company's books in the amount of $29,585,437 as of February 29, 2024, and comprised principal of $27,785,981 and accrued interest/fees (including default interest of 20% from and after the payment default on November 19, 2023) of $1,799,456.

197. Charge further disclosed that in addition to these amounts that are currently reflected in Charge's books for Arena's pre-petition secured claim, Arena asserted claims for: (i) more than $7 million of additional default interest based on covenant defaults occurring prior

to the November 19, 2023 payment default; (ii) $12,498,889 of additional principal, plus interest and late fees of more than $4 million, on account of certain senior notes that were converted by Arena to Series D Preferred Stock, where Arena asserts that the conversion was void *ab initio* due to Charge's breaches of certain representations and warranties; and (iii) liquidated damages of up to $160 million.

198. Charge also acknowledged that in the year preceding the Notes maturity date (*i.e.*, November 2022, the "Notes Maturity Date"), the Company officers, in consultation with the Company directors, explored strategic options for addressing the Notes through a refinancing with a new third party.

199. In addition, Charge acknowledged that it retained the law firm Cravath to investigate the propriety of positions that Arena was taking as lender and determine if any actionable claims may exist as a result based on potential causes of action, including, but not limited to, breach of the implied covenant of good faith and fair dealing, tortious interference with economic relations with third parties, and/or actual fraud.

200. Charge's efforts to obtain new financing to pay off the Notes in June and July 2023 were ultimately thwarted by conditions imposed by Arena. Charge disclosed that at this time, it re-initiated negotiations with Arena to explore options, including determining if its existing capital would be sufficient to satisfy the Notes, while maintaining adequate liquidity.

201. Also at this time, the Company faced the potential of no longer being considered a going concern. It was agreed that $5.0 million of additional liquidity would be required at the Company to maintain adequate levels of cash to support the forward-looking going concern analysis. The Company failed to disclose these liquidity concerns to the public.

202. According to Charge, Orr agreed to provide a $5.0 million equity line of credit whereby Charge had the right to require KORR to purchase up to $5.0 million of common stock (the "KORR Shares"), at a purchase price of $1.00 per share. This agreement was memorialized in an August 2023 securities purchase agreement.

203. Although the Company and Arena did not agree on the total amount owed on the Notes, Charge was seeking to make a payment of a substantial amount of the principal and interest owed on the Notes Maturity Date and then continue to negotiate with Arena thereafter to determine what the arrearage may be and how it would be addressed ("Proposed Notes Payment").

204. In the weeks prior to the Notes Maturity Date, Charge sought the return of the funds managed by KORR to make the Proposed Notes Payment prior to the Notes Maturity Date. Charge disclosed that at this time, the Company had identified a new lender interested in potentially extending financing to it, provided the Company had obtained the funds managed by KORR, the KORR Shares sale proceeds, and had satisfied the Notes. KORR did not return the funds, and subsequently refused to purchase the additional shares.

205. According to Charge, without these amounts, Charge would have insufficient liquidity to repay the Notes in full on the Notes Maturity Date, while maintaining adequate liquidity at Charge and its subsidiaries. The Company did reach out to Arena and requested the ability to pay off one of the Notes while extending the maturity date of the other so it could address the delay in receiving funds from KORR. Arena declined to extend one or both of the Notes. As a result, Charge and its subsidiaries (as guarantors) allegedly defaulted on the Notes on November 19, 2023.

206. On December 30, 2023, Cravath delivered a draft complaint against Arena on multiple grounds to the Company (the "Arena-Claims Complaint").

207. On January 8, 2024, Squire Patton Boggs filed a complaint against KORR in the Supreme Court of New York, New York County seeking both a temporary restraining order over the funds managed by KORR and damages in excess of $15,000,000.

208. On April 7, 2024, KORR Acquisitions filed a Proof of Claim in the Charge bankruptcy asserting a claim against Charge of $24,570,000 as described above.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS

209. During the Class Period, Defendants made materially false and misleading statements and/or failed to disclose, *inter alia*: (i) the nature and extent of Charge's relationship and investments with Defendant Orr and the KORR Entities; (ii) that in connection with subordinated convertible financing, Arena had entered into an agreement to purchase 9,000,000 shares from Charge's insiders, Defendant Fox and KORR Value (4.5 million shares from each) at a price of about $0.22 per share at a time when Charge's market price was approximately $3.50 per share; (iii) that, according to KORR, in connection with that agreement, KORR caused an additional 4.5 million shares of Charge common stock to be transferred to Arena to fulfill Fox's pledge under the Side Letter, based on Charge's promise to make the transferor whole on the anticipated date of Charge's common stock listing on the Russell 2000 Index; (iv) Charge's unrestricted cash actually represented an investment in a private equity fund that required advance notice of withdrawals before the cash could be available; (v) Charge's current assets, including cash balances and investments in marketable securities, and Charge's total liquidity were misstated; (vi) Charge had considered Arena's actions in interfering with Charge's efforts to refinance its debt as sufficiently egregious that it retained counsel at the law firm of Cravath to prepare a complaint against Arena asserting claims of lender liability, among other claims; (vii) Charge's fundamental financial condition, liquidity, business prospects and going concern

risk were undisclosed; and (viii) that the operation and adequacy of Charge's internal controls were misstated.

210. Defendants made these materially false and misleading statements in various SEC filings, including registration statements, quarterly and annual reports, and statements of beneficial ownership, as well as in various Charge press releases, public statements, and earnings calls.

211. The following table sets forth relevant filings that the Company made that contain material misstatements or omissions, the date they were filed with the SEC, which of the Defendants signed those filings, which of the Defendants signed the SOX certifications accompanying those filings, and how they are referred to throughout the remainder of this Complaint:

**Table 3: Misstatements by Date and Signatory**

| Description of the Filing | Date of the Filing | Defendant Signatory to the Filing | Defendant Signatory to the Accompanying SOX Certifications | Abbreviation |
|---|---|---|---|---|
| 2019 Annual Report | June 19, 2020 | Orr | N/A | "2019 Annual Report"[4] |
| S-1 Draft Registration Statement | August 7, 2020 | Orr | N/A | "August 7, 2020 DRS" |
| S-1 Draft Registration Statement | February 12, 2021 | Fox; Denson; Orr | N/A | "February 12, 2021 DRS" |
| S-1 Draft Registration Statement | May 14, 2021 | Fox; Denson; Orr | N/A | "May 14, 2021 DRS" |
| S-1 Draft Registration Statement | June 11, 2021 | Fox; Denson; Orr | N/A | "June 11, 2021 DRS" |

[4] The 2019 Annual Report was not filed with SEC, but was instead filed pursuant to the Pink Basic Disclosure Guidelines.

| | | | | |
|---|---|---|---|---|
| S-1 Draft Registration Statement | July 20, 2021 | Fox; Denson; Orr | N/A | "July 20, 2021 DRS" |
| S-1 Draft Registration Statement | August 4, 2021 | Fox; Denson; Orr | N/A | "August 4, 2021 DRS" |
| S-1 Draft Registration Statement | August 25, 2021 | Fox; Denson; Orr | N/A | "August 25, 2021 DRS" |
| S-1 Draft Registration Statement | October 28, 2021 | Fox; Schweller; Denson | N/A | "October 28, 2021 DRS" |
| S-1 Draft Registration Statement | November 9, 2021 | Fox; Schweller; Denson | N/A | "November 9, 2021 DRS" |
| S-1 Draft Registration Statement | November 26, 2021 | Fox; Schweller; Denson | N/A | "November 26, 2021 DRS" |
| S-1 Registration Statement | December 10, 2021 | Fox; Schweller; Denson | N/A | "December 10, 2021 RS"[5] |
| Form 8-K | March 24, 2022 | Schweller | N/A | "March 24, 2022 8-K" |
| Form 10-K | March 29, 2022 | Fox; Schweller; Denson | Fox; Schweller | "2021 10-K" |
| Form 10-Q | May 16, 2022 | Fox; Schweller | Fox; Schweller | "1Q2022 10-Q" |
| Schedule 14A Preliminary Proxy Statement | July 13, 2022 | Fox[6] | N/A | July 13, 2022 Preliminary Proxy Statement |
| Schedule 13G | June 22, 2022 | Orr; KORR Value; KORR Acquisitions | N/A | "June 22, 2022 Schedule 13G" |
| Form 10-Q | August 15, 2022 | Fox; Schweller | Fox; Schweller | "2Q2022 10-Q" |
| S-1 Registration Statement | August 24, 2022 | Fox; Schweller; Denson | N/A | "August 24, 2022 RS" |

[5] The December 10, 2021 Registration Statement became effective on December 15, 2021.

[6] Because the July 13, 2022 Preliminary Proxy Statement was not a definitive proxy statement, it was not signed. However, Charge filed its definitive proxy statement on August 4, 2022, which was signed by Fox and contained the same materially false and misleading statements and omissions at issue.

| | | | | |
|---|---|---|---|---|
| S-1/A Registration Statement | August 30, 2022 | Fox; Schweller; Denson | N/A | "August 30, 2022 RS" |
| Form 10-Q | November 14, 2022 | Fox; Schweller | Fox; Schweller | "3Q2022 10-Q" |
| Form 10-K | March 15, 2023 | Fox; Schweller; Denson | Fox; Schweller | "2022 10-K" |
| Form 10-Q | May 10, 2023 | Fox; Schweller | Fox; Schweller | "1Q2023 10-Q" |
| Form 10-Q | August 14, 2023 | Fox; Schweller | Fox; Schweller | "2Q2023 10-Q" |
| S-3 Registration Statement | August 15, 2023 | Fox; Schweller; Denson | N/A | "August 15, 2023 RS" |
| Form 10-Q | November 8, 2023 | Denson; Schweller | Denson; Schweller | "3Q2023 10-Q" |
| Form 8-K | November 8, 2023 | Schweller | N/A | "November 8, 2023 8-K" |
| Form 8-K | November 21, 2023 | Schweller | N/A | "November 21, 2023 8-K" |

**A. Misstatements Regarding Charge's Assets and Liquidity**

212. During the Class Period, the Company made quarterly representations concerning Charge's total current assets, cash and cash equivalents, investments in marketable securities, non-current assets, and "total liquidity" (which, per Charge's definition, was primarily comprised of cash and cash equivalents and investments in marketable securities, together with available amounts under lines of credit), as specified below (*see also* ¶¶ 135, 168, *supra*):

**Table 4: Charge's Reported Current Assets, Cash, Marketable Securities and Total Liquidity Throughout the Class Period**

| Reporting Date | Document / Filing Date / Page Nos. | Total Current Assets | Cash and Cash Equivalents | Marketable Securities | Non-Current Assets | Total Liquidity |
|---|---|---|---|---|---|---|
| 12/13/2021 | 2021 10-K 3/29/2022 pp. F-3, F-13, F-16 | $107,935,965 | $18,238,264 | $9,618,743 | $0 | N/A |
| 3/31/2022 | 1Q2022 10-Q 5/16/2022 pp. F-1, F-8 | $128,083,474 | $26,381,238 | $23,721,546 | $232,000 | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/30/2022 | 2Q2022 10-Q 8/15/2022 pp. 4, 11-12 | $149,536,367 | $46,581,305 | $16,325,152 | $232,000 | N/A |
| 9/30/2022 | 3Q2022 10-Q 11/14/2022 pp. 4, 11 | $130,349,585 | $36,235,710 | $6,404,567 | $232,000 | N/A |
| 12/31/2022 | 2022 10-K 3/15/2022 pp. 53, F-4, F-17-18, F-20 | $116,509,000 | $26,837,000 | $6,757,000 | $240,000 | $39,600,000 |
| 3/31/2023 | 1Q2023 10-Q 5/10/2023 pp. 5, 15, 17, 40 | $132,793,000 | $36,493,000 | $6,548,000 | $248,000 | $54,000,000 |
| 6/30/2023 | 2Q2023 10-Q 8/14/2023 pp. 4, 20, 22, 46 | $146,603,000 | $50,142,000 | $11,597,000 | $248,000 | $72,700,000 |
| 9/30/2023 | 3Q2023 10-Q 11/8/2023 pp. 4, 20, 22, 44 | $126,035,000 | $51,359,000 | $5,868,000 | $248,000 | $68,300,000 |

213. Each of the above-specified representations concerning Charge's total current assets, cash and cash equivalents, investments in marketable securities, non-current assets, and "total liquidity" was materially false and/or misleading. As Charge itself admitted on November 21, 2023, it had, at all prior times during the Class Period, publicly reported its investment in KORR Value as "cash, cash equivalents, marketable securities or similar readily liquid assets," rather than what it actually was: a stake in the KORR Value limited partnership that, under the terms of the KORR Value LPA – and unlike either cash or marketable securities – was "not immediately able to be liquidated or readily accessible."

214. Therefore, each of the above-identified representations concerning Charge's cash and cash equivalents, and investments in marketable securities, was materially overstated and materially false and/or misleading, because each included sums that were ***not*** cash and cash

equivalents, or investments in marketable securities, but instead were Charge's stake in KORR Value. For the same reason, each of the above-identified representations concerning Charge's current assets and "total liquidity" was materially overstated and materially false and/or misleading, because current assets were substantially, and "total liquidity" nearly wholly, comprised of Charge's cash and cash equivalents and investments in marketable securities.

215. Charge's KORR Value investment was not cash, and not a marketable security – but rather, a stake in a limited partnership whose terms rendered investment redemption/liquidation wholly outside Charge's control (and thus materially distinct from cash and marketable securities). Although KORR Value might have held cash and marketable securities in its portfolio, Charge, as a limited partner in KORR Value, neither owned nor controlled any of the cash and marketable securities held in KORR Value, and could not readily access or liquidate them – as vividly demonstrated here, albeit behind the scenes and unbeknownst to the public, by Charge's repeated and largely unsuccessful efforts during the six-month period between May and mid-November 2023 to extricate itself from and/or liquidate its KORR Value investment. *See* ¶¶ 143-78, *supra*.

216. Thus, in both principle and fact, Charge's KORR Value investment was a non-current asset. However, the Company did not publicly report it as such, and instead misreported it as marketable securities and cash. Therefore, each of the above-identified representations concerning Charge's non-current assets was materially understated and materially false and/or misleading.

**B. <u>Misstatements Regarding the Side Letter and Dispute with Arena</u>**

217. As detailed above in ¶¶ 62-78, 95-98, despite extensive disclosures regarding the Arena SPA and other financings with Arena, the Side Letter agreement was not disclosed in any of the filings identified in Table 3, and of particular import, not in any of the filings registering

and offering Arena's securities for sale (the December 10, 2021 RS, August 24, 2022 RS, Augst 30, 2022 RS, and August 15, 2023 RS).

218. Further, despite retaining Cravath for a second time in November 2023, to investigate and prepare a complaint against Arena for Arena's misconduct regarding its financings and control, Defendants omitted the material fact that Arena was thwarting Charge's efforts to obtain new financing to pay the Notes and forcing Charge into bankruptcy from Charge's public statements made between November 2023 through the end of the Class Period.

219. The statements above were materially false and misleading when made or omitted information necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

### C. Misstatements Regarding Defendant Orr's Control of Charge Common Stock and the Side Letter

220. As explained above, Orr took various steps designed to create the appearance that he was disassociating himself from Charge and relinquishing his ability to effectively control it.

221. The October 28, 2021 DRS filed by the Company informed the market that Orr had sold his holdings in Charge common stock down from 42.50% to 10.20% of the Company's outstanding common stock, but omitted to mention what became of that stock. Although the October 28, 2021 DRS noted that another significant holder in Charge, Gabriel 613 Trust, now owned 19.45% of Charge, it omitted to state that Orr had any personal connection to Gabriel 613 Trust. The October 28, 2021 DRS further stated that the trustee of Gabriel 613 Trust, Greg Goldberg, had "sole voting and dispositive power" over shares of Charge common stock held by Gabriel 613 Trust, but omitted to state that Goldberg was a limited partner in KORR Value.

222. The November 9, 2021 DRS, the November 26, 2021 DRS, and the December 10, 2021 DRS, all filed by the Company, similarly omitted information about Orr's divestiture, Gabriel

613 Trust's connection to Orr, and Orr's connection to its trustee, and similarly represented that Goldberg had "sole voting and dispositive power" over shares of Charge common stock held by Gabriel 613 Trust.

223. On March 24, 2022, the Company filed a Current Report on Form 8-K, disclosing to investors that Orr had sold some of his holdings in Charge common stock to a "trust for the benefit of" Orr's children, but did not specifically identify that trust as Gabriel 613 Trust.

224. On June 2, 2022, Orr "effectuated the transfer" of 4.5 million shares of Charge common stock from Gabriel 613 Trust to Arena as part of an undisclosed "Side Letter" entered into between Orr, Charge, Fox, and Arena in connection with the December 2021 SPA. This transfer was made at the request of Fox, "in his capacity as [Charge's] Chief Executive Officer." In return for this transfer, "[Charge] promised to make [Orr] whole by paying [Orr] the value of the additional 4.5 million shares." The existence of this "Side Letter" was not disclosed to investors at any time prior to bankruptcy proceedings.

225. The June 22, 2022 Schedule 13G, filed by the KORR Entities and Defendant Orr as Reporting Persons, disclosed for the first time that Orr's children were the beneficiaries of Gabriel 613 Trust, but reiterated that Goldberg had "sole voting and dispositive power" over Charge common stock held by Gabriel 613 Trust and similarly omitted to state that Goldberg was a limited partner in KORR Value.

226. The July 13, 2022 Preliminary Proxy Statement filed by the Company specifically stated that Gabriel 613 Trust had sold 4.5 million shares of Charge common stock but failed to disclose the identity of the purchaser(s) or that they had been sold pursuant to the "Side Letter" between Orr, Charge, Fox, and Arena in connection with the December 2021 SPA. The July 13,

2022 Preliminary Proxy Statement likewise reiterated that Goldberg had "sole voting and dispositive power" over Charge common stock held by Gabriel 613 Trust.

227. The statements in ¶¶ 220-26 above were materially false and misleading when made or omitted information necessary to make the statements made, in light of the circumstances under which they were made, not misleading for the following reasons.

228. ***First***, it was materially false and misleading for Orr and the KORR Entities to repeatedly represent that Goldberg had "sole voting and dispositive power" over the shares held by Gabriel 613 Trust when Orr, in fact, had the power to – and did – effectuate a transfer of Charge common stock from Gabriel 613 Trust eight months after first making that representation, and 20 days after effectuating that transfer.

229. ***Second***, the Company's failure to disclose that Orr had a personal connection to Gabriel 613 Trust, or that its trustee was a limited partner in KORR Value, were material omissions.

230. ***Third***, the fact that the Company's July 13, 2022 Preliminary Proxy Statement (1) affirmatively stated that Gabriel 613 Trust had sold 4.5 million shares of Charge common stock but did not disclose why or who the purchaser was, and (2) repeated the false representation that Goldberg had "sole voting and dispositive power" over Charge common stock held by Gabriel 613 Trust – when Fox, the CEO, was surely aware of those facts as a ***party*** to the Side Letter – was materially false and misleading.

231. ***Fourth***, the Company's failure to disclose that Charge had become indebted to Orr for the value of 4.5 million shares of Charge common stock on account of the Side Letter was a material omission.

232. ***Fifth***, the Company's failure to disclose the Side Letter was, in and of itself, a material omission.

233. As a result of these materially false and misleading statements and omissions about Orr's control of Charge common stock and the market was misinformed about the true state of affairs at Charge.

**D. Misstatements Regarding Charge's Relationship and Investments with Defendant Orr and the KORR Entities**

234. On May 9, 2020, Charge (at that time, known as GoIP Global) entered into the KORR Value LPA. Charge did not disclose the existence of the KORR Value LPA until November 21, 2023.

235. Charge first disclosed the existence of the Informal Arrangement in the Company's February 12, 2021 DRS, stating: "In addition to investing in ***marketable securities***, under the advisory of KORR Acquisition Group, Inc. (a related party and shareholder), Charge Investments invests in ***limited private investments*** in certain businesses that it finds to be oportunistic [sic.]." The Company made an identical disclosure in the May 14, 2021 DRS. Neither the February 12, 2021 DRS nor the May 14, 2021 DRS disclosed the existence of the KORR Value LPA.

236. Over the next several months, the Company – at the urging of the SEC – disclosed additional information about the Informal Arrangement. In the June 11, 2021 DRS, the Company stated:

> We aim to invest in opportunities that would ***complement*** our two operating divisions in addition to ***marketable securities, including money markets funds and other listed securities***. Our Investment services are aimed at ***offsetting the overall cost of capital***. . . .
>
> In addition to investing in ***marketable securities***, under the advisory of KORR Acquisition Group, Inc. (a related party and shareholder), Charge Investments invests in ***limited private investments*** in certain businesses that it finds to be opportunistic. . . . ***Our arrangement with KORR is at will*** . . . .

> We currently intend to keep our investment opportunities to ***less than 20% of our assets, and of that, less than 5% in illiquid assets***. We ***continuously monitor and review the value of our investments***, including, but not limited to conducting a mark-to-market valuation of our investments ***on a weekly basis***, and, if ever we exceed 20%, we will liquidate marketable securities to stay within our intended maximum investment of 20% of our total assets.

237. The Company made identical disclosures in the July 20, 2021 DRS, the August 4, 2021 DRS, the August 25, 2021 DRS, the October 28, 2021 DRS, the November 9, 2021 DRS, the November 26, 2021 DRS, and the December 10, 2021 RS. None of these SEC filings disclosed the existence of the KORR Value LPA.

238. In an exhibit filed with the July 20, 2021 DRS, Charge – again, at the urging of the SEC – provided further information about the Informal Arrangement:

> Charge Enterprises, Inc. . . . has entered into an ***informal at-will arrangement*** with KORR Acquisitions Group, Inc., an entity controlled by Kenneth Orr, the Company's chairman of the board of directors . . . .
>
> Pursuant to the terms of the arrangement, KORR [Acquisitions] will provide investment advisory services ***on an as-needed basis*** as requested by the Company. In connection with such services, KORR [Acquisitions] shall be responsible for the investment and reinvestment of certain assets of the Company, ***as may be designated by Company, from time to time***, to be subject to [KORR Acquisitions'] management (the "Assets"). In connection with such services, KORR [Acquisitions] shall be granted ***discretionary authority, without prior consultation with the Company, to buy, sell, trade and allocate in and among stocks, bonds and other securities and/or contracts relating to the same***, or otherwise, and to provide instructions in furtherance of such authority, provided the value of the Assets shall not exceed 20% of the Company's total assets.
>
> The Company's arrangement with KORR [Acquisitions] is ***at will and may be terminated at any time***. . . .

239. The Company made identical disclosures in the August 4, 2021 DRS, the August 25, 2021 DRS, the October 28, 2021 DRS, the November 9, 2021 DRS, the November 26, 2021 DRS, and the December 10, 2021 RS, and the 2021 10-K. None of these SEC filings disclosed the existence of the KORR Value LPA.

240. Charge and KORR Acquisitions operated under the Informal Arrangement until June 2022, at which time they entered into a formal, written, Special Advisor Agreement whereby KORR Acquisitions agreed to "manage the Company's investment account" in exchange for a $500,000 up-front payment and a monthly payment of $25,000.

241. Charge disclosed the existence of the Special Advisor Agreement in its 2Q2022 10-Q filed on August 15, 2022. The 2Q2022 10-Q omitted to state any of the material terms of the Special Advisor Agreement. The 3Q2022 10-Q, 2022 10-K, 1Q2023 10-Q, 2Q2023 10-Q, and 3Q2023 10-Q made substantively identical, misleading, and incomplete disclosures.

242. The statements in ¶¶ 234-41 above were materially false and misleading when made or omitted information necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

243. ***First***, taken as a whole, the Company's statements falsely stated that the majority of Charge's invested capital was invested in liquid investments such as "marketable securities" or "money market funds," and that its "private investments" were "limited." To the contrary, when the Company made these statements, Charge was invested in KORR Value – an illiquid limited partnership. Charge did not own marketable securities. Rather, the Company merely owned an interest in a limited partnership controlled by Orr. Charge did not have the ability to buy or sell any of the individual securities in which the partnership traded and could not liquidate any portion of its partnership interest immediately as necessary. KORR Acquisitions, as general partner of KORR Value, had the "sole and absolute" right to limit redemptions of Charge's invested capital "at any time for any reason."

244. ***Second***, it was materially misleading for the Company to state that Charge's Informal Arrangement with KORR Acquisitions was "at will" and terminable "at any time"

because these statements falsely implied that Charge could exit the Informal Arrangement with little or no notice to Orr, and accordingly receive the cash value of its investments immediately upon request. This was false, evidenced by Orr's repeated refusal to return the Company's funds over the six-month period between May and November 2023.

245. ***Third***, it was materially false for the Company to state that Charge "continuously monitor[ed] and review[ed] the value of [its] investments . . . on a weekly basis" because, when Denson emailed Orr on April 22, 2021, he had not seen the Company's brokerage account statements ***from January of that year***. Similarly, the statement that Orr was managing funds "as may be designated by [Charge], from time to time" implies a state of affairs in which the Company was ultimately in control of its investment accounts when, in reality, the only person with exclusive authority over those investment accounts was Orr, who acted "with no independent oversight" and controlled a bank account in connection therewith.

246. ***Fourth***, taken as a whole, the Company's statements falsely implied that the funds invested with Orr were merely a way of earning additional income on cash that the Company considered a luxury and did not need immediate access to. It was highly misleading to state that the funds that Charge was investing were designed to "complement" its primary revenue streams when a lack of access to those funds – which Denson admitted were "critical" to the Company's liquidity – ultimately rendered the Company insolvent and in default to its senior lender, and led to the "imminent cascade of negative consequences" that occurred in November 2023.

247. ***Fifth***, the Company's failure to disclose the material terms of the Special Advisor Agreement was a material omission because it left the market to assume that the Special Advisor Agreement did not materially alter the terms of the Informal Arrangement and, disclosures surrounding it which were, as explained above, materially false and misleading.

248. As a result of these materially false and misleading statements and omissions about the nature and extent of Charge's investment advisory relationship with Orr and the KORR Entities, the market was misinformed about the true state of affairs at Charge.

**E. Misstatements Regarding Charge's Financial Condition, Liquidity, Business Prospects and Going Concern Risk**

249. As detailed above in ¶¶ 142-65, beginning in the spring of 2023: (1) Charge privately informed Orr that the Company would require the return of the Company's investment capital to satisfy certain Company liabilities that were to come due in November 2023, including the Arena SPAs; and (2) between May and November of 2023, Charge management and Orr privately negotiated four "drawdown schedules" by which Orr was to return the investment capital that was under Orr's control. However, Orr never lived up to any of these drawdown schedules, and Charge was unable to secure full return of its funds from Orr and the KORR Entities.

250. In May 2023, Orr agreed to return $10 million by July 2023. This did not happen.

251. On May 22, 2023, Denson emailed Orr and informed him that the Company would be (1) leaving the existing funds with Orr to manage until November, and (2) not be giving him any additional capital to manage, and that the Company would be "looking at safe / liquid places" for this additional capital in the meantime.

252. In August 2023, Orr agreed to return (1) $3 million by the first week of September 2023; (2) $3 million between September 15-30, 2023; (3) $6 million between October 15-30, 2023; and (4) the remainder between November 1-10, 2023.

253. Despite agreeing to return a total of $6 million in September, Orr and KORR Acquisitions had only returned $2.25 million by the end of that month. Schweller and Denson did not disclose this to investors.

254. Further, and despite his agreement to return $6 million in October, Orr only returned $1.75 million of Company funds in October 2023. Thus, by the end of October, and despite previously agreeing to return $12 million of Company funds by the end of October, Orr had only returned $4 million.

255. On November 2, 2023, Denson and Orr spoke on the phone to discuss Orr's failure to adhere to the drawdown schedule. On that call, Orr proposed a third drawdown schedule, offering to return (1) $1 million by the end of the day; (2) $3 million on November 6; (3) $3 million on November 14; and (4) the remainder by the "end of 2023, or perhaps in 2024." Orr did not live up to this, or any other, drawdown schedule.

256. Defendants Denson and Schweller knew and understood that, if Orr and KORR Acquisitions failed to return the Company funds as requested, a default on the Arena SPAs was virtually certain, and that it would lead to an "imminent cascade of negative consequences," namely, the invocation of cross-default provisions in the Company's other debt instruments.

257. On November 1, 2023, Denson emailed Orr and told him that his failure to return the Company's funds was causing "issues / difficult conversations."

258. Yet, the Company's 3Q2023 10-Q and the November 8, 2023 8-K omitted to state the difficulties the Company faced in seeking the return of its funds from Orr, nor mentioned the possibility of a default on the Arena SPAs if Charge failed to receive those funds. Instead, the Company continued to paint a rosy public picture of its financial condition and future prospects, as it claimed to have more than $57.2 million in cash and marketable securities on hand.

259. In the November 8, 2023 8-K, Denson stated that the Company was "well underway in strategic planning for the future." Schweller stated that the Company was "executing [its] forthcoming comprehensive strategic plan" and "optimizing capital allocation."

260. In fact, the 3Q2023 10-Q stated, point blank, that management "***expect[s] to have sufficient resources to meet [Charge's] current operating liquidity and capital requirements for the next 12 months***, including after accounting for the repayment of the $27.8 million that comes due and payable under the [Arena] Notes on November 19, 2023." According to management, its ability to meet current operating liquidity was due in largest part to the Company's "cash and cash equivalents" and "investments in marketable securities." With respect to "excess liquidity" generated through investing, management stated that it did not believe there was "***any material exposure with respect to these assets***."

261. That same day, following Charge's release of its quarterly earnings in the 3Q2023 10-Q, Charge held an earnings call. In response to a question from an H.C. Wainwright analyst about the Company's balance sheet, Schweller stated that the Company was "managing [its] balance sheets and . . . [has] ***the proper liquidity to meet [its] operational needs and service [its] debt***." Additionally, in response to a question from an Alliance Global Partners analyst about the Company's near-term debt maturity, Denson stated – again, point blank – that Charge was "***on track to fully pay the outstanding notes*** which have an aggregate face value of $27.8 million on or before the maturity date of November 19, 2023."

262. The statements in ¶¶ 249-61 above were materially false and misleading when made or omitted information necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

263. ***First***, the failure to disclose that the Company had agreed to various "drawdown schedules" with Orr for the return of the Company's investment capital which was "critical to [its] liquidity" was a material omission because the failure to receive that capital rendered default on the Arena SPAs a virtual certainty.

264. ***Second***, it was materially misleading to report $51,359,000 in cash and cash equivalents and a further $5,868,000 in marketable securities as of the end of the third quarter of 2023 when the failure to receive roughly $10 million from Orr rendered the Company unable to satisfy its $27.8 million obligation to Arena. None of the Company's SEC filings explained "cash and cash equivalents" and "marketable securities" in any way that would suggest that the funds included in these metrics were anything but readily liquid.

265. ***Third***, it was materially false and misleading to state that the Company was "well underway in strategic planning for the future," that it had "proper liquidity to meet [its] operational needs and service [its] debt" and was "on track to fully pay" its obligations under the Arena SPAs when management was undoubtedly aware that it lacked the funds to satisfy those obligations.

266. ***Fourth***, it was materially false and misleading to state that the Company was not at risk of "any material exposure" with respect to invested assets when management was aware ***for months*** that Orr was continuously failing to return the Company's investment capital and when management was having "difficult conversations" about this failure with its board of directors and its auditor.

267. As a result of these materially false and misleading statements and omissions about the Company's financial condition and liquidity, the market was misinformed about the true state of affairs at Charge.

### F. Certifications Pursuant to the Sarbanes-Oxley Act of 2002

268. Under the regulations and guidance promulgated by the SEC, companies whose stock is publicly traded in the United States – such as Charge – have important public reporting and disclosure obligations.

269. Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition.

Investors generally rely on the accuracy and transparency of these disclosures – as well as other public statements made by the company – when determining whether to invest.

270. Public companies like Charge are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations. Members of the company's executive team must be involved in creating and designing these controls and must personally guarantee their effectiveness.

271. Section 404 of SOX requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure and assess the effectiveness of such internal disclosure controls and procedures.

272. Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's internal controls. Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each periodic report that:

- he or she has reviewed the report;
- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;
- he or she and the other certifying officers:
    - are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;
    - have designed such disclosure controls and procedures to ensure that material information is made known to them,

particularly during the period in which the periodic report is being prepared;

- have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and
- have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):
  - any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and
- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 34-46427, § II.A (Aug. 29, 2002) (footnotes omitted).

273. Throughout the Class Period, Defendants repeatedly and falsely certified to investors that they had established effective internal disclosure controls and procedures for Charge. As set forth above, some combination of Defendants Fox, Schweller, and Denson provided these disclosure control certifications in the 2021 10-K, 1Q2022 10-Q, 2Q2022 10-Q, 3Q2022 10-Q, 2022 10-K, 1Q2023 10-Q, 2Q2023 10-Q, and 3Q2023 10-Q.

274. In the 2021 10-K, for example, Charge, through Fox and Schweller, stated:

> Our disclosure controls and procedures are designed to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management,

> including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> Our management, with the participation and supervision of our Chief Executive Officer and our Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of such date, our disclosure controls and procedures were, in design and operation, effective at a reasonable assurance level.

275. Charge made substantively identical disclosures in the 1Q2022 10-Q, 2Q2022 10-Q, 3Q2022 10-Q, 2022 10-K, 1Q2023 10-Q, 2Q2023 10-Q, and 3Q2023 10-Q.

276. Along with certain of Charge's SEC filings, some combination of Fox, Schweller, and Denson provided a certification concerning the Company's internal disclosure controls and procedures pursuant to Section 302 of SOX. In her certification accompanying the 2021 10-K, for example, Schweller stated:

> 1. I have reviewed this Annual Report on Form 10-K of Charge Enterprises, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
>    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
>    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

4. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

277. Schweller, along with some combination of Fox and Denson (as specified at ¶ 212, *supra*), provided substantively identical disclosures in the 1Q2022 10-Q, 2Q2022 10-Q, 3Q2022 10-Q, 2022 10-K, 1Q2023 10-Q, 2Q2023 10-Q, and 3Q2023 10-Q.

278. These statements in ¶¶ 268-77 were false and misleading when made and failed to state material facts. It was materially misleading for Defendants to represent that Charge's internal disclosure controls and procedures were effective during the Class Period when that was not the case, and Defendants repeatedly and successfully evaded those controls to perpetrate their fraud. Among other things, Defendants knew or recklessly disregarded that KORR Acquisitions would not timely return funds that were "critical" to the Company's liquidity and ability to continue as a going concern, and knew or recklessly disregarded that KORR Acquisitions had invested these Company funds in an illiquid partnership interest. Defendants also knew or recklessly disregarded that, as of November 2023, KORR Acquisitions' failure to return these funds virtually guaranteed that Charge would be unable to service the Arena Notes. Defendants concealed this information

until after Charge received a default notice from Arena. By doing so, Defendants created the false impression that Charge had sufficient liquidity to service its debt and continue as a going concern.

279. In addition to these materially false and misleading statements made in Company SEC filings, Fox and Schweller made a number of materially false and misleading oral statements concerning the importance of internal disclosure controls and internal control over financial reporting. For example, upon her appointment as the CFO of Charge in September 2021, Schweller stated that her "***immediate focus*** will be on ***ensuring resilience in accounting and robust internal controls over financial reporting***, as well as effective financial integration of acquisitions, to drive value to shareholders over the long term and support a Nasdaq listing in the short term." Several months later, on March 9, 2022, Fox stated that one of the things he had "hammered home to [the Charge] compliance department, our [SOX] team, our CFO, is that I'm not going to ever be upset at somebody making a mistake. I'm going to be upset if ***somebody tries to cover something up***. . . . And so, we have kind of a ***zero tolerance policy***."

280. As a result of these materially false and misleading statements and omissions about the Company's financial condition and liquidity, the market was misinformed about the true state of affairs at Charge.

## VI. SUMMARY OF DEFENDANTS' SCIENTER

### A. The Management Defendants

281. As alleged herein, the Management Defendants acted with scienter in that the Management Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. The Management Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities

laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Charge, and their control over and/or receipt of Charge's allegedly materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

282. The Management Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicitly of, or at least the reckless disregard by, personnel at the highest levels of the Company.

283. The Management Defendants received monthly account statements (such as the one whose image is partially reproduced in ¶ 126) that plainly indicated the true nature of Charge's interest in the KORR Value limited partnership. The Management Defendants therefore knew that Charge did not have the ability to buy or sell any of the individual securities that the partnership held and/or traded, and that Charge could not liquidate any portion of its partnership interest immediately.

284. Additionally, the Management Defendants had direct knowledge, through firsthand dealings, of the Side Letter between Fox, Orr and Arena.

285. Likewise, the Managements Defendants' direct, private communications with Orr and Arena between May and November 2023 made them aware that Charge's financial condition, liquidity and ability to continue as a going concern were not as solid as publicly represented, and to the contrary were placed in high jeopardy by Orr's control over and disinclination to return Charge's funds, and Arena's financial pressure and demands.

286. Management Defendants were also aware that Charge had retained Cravath to investigate claims against Arena for wrongful conduct by Arena.

287. The Management Defendants, because of their positions with Charge, controlled the contents of Charge's public statements during the Class Period. The Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Charge's corporate statements and is, therefore, responsible and liable for the representations contained therein.

**B. Orr and the KORR Entities**

288. As alleged herein, Orr and the KORR Entities acted with scienter in that Orr and the KORR Entities knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in their own name during the Class Period were materially false and misleading. Orr and the KORR Entities knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Orr and the KORR Entities, by virtue of their knowledge of the true facts regarding their ownership and/or control of Charge common stock, were active and culpable participants in the fraudulent scheme alleged herein.

289. Orr and the KORR Entities, because of their control over the Company's investment capital, their control over a bank account in the name of the Company, their ownership and control – direct or indirect – of Charge common stock, their status as a creditor of Charge for the value of 4.5 million shares of Charge common stock pursuant to the undisclosed "Side Letter,"

and their ability to control the contents of Charge's public filings with respect to their ownership – direct or indirect – of Charge securities, controlled Charge.

290. Orr and the KORR Entities had the motive to disseminate false and misleading information concerning their ownership of Charge common stock and the status of the Company's investment capital because, in doing so, Orr and the KORR Entities were able to artificially inflate the value of Charge common stock, of which they – and Orr's children, as beneficiaries of Gabriel 613 Trust – were considerable holders. Orr and the KORR Entities had the opportunity to disseminate false and misleading information concerning their ownership of Charge common stock and the status of the Company's investment capital because Orr played an integral role in the Company's transition from a "shell company" to an uplisting on NASDAQ, and therefore had personal relationships with the Company's executives and members of its Board of Directors.

291. Orr and the KORR Entities had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their ownership and control of Charge common stock and the Company's investment capital, as well as access to material, non-public information, Orr and the KORR Entities knew or recklessly disregarded that the adverse facts specified herein had not been disclosed and were being concealed from the investing public and that the positive representations that were being made were false and misleading.

292. As a result of the foregoing, each of the Defendants is responsible for the accuracy of Charge's corporate statements and is, therefore, responsible and liable for the representations contained therein.

**C. <u>Arena Defendants</u>**

293. The Arena Defendants, because of their ownership and control – direct or indirect – of Charge common stock, their status as a creditor of Charge under the financing agreements,

including, but not limited to, their ability to thwart Charge's efforts to obtain new financing to pay off the Notes, and their ability to control the contents of Charge's public filings with respect to their ownership – direct or indirect – of Charge securities, controlled Charge.

294. The Arena Defendants had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their ownership and control of Charge common stock and through the financial agreements and/or ownership of debt and equity securities, as well as access to material, non-public information such as the Side Letter, the Arena Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed and were being concealed from the investing public and that the positive representations that were being made were false and misleading.

## VII. LOSS CAUSATION

295. During the Class Period, as alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Charge common stock and operated as a fraud or deceit on purchasers of Charge common stock. When the truth about the Defendants' misconduct was revealed, the value of Charge common stock declined precipitously as the prior artificial inflation was removed from, and no longer propped up, the price of Charge's shares. The decline in the price of Charge common stock, and Charge's eventual descent into bankruptcy, were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the Charge common stock price decline negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*,

damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the prices of Charge common stock and the subsequent decline in the value of Charge common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

296. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly and proximately caused the damages suffered by Plaintiff and other members of the Class. Those statements were materially false and misleading through their failure to disclose, *inter alia*, a true and accurate picture of the nature and extent of Charge's relationship with Orr and the KORR Entities, that in connection with the Arena financing the Side Letter was entered into, the degree of control that Orr and the KORR Entities exercised over Charge assets that were "critical" to the Company's liquidity, the nature of the investments that Orr and the KORR Entities held on the Company's behalf, and the sufficiency of the Company's internal disclosure controls.

297. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Charge common stock to be artificially inflated. Plaintiffs and other Class members purchased Charge common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

298. Had the investing public been told the truth – that Charge's current assets and liquidity were substantially less than publicly represented; that Arena, Fox and KORR entered into the Side Letter in connection with the Arena financings; that Orr retained substantial control over Charge's shares, business and ability to continue as a going concern; that Charge lacked effective financial and disclosure controls and had placed critical portions of its working capital in non-

marketable securities which it could not readily liquidate, access or control, and could not meet loan commitments as a result – there would have been no market for the Company's stock.

299. The Company's failure was within the zone of risk that the misstatements and scheme concealed.

300. When the relevant truth and its impact on Charge's financial prospects and results entered the market through multiple partial disclosures, the price of Charge common stock dropped, as the artificial inflation came out of the stock price. As a result of their purchases of Charge common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

301. The disclosures that corrected the market price of Charge common stock are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

**A. <u>March 24, 2022</u>**

302. On March 24, 2022, the Company filed a Current Report on Form 8-K, disclosing to investors that Orr had sold his some of his holdings in Charge common stock to a "trust for the benefit of" Orr's children, but did not specifically identify that trust as Gabriel 613 Trust, nor was Orr's continuing control disclosed at that time.

303. On this news, the price of Charge shares declined, falling approximately 13.8%, or $0.79 per share, to close at $4.95 per share on March 24, 2022 (from a closing price of $5.74 per share on March 23, 2022, the trading day immediately prior).

304. Despite the significant decline in the price of Charge common stock, the price remained artificially inflated as Defendants continued to mislead the market.

### B. June 22, 2022

305. On June 22, 2022, Orr and the KORR Entities filed a Schedule 13G with the SEC, which stated that Orr "may be deemed to own 18,395,848 shares of Charge common stock" (roughly consistent with his holdings as stated on the Company's December 10, 2021 registration statement). However, in a footnote thereto, Orr and the KORR Entities stated that this number *specifically excluded*:

> 35,593,906 shares of [Charge] Common Stock held by Gabriel 613 Trust. . . . The ***beneficiaries of Gabriel 613 [Trust] are Mr. Orr's children*** and Greg Goldberg, as trustee of Gabriel 613, has ***sole voting and dispositive power*** over the shared [sic.] held by Gabriel 613 [Trust]. Mr. Orr ***disclaims beneficial ownership*** of the [Charge securities] owned directly by Gabriel 613 [Trust] and the filing of this Schedule 13G shall not be deemed an admission that Mr. Orr is the beneficial owner of such securities for purposes of Section 13 or for any other purpose.

306. On this news, the price of Charge shares declined, falling approximately 4.4%, or $0.26 per share, to close at $5.68 per share on June 23, 2022 (from a closing price of $5.94 per share on June 22, 2022, the trading day immediately prior).

307. Despite the significant decline in the price of Charge common stock, the price remained artificially inflated as Defendants continued to mislead the market.

### C. November 21, 2023

308. On November 21, 2023, in a Form 8-K filed with the SEC, Charge informed the market of the dire situation it faced, admitted that its funds were invested pursuant to the KORR Value LPA and therefore unavailable, and disclosed that Charge had received a default notice from Arena that would likely lead to invocation of the cross-default provisions under the Company's other debt instruments.

309. On this news, the price of Charge shares declined, falling approximately 19.7%, or $0.047 per share, to close at $0.238 per share on November 21, 2023 (from a closing price of $0.285 per share on November 20, 2023, the trading day immediately prior).

310. Despite the significant decline in the price of Charge common stock, the price remained artificially inflated as Defendants continued to mislead the market.

### D. December 6, 2023

311. On December 6, 2023, in a Form 8-K filed with the SEC, Charge informed the market that it had received several additional default notices from Arena, and further disclosed that the Company was ceasing the operations of certain of its telecommunications subsidiaries in an effort to preserve liquidity.

312. On this news, the price of Charge shares declined, falling approximately 14.5%, or $0.025 per share, to close at $0.147 per share on December 7, 2023 (from a closing price of $0.172 per share on December 6, 2023, the trading day immediately prior).

313. Despite the significant decline in the price of Charge common stock, the price remained artificially inflated as Defendants continued to mislead the market.

### E. January 25, 2024

314. On January 25, 2024, in a Form 8-K filed with the SEC, Charge informed the market that the Company had received a foreclosure notice from Arena stating that, to satisfy the Company’s outstanding indebtedness, Arena would be holding an auction pursuant to the Uniform Commercial Code to liquidate 100 percent of the equity interests in certain Charge subsidiaries at auction.

315. On this news, the price of Charge shares declined, falling approximately 8.2%, or $0.013 per share, to close at $0.145 per share on January 26, 2024 (from a closing price of $0.158 per share on January 25, 2024, the trading day immediately prior).

316. Despite the significant decline in the price of Charge common stock, the price remained artificially inflated as Defendants continued to mislead the market.

**F. February 28, 2024**

317. On February 28, 2024, in a Form 8-K filed with the SEC, Charge announced that it had entered into a Restructuring Support Agreement with two affiliates of Arena, which was to be implemented through the commencement of a voluntary Chapter 11 case in the U.S. Bankruptcy Court for the District of Delaware.

318. On this news, the price of Charge shares declined, falling approximately 53.3%, or $0.032 per share, to close at $0.028 per share on February 28, 2024 (from a closing price of $0.06 per share on February 27, 2024, the trading day immediately prior).

**G. February 29, 2024**

319. On February 29, 2024, NASDAQ suspended trading of Charge common stock.

320. On this news, the price of Charge shares declined, falling approximately 50%, or $0.014 per share, to close at $0.014 per share on February 29, 2024 (from a closing price of $0.028 per share on February 28, 2024, the trading day immediately prior).

**H. March 7, 2024**

321. On March 7, 2024, Charge filed its voluntary petition for bankruptcy under Chapter 11.

322. On this news, the price of Charge shares declined, falling approximately 29.9%, or $0.009 per share, to close at $0.021 per share on March 7, 2024 (from a closing price of $0.03 per share on March 6, 2024, the trading day immediately prior).

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

323. Plaintiff and other members of the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted

herein against Defendants are predicated upon omissions of material facts for which there was a duty to disclose.

324. Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Charge common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Charge common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

(b) Charge regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Charge was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

325. As a result of the foregoing, the market for Charge common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of Charge common stock. Under these circumstances, all those who transacted in Charge common stock during the Class Period suffered similar injury through their transactions in Charge common stock at artificially inflated prices and a presumption of reliance applies.

## IX. NO SAFE HARBOR

326. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. None of the specific statements pled herein were identified as "forward-looking statements." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying potential factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew or should have known that the particular forward-looking statements was false and/or the forward-looking statements was authorized and/or approved by an executive officer of Charge who knew that those statements were false when made.

## X. CLASS ACTION ALLEGATIONS

327. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the following Class: all persons and entities who purchased or otherwise acquired the publicly-traded common stock of Charge during the period from October 28, 2021 through and including February 28, 2024, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Charge during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

328. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Charge's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Charge shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Charge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

329. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class sustained damages from Defendants' wrongful conduct alleged herein.

330. Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

331. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A. whether the federal securities laws were violated by Defendants' acts as alleged herein;

B. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the Company's business, operations, and prospects;

C. whether Defendants made false and/or misleading statements;

D. whether Defendants' statements omitted material facts necessary to make the statements made, in light of circumstances under which they were made, not misleading;

E. whether Defendants knew or recklessly disregarded that their statements were false and misleading; and

F. to what extent the members of the Class have sustained damages and the proper measure of such damages.

332. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against the Management Defendants and KORR Defendants)**

333. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

334. This cause of action is asserted against the Management Defendants and the KORR Defendants, and is based upon their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

335. During the Class Period, the Management Defendants and the KORR Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or

recklessly engaged in acts, transactions, practices and courses of conduct which operated as a fraud and deceit upon Plaintiff and other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such a scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; (ii) artificially inflate and maintain the market price of Charge common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Charge common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

336. Pursuant to the above plan, scheme, and course of conduct, each of the Management Defendants and the KORR Defendants participated directly or indirectly in the preparation and/or issuance of annual reports, SEC filings, press releases, and other statements that were designed to influence the market for Charge common stock. Such reports, filings, releases, and statements were materially false and misleading in that they omitted to disclose adverse facts and information and misrepresented the truth about Charge's financial condition, risk factors, liquidity, present and future business prospects, ownership, management, control, and the integrity of the market for its publicly traded common stock.

337. By virtue of their positions, ownership and/or control of Charge, the Management Defendants and the KORR Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and other members of the Class, or, in the alternative, acted with reckless disregard for

the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Management Defendants and the KORR Defendants. Said acts and omissions of the Management Defendants and the KORR Defendants were committed willfully or with reckless disregard for the truth. In addition, each Management Defendant and KORR Defendant knew or recklessly disregarded that material facts were being omitted and misrepresented as alleged herein.

338. Each of the Management Defendants' primary liability, and control person liability, arises from the following facts: (1) they were high level officers, controlling shareholders, and/or directors of the Company during the Class Period; (2) by virtue of his or her responsibilities, ownership, and activities as a senior executive officer and/or director, they were privy to and participated in the creation and development of reporting concerning the Company's ownership, control and financial condition, and the facts concerning the nature and extent of the Company's relationship with Orr and the KORR Entities; (3) they were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

339. Pursuant to the above plan, scheme, and course of conduct, Orr and the KORR Entities participated directly or indirectly in the preparation and/or issuance of various Charge SEC filings that were designed to influence the market for Charge common stock. Such filings were materially false and misleading in that they omitted to disclose adverse facts and information and misrepresented the truth about Orr's and the KORR Entities' ownership and control of Charge common stock, and the integrity of the market for Charge common stock.

340. By virtue of their ownership and/or control – direct or indirect – of Charge common stock, Orr and the KORR Entities had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Orr and the KORR Entities. Said acts and omissions of Orr and the KORR Entities were committed willfully or with reckless disregard for the truth. In addition, Orr and the KORR Entities knew or recklessly disregarded that material facts were being omitted and misrepresented as alleged herein.

341. During the Class Period, Charge common stock traded in an active and efficient market. Plaintiff and other members of the Class, relying on the materially false and misleading statements and the material omissions from such statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying on the integrity of the market, purchased or otherwise acquired shares of Charge common stock at artificially inflated prices caused by the Management Defendants' and the KORR Defendants' wrongful conduct. Had Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired Charge common stock at the artificially inflated prices that they paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Charge common stock was substantially lower than the prices paid by Plaintiff and other members of the Class.

342. By reason of the conduct alleged herein, the Management Defendants and the KORR Defendants knowingly and/or recklessly violated Section 10(b) of the Exchange Act and Rule 10b- 5 promulgated thereunder.

343. This action was filed within two years of discovery of the fraud and within five years of each Class member's purchases of securities, including Plaintiff's purchases, giving rise to the cause of action.

344. As a direct and proximate result of the Management Defendants' and the KORR Defendants' wrongful conduct and omissions and misrepresentations regarding the same, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Charge common stock during the Class Period.

345. Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Charge common stock. Plaintiff and other members of the Class would not have purchased Charge common stock at the prices they paid, or at all, if they had been aware that the market had been artificially and falsely inflated by Defendants' false and misleading statements.

346. As a direct and proximate cause of the Management Defendants' and the KORR Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Charge common stock during the Class Period.

## SECOND CAUSE OF ACTION
**Violations of Section 20(a) of the Exchange Act**
**(Against All Defendants)**

347. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

348. This cause of action is asserted against all Defendants, and is based upon their violations Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

349. During the Class Period, Defendants controlled Charge and/or their co-Defendants and/or the content of Charge's SEC filings.

350. Although not named as a defendant in this action, Charge was a primary violator of Section 10(b) on account of the fraudulent scheme and unlawful course of conduct perpetrated by the Defendants.

351. The Management Defendants, each primary violators of Section 10(b) of the Exchange Act, were able to, and did, control Charge, by directing the operation and management of Charge, and conducting and participating, directly and indirectly, in the conduct of Charge's business affairs and/or public disclosures to the investing public.

352. Because of their positions as high-level officers and/or directors of Charge, their controlling beneficial shareholder status, or their ability to make materially false and misleading statements on behalf of Charge, the Management Defendants were "controlling persons" of Charge within the meaning of Section 20(a) of the Exchange Act. In this capacity, the Management Defendants participated in the unlawful conduct alleged which artificially inflated the market price of Charge common stock, causing economic harm to Plaintiffs and other members of the Class.

353. Because of their (1) beneficial ownership of Charge common stock, (2) indirect control over the shares of Charge common stock held by Gabriel 613 Trust, (3) direct control over Charge's investment capital "without any independent oversight," including the authority to deny withdrawals of that investment capital "for any reason," (4) direct control of a bank account in the Company's name, (5) ability to control the content of Charge's SEC filings, and (6) status as a creditor of Charge for the value of $4.5 million shares of Charge common stock pursuant to the undisclosed "Side Letter," Orr and the KORR Entities were "controlling persons" of Charge within the meaning of Section 20(a) of the Exchange Act. In this capacity, Orr and the KORR Entities participated in the unlawful conduct alleged which artificially inflated the market price of Charge common stock, causing economic harm to Plaintiff and other members of the Class.

354. The Arena Defendants each had the ability to influence the policies and management of the Company at all relevant times by their control over the Company through the financing agreements and/or ownership of debt and equity securities. The Arena Defendants exercised control over the general operations of Charge and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. Using this control the Arena Defendants prevented Charge from obtaining new financing to pay the Notes and forced Charge into bankruptcy. In this capacity, the Arena Defendants participated in the unlawful conduct alleged which artificially inflated the market price of Charge common stock, causing economic harm to Plaintiff and other members of the Class.

355. The Defendants acted as controlling persons of some or all of their co-Defendants and/or Charge because they each had the capacity to control, or did actually control, their co-Defendants and/or Charge in their violations of the securities laws, and are therefore liable under Section 20(a) of the Exchange Act.

**THIRD CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**(Against the KORR Defendants and Arena Defendants)**

356. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

357. Defendants Fox, Denson, and Schweller intentionally made numerous misstatements and misrepresentations to Plaintiff and Class members, and/or concealed or failed to disclose material information to Plaintiff and Class members, that they knew not to be true or did not believe to be true, including, but not limited to that: (i) the nature and extent of Charge's relationship and investments with Defendant Orr and the KORR Entities; (ii) that in connection with subordinated convertible financing, Arena had entered into an agreement to purchase

9,000,000 shares from Charge's insiders, Defendant Fox and KORR Value (4.5 million shares from each) at a price of about $0.22 per share at a time when Charge's market price was approximately $3.50 per share; (iii) that, according to KORR, in connection with that agreement, KORR caused an additional 4.5 million shares of Charge common stock to be transferred to Arena to fulfill Fox's pledge under the Side Letter, based on Charge's promise to make the transferor whole on the anticipated date of Charge's common stock listing on the Russell 2000 Index; (iv) that Charge's current assets, including cash balances and investments in marketable securities, and Charge's total liquidity were misstated; (v) that Charge had considered Arena's actions in interfering with Charge's efforts to refinance its debt as sufficiently egregious that it retained counsel at the law firm of Cravath to prepare a complaint against Arena asserting claims of lender liability, among other claims; and (vi) that Charge's fundamental financial condition, liquidity, business prospects and going concern risk were undisclosed.

358. Defendants Fox, Denson, and Schweller knew that the representations they made were false when made and made the intentional misrepresentations or omissions with the intent that Plaintiff and members of the Class rely upon those misstatements or omissions.

359. Defendants Fox, Denson, and Schweller's false and misleading representations, concealment, or silence induced Plaintiff and Class members to purchase Charge common stock.

360. Plaintiff and Class members justifiably relied upon the false and misleading representations, concealment, or silence, which induced them to purchase Charge common stock.

361. The Arena Defendants and the KORR Defendants aided and abetted the fraud perpetrated by Defendants Fox, Denson, and Schweller. The Arena Defendants and the KORR Defendants knew that Defendants Fox, Denson, and Schweller owed duties to the Plaintiff and members of the Class and substantially assisted them in their violations of the Exchange Act.

362. Through the Arena Defendants' extensive financing of Charge, the Arena Defendants had actual knowledge, or consciously disregarded, the fact that Defendants Fox, Denson, and Schweller were making false and misleading representations to Plaintiff and the Class concerning Charge's financing and financial condition.

363. Through the KORR Defendants' direct control over Charge's investment capital "without any independent oversight," including the authority to deny withdrawals of that investment capital "for any reason," direct control of a bank account in the Company's name, ability to control the content of Charge's SEC filings, and status as a creditor of Charge for the value of $4.5 million shares of Charge common stock pursuant to the undisclosed "Side Letter," the KORR Defendants had actual knowledge, or consciously disregarded, the fact that Defendants Fox, Denson, and Schweller were making false and misleading representations to Plaintiff and the Class concerning Charge's financing and financial condition.

364. The Arena Defendants and KORR Defendants provided substantial assistance to Defendants Fox, Denson, and Schweller's fraud. The Arena Defendants and KORR Defendants knew that false statements were being sent to Plaintiff and Class members and that Plaintiff and members of the Class would rely on the false and misleading statements and omissions. The Arena Defendants and KORR Defendants acted with the intention of advancing the fraud's commission.

365. Accordingly, the Arena Defendants and KORR Defendants knowingly participated in the fraud and/or recklessly disregarded the fraud by Defendants Fox, Denson, and Schweller and are liable to Plaintiff and members of the Class for damages

## XII. PRAYER FOR RELIEF

366. WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

(a) declaring this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing his counsel as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

(b) awarding compensatory damages against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

(c) awarding Plaintiff's reasonable costs and experts' and attorneys' fees; and

(d) awarding such other and further equitable and injunctive relief as the Court may deem just and proper.

## XIII. JURY DEMAND

367. Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: January 17, 2025

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Brandon Walker*
Brandon Walker
Lawrence P. Eagel
Marion C. Passmore
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: walker@bespc.com
eagel@bespc.com
passmore@bespc.com

*Attorneys for Lead Plaintiff Timothy K. Klintworth*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of January, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

By: /s/ *Brandon Walker*
Brandon Walker