UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
DAVID FINKELSTEIN, *individually and on behalf of all*                 :
*others similarly situated*,                                           :
                                                                       :
                                          Plaintiffs,                  :          24-CV-4056 (JMF)
                                                                       :
            -v-                                                        :
                                                                       :          OPINION AND ORDER
ANDREW FOX et al.,                                                     :
                                                                       :
                                          Defendants.                  :
                                                                       :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

In this putative class action, Lead Plaintiff David Finkelstein brings securities fraud and

common law fraud claims against former directors, officers, and entities affiliated with Charge

Enterprises, Inc. ("Charge") on behalf of many of the firm's shareholders ("Plaintiffs").[1]  The

Complaint alleges that Defendants made material misstatements and omissions in public filings

and statements in connection with events that ultimately led to Charge's bankruptcy and the

delisting of its publicly traded shares and, in so doing, violated Sections 10(b) and 20(a) of the

---

[1]      The directors named as Defendants are Phillip P. Scala, Justin Deutsch, James Murphy, Baron Davis, Benjamin Carson, Jr., Chantel E. Lenard, Gary Jacobs, Amy Hanson, and Jacky Wu (collectively, the "Director Defendants").  *See* ECF No. 119 ("FAC" or "Complaint"), ¶¶ 37-46.  The officers named as Defendants are former Chief Executive Officer Andrew Fox, former Chief Financial Officer Leah Schweller, and former Chief Operations Officer and interim Chief Executive Officer Craig Denson (collectively, the "Management Defendants").  *See id.* ¶¶ 33-36.  And, as discussed in greater detail below, there are two groups of entity Defendants.  The first is composed of entities controlled by Defendant Kenneth Orr, who invested Charge's money, namely the Korr Acquisitions Group and Korr Value L.P. (collectively, with Orr, the "KORR Defendants").  *See id.* ¶¶ 47-50.  The second is composed of major lenders to Charge: Arena Investors, LP; AI Amped I, LLC; AI Amped II, LLC; Mt. Whitney Securities, LLC; Arena Origination Co., LLC; Arena Finance Markets, LP; Arena Special Opportunities Fund, LP; Arena Special Opportunities Partners, I, LP; Arena Structured Private Investments LLC; and Arena Investors GP, LLC (collectively, the "Arena Defendants" or "Arena").  *See id.* ¶¶ 51-57.

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. *See generally* ECF No. 119 ("FAC" or "Complaint"). Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims for failure to state a claim. *See* ECF Nos. 125, 163, 166, 168, 171. For the reasons that follow, the Arena Defendants', KORR Defendants', and Andrew Fox's motions to dismiss are GRANTED; the Director Defendants' motion to dismiss is GRANTED in part and DENIED in part; and Craig Denson and Leah Schweller's motion to dismiss is also GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g., Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *see also, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("*ATSI*") (stating that a court may consider "legally required public disclosure documents filed with the SEC" on a Rule 12(b)(6) motion to dismiss).

## A.  Charge's Formation and Relationship with Kenneth Orr

The company that is at the heart of this case, Charge, began its corporate life in May 2003 as an "industry agnostic" "shell company" known as "E-Education Network Inc." FAC ¶¶ 63, 67. Two years later, it was rebranded "GoIP Global, Inc." *Id.* ¶ 63. From then until May 2020, Kenneth Orr controlled more than 80% of GoIP Global's voting shares and served as its Chief Financial Officer ("CFO"), President, and Chairman of the Board. *Id.* ¶ 64. On May 8, 2020, Phillip P. Scala was appointed as the Interim Chief Executive Officer ("CEO") of GoIP Global. *Id.* ¶ 65. The next day, he apparently entered GoIP Global into a limited partnership

agreement with KORR Value L.P. (the "KORR Value LPA").  *Id.*  Under the terms of the KORR Value LPA, GoIP Global was made a limited partner in KORR Value L.P. and gave the fund's general partner — KORR Acquisitions — the power to direct investments of its capital and "unfettered authority to deny requests by GoIP Global to withdraw its invested capital."  *Id.* Because KORR Acquisitions was (and presumably still is) controlled by Orr, *see id.* ¶ 48, this meant, in effect, that Orr himself had sole and dispositive power over any investments GoIP Global made through KORR Value L.P.

According to Orr, GoIP Global's goal during this time was to "build market cap[italization] through a series of accretive acquisitions," *id.* ¶ 67, which it began to undertake in the summer and fall of 2020.  In May 2020, it acquired Transworld Enterprises, Inc. and, in October, it acquired two additional companies: GetCharged, Inc. and PTGi International Carrier Services, Inc. ("PTGi"). *Id.* ¶¶ 66, 68-69.  Andrew Fox was the CEO of GetCharged, Inc., and Craig Denson was the President and CEO of PTGi.  *Id.* ¶¶ 68-69.  After consummation of the GetCharged, Inc. acquisition, Scala resigned as interim CEO of GoIP Global, and Fox replaced him in that role.  *Id.* ¶ 68.  At the same time, Denson began serving as GoIP Global's Chief Operating Officer ("COO").  *Id.* ¶ 35.  Shortly thereafter, in January 2021, the firm changed its name to Charge Enterprises, Inc, *id.* ¶ 70, and officially began operations as an "electrical, broadband, and [electric vehicle] charging infrastructure company," *id.* ¶ 59.

In and around this period, Charge was deeply connected with Orr and the entities closely associated with him.  From May 2020 to September 2021, for example, Orr served as the Chairman of the Board of Directors of Charge, *see id.* ¶ 47, and owned nearly half of the company's voting shares, *see id.* ¶ 106.  Additionally, during the fourth quarter of 2020, Charge (then GoIP Global) entered into an "investment advisory relationship" with KORR Acquisitions

3

in which that entity, which was controlled by Orr, agreed to provide consulting and advisory services to Charge in exchange for fees (the "Informal Arrangement"). *See id.* ¶¶ 136-37. As a result of this Informal Arrangement, Charge's management began receiving investment account activity statements from Orr stating that the name of the account being managed for Charge was "Korr Value, L.P." and listing the "Customer Type" as "Partnership." *Id.* ¶ 145.

But during the summer of 2021, as Charge prepared to seek a listing on the NASDAQ stock exchange, the SEC and NASDAQ "raised a number of questions regarding Orr's involvement with Charge," including the nature of the Informal Arrangement. *Id.* ¶¶ 101, 139. (Orr had previously been convicted in connection with the fraudulent sale of stock and had been permanently barred from associating with securities brokers and dealers by the SEC. *See id.* ¶ 101 n.3.) In response, Charge clarified in draft registration statements ("DRSs") that its Informal Arrangement with KORR Acquisitions was "at will" — i.e., that it could "be terminated at any time" — and that it intended to keep its investment to "less than 20% of [Charge's] assets." *Id.* ¶¶ 140, 143 (emphasis omitted). Additionally, on September 14, 2021, Orr stepped down from his role as Chairman and divested a large portion of his holdings in Charge; public filings showed that he reduced his share to approximately 10% of the firm's outstanding shares. *See id.* ¶ 102-03. None of the public filings, however, indicated what happened to the roughly sixty million shares that Orr divested, *see id.* ¶ 107, but they disclosed that, around the same time, a new entity — the Gabriel 613 Trust ("Trust") — emerged as the owner of nearly 20% of Charge's outstanding common stock, *see id.* ¶ 108. A subsequent filing by Orr, on June 22, 2022, disclosed that its trustee — Greg Goldberg — was a limited partner in KORR Value L.P. and its beneficiaries were Orr's children. *See* ¶¶ 109, 112. Nonetheless, Orr expressly disclaimed any beneficial ownership of Charge shares owned by the Trust. *Id.* ¶ 112.

4

Additionally, Charge deepened its relationship with KORR Acquisitions (and thus Orr) for investment advisory services. Late in 2022, it disclosed that it had entered into a new agreement (the "Strategic Advisor Agreement") with KORR Acquisitions, pursuant to which it would provide KORR Acquisitions with "an upfront payment of $500,000" and an "annual advisory fee" of $300,000 in exchange for, among other things, "strategic investment advice." *See id.* ¶¶ 150-52 (internal quotation marks omitted).

**B. Charge's Relationship with Arena and the Side Letter**

At the same time, Charge was also building a relationship with Arena, a major lender. In May 2021, the two entered into a securities purchase agreement ("SPA") that raised nearly $17 million in exchange for promissory notes that were partially convertible for Charge stock. *Id.* ¶¶ 73, 75. On December 17, 2021, Charge entered into another SPA with Arena to raise another $20 million via promissory notes, with repayment due on November 19, 2023. *Id.* ¶ 77. Under the terms of that SPA, Charge also issued to Arena approximately $7 million worth of shares and warrants to purchase up to an additional two million Charge shares at $4.00 per share. *Id.*; *see also* ECF No. 119-1. These SPAs were fully disclosed in public filings. *See* FAC ¶¶ 79, 90, 96. As a result of these agreements, Arena held approximately 10% of Charge's outstanding common stock outright and held instruments that were convertible for another 10%. *Id.* ¶ 176.

But unbeknownst to the investing public and undisclosed in any public filings, Orr (through the KORR Value L.P.) and Fox entered into a side agreement (the "Side Letter") with Arena at the same time as the December 17, 2021 SPA. *See id.* ¶ 82; ECF No. 119-2 ("Side Letter"). Under the terms of the Side Letter, KORR Value and Fox each pledged to transfer 4.5 million shares of Charge common stock to Arena for a total of $2 million, *see* FAC ¶ 82, "[i]n addition to the consideration granted to [Arena] pursuant to the [December 17] SPA," and "as an

additional inducement to [Arena] to invest in [Charge]," Side Letter 1.  On December 17, 2021, apparently in connection with the Side Letter, two third-party entities — Bar-Marc Realty, LLC and the Trust — signed and delivered to Charge "representation letters" specifying the terms of the transfer.  FAC ¶ 83; *see also* ECF No. 119-3 ("Rep. Ltrs.").  Ultimately, however, Fox was either unwilling or unable to transfer the shares to which he had committed and apparently requested, "in his capacity as [Charge's] Chief Executive Officer," FAC ¶ 115 (emphasis omitted), that Orr fulfill his obligation, *id.* ¶¶ 85-86.  In exchange, he promised that Charge would reimburse Orr for the value of the 4.5 million shares, as measured by Charge's stock price when it listed on the Russell 2000 Index.  *See id.* ¶ 87.  Accordingly, on June 2, 2022, the Trust transferred shares to Arena "at Orr's direction."  *Id.* ¶ 116 (emphasis omitted).  A few weeks later, on June 24, 2022, Charge listed on the Russell 2000 Index at $5.46 per share.  *Id.* ¶ 88.  In a preliminary proxy statement filed on July 13, 2022, Charge disclosed that the number of shares owned by the Trust had decreased by 4.5 million, but it did not disclose that the decrease was a result of the Side Letter.  *See id.* ¶¶ 118-19.

## C.  Problems with Orr and Arena Emerge

In public filings and statements, Charge and its officers placed particular emphasis on the strength of the firm's balance sheet and financial discipline, stating that it had "a tremendous amount of cash," *id.* ¶ 122 (internal quotation marks omitted), and reporting between $30 to $60 million in marketable securities, cash, and cash equivalents between 2021 to 2023, *see id.* ¶¶ 123-24.  And in one of her first statements after being hired as Chief Financial Officer in September 2021, Schweller stated that her "immediate focus," as CFO, "[would] be on ensuring resilience in accounting and robust internal controls over financial reporting."  *Id.* ¶ 126 (cleaned up).  Likewise, Fox emphasized a need to "invest in [Charge's] back office" to ensure the

"[Sarbanes-Oxley Act] compliance" required to "stand up a public entity and build a[n] infrastructure worthy of a 50-year run." *Id.* ¶ 128 (emphasis omitted).  He also stated that Charge had a "zero tolerance policy" for covering up any mistakes regarding its finances. *Id.* ¶ 130 (emphasis omitted).

Despite Charge's public proclamations, the management team privately began to recognize the possibility that the firm could face a liquidity crunch because of liabilities coming due, including the tens of millions of dollars it owed to Arena pursuant to the 2021 SPAs.  *See id.* ¶ 156.  On December 3, 2022, Denson emailed Orr, Fox, Schweller, and other members of Charge's finance team notifying them that the company had been "unable to generate enough business in November" to cover liabilities that would be due in January and would therefore "require $8M back from the investment account" run by Orr.  *Id.* ¶ 157 (internal quotation marks omitted).  Orr acknowledged receipt of the email and indicated that he would be prepared to return $8 million.  *See id.*  Five days later, Denson followed up, informing Orr that the company would instead need $7 million, but sooner, with $2 million needed before the end of the year and $5 million in mid-January.  *Id.* ¶ 158.  Schweller chimed in, noting that she was "[g]etting questions from analysts on cash balance," and asked if there was an "estimated return balance by 3/31/23."  *Id.* ¶ 159 (cleaned up).  Denson replied that the goal was to have $14 million available by that date.  *See id.* ¶ 160.  It is not clear from the record whether Orr returned the $7 million requested by January.

But the company's real liquidity problems began in April 2023, when Denson informed Orr that Charge would require the complete return of its invested funds by November 1, 2023, to address, among other things, its outstanding debt to Arena, which was due November 19, 2023. *Id.* ¶ 162.  A month later, Denson followed up in a new email, stating that Fox and Orr had

agreed to take the following steps to prevent a liquidity crisis: (1) "Leave all existing funds [Orr] is managing in place through to the end of the year"; (2) not send Orr any "excess cash generated by [Charge] now through . . . July" and to "look at safe / liquid places for these funds"; and (3) have all of Charge's funds returned by "October / November." *Id.* ¶ 166 (cleaned up). There was some disagreement over this plan, with Schweller and Denson recommending that Fox withdraw the funds from the account run by Orr immediately because Charge was "continu[ing] to lose money." *Id.* ¶¶ 167-68 (internal quotation marked omitted). But they ultimately acknowledged that it was Fox's "call as CEO." *Id.* (internal quotation marks omitted).

Accordingly, beginning in May of 2023, Charge's management team and Orr negotiated and agreed to a series of "drawdown schedules" that set out the dates by which Orr would return Charge's investment capital. *Id.* ¶ 164. Under the terms of the first drawdown schedule, Orr agreed to return $10 million by July 2023. *Id.* ¶ 165. But despite that agreement, Orr returned only $5 million, a fact that was not disclosed to investors. *Id.* ¶ 169. Then, on July 25, 2023, Schweller emailed Orr stating that the company "needed $10 million returned immediately." *Id.* ¶ 170. Denson followed up, stating that he would provide "a schedule in a week or so" for returning the remaining funds. *Id.* (internal quotation marks omitted). On August 22, 2023, Denson and Orr confirmed a second drawdown schedule for returning the remaining $14 million of company funds invested with Orr: $3 million was to be returned by the first week of September, another $3 million by the end of September, $6 million by the end of October, and the remainder in early November. *See id.* ¶ 171. Once again, however, Orr failed to meet the

schedule and returned only $2.25 million by the end of September and $1.75 million in October, none of which was disclosed to investors. *See id.* ¶¶ 192, 194-95.

Around the same time, Charge's relationship with Arena was also deteriorating. Charge sought to either refinance its loans with Arena or seek additional financing to pay them off, but Arena took the view that certain provisions of the SPAs it had entered "prohibit[ed] [Charge] from refinancing . . . and from incurring additional indebtedness . . . without [Arena's] consent." *See* ECF No. 165-6 ("2Q 2023 10-Q"), at 3.[2] Charge disagreed with that position and, in an August 14, 2023 filing, publicly disclosed that it planned to "take appropriate action to preserve the Company's rights," including "litigation with [Arena], whether brought by us or against us." *Id.*; *see also* FAC ¶ 247. Around the same time, Arena sent an open letter to Charge's Board, FAC ¶ 117, expressing disappointment in the firm's "underperformance" and attributing it to the company's "lack of leadership and public company experience of [m]anagement, . . . and failure to achieve profitability," *id.* ¶ 180 (internal quotation marks omitted). Arena nonetheless expressed that its "strong preference" was to "work with Charge collaboratively regarding our ideas and [] request[ed] a meeting with [the] Board." *Id.* ¶ 177 (internal quotation marks omitted). Just a few days later, Charge announced Fox's resignation as CEO and Chairman of the Board, effective August 31, 2023. *See id.* ¶ 181. Denson was appointed interim CEO while Fox stayed on as a director. *See id.* But Arena remained dissatisfied. It sent another open letter to the Board in September 2023 that took an even harder line. *Id.* ¶ 183. It demanded that Charge take action in seven key areas "immediately" and requested that Arena be "consulted in the process of searching for additional director candidates" and "in the CEO search process." *Id.*

---

[2]    Citations to 2Q 2023 10-Q are to the page number or numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

¶¶ 184-86 (internal quotation marks omitted).  In response, Charge retained the services of Cravath, Swaine & Moore LLP ("Cravath") to investigate the legality of Arena's actions and Charge's ability to bring suit.  *Id.* ¶ 235.  Cravath ultimately delivered a draft complaint, but Charge never filed it.  *See id.* ¶¶ 20, 242, 254.

Against this backdrop and with growing urgency, Denson emailed Orr on November 1, 2023, reminding him of Charge's obligations to Arena and that the company therefore "need[ed] [its] money returned ASAP this week."  *Id.* ¶ 196 (internal quotation marks omitted).  He further stated that he had "communicated to [Charge's auditor] and . . . board the schedule which was agreed to [in August 2023]" and that Orr's failure to meet it was "causing issues / difficult conversations."  *Id.* (internal quotation marks omitted).  The next day, Denson and Orr agreed to a third drawdown schedule: $1 million by the end of the day, $3 million by November 6, 2023, $3 million by November 14, 2023, and the remainder by the "end of 2023, or perhaps in 2024."  *Id.* ¶ 197 (internal quotation marks omitted).  Once again, however, Orr failed to meet even the first deadline of this new schedule.  *See id.* ¶ 199.  On November 3, 2023, Denson warned Orr that Charge's "ability to continue as a going concern" was in jeopardy, and they agreed to yet another drawdown schedule: $1 million by end of day, $3 million early in the week of November 6, 2023, and $6.75 million by November 13 or 14, 2023.  *Id.* ¶ 200.  Orr returned only $800,000 on November 3, 2023, and another $200,000 on November 6, 2023.  *Id.* ¶ 201.

Throughout this period, Charge and its officers did not disclose any of the drawdown schedules, let alone Orr's repeated failures to meet them.  Indeed, its Q3 2023 quarterly report, which was released on November 8, 2023, expressly stated that the company had $51 million in cash and cash equivalents, *id.* ¶¶ 204, 206, and that it "expect[ed] to have sufficient resources to meet our current operating liquidity and capital requirements for the next 12 months, including

10

after accounting for the repayment of the $27.8 million that comes due and payable under the [Arena SPAs] on November 19, 2023," *id.* ¶ 207 (cleaned up). And on an earning call the same day, Schweller and Denson reiterated that message, assuring investors that Charge had "the proper liquidity to . . . service [its] debt," and was "on track to fully pay the outstanding [Arena SPAs]." *Id.* ¶ 208 (cleaned up).

Matters came to a head on November 12, 2023, when Denson again emailed Orr, emphasizing that it was "critical to [Charge's] liquidity" that the company receive the approximately $6.5 million Orr had committed to return in the fourth drawdown schedule. *Id.* ¶ 209 (cleaned up). But the next day, Orr formally notified Charge's Chief Legal Officer that he would not be returning the funds as promised because, in his view, the parties' relationship was governed by the KORR Value LPA that Scala had signed in 2020, which provided KORR Acquisitions (and thus Orr) with the "sole and absolute" right to limit redemptions of Charge's investments "at any time for any reason." *Id.* ¶ 210 (internal quotation marks omitted). This was the first time Orr had ever mentioned the KORR Value LPA; he said he was invoking his rights under that agreement to refuse because the requested funds were "cross-collateralized" with other accounts that were "under water." *Id.* ¶ 210 (internal quotation marks omitted). On November 19, 2023, Arena's loans became due; Charge lacked the liquidity to pay.

## D. Charge Discloses Its Liquidity Problems and Files for Bankruptcy

The first public disclosure of these problems was in a November 21, 2023 filing, in which Charge stated that it had received a default notice from Arena and admitted that its previous representations regarding its liquidity were false because those sums had apparently been invested in an illiquid partnership interest in KORR Value L.P. and thus remained inaccessible. *See id.* ¶ 211. It warned that continued liquidity issues could generate additional

11

defaults, which could "render the Company insolvent and unable to sustain its operations and continue as a going concern." *Id.* ¶ 212 (internal quotation marks omitted).  On this news, Charge's stock price, which had already been in decline, plummeted approximately 27%.  *See id.* ¶¶ 81, 214.

Charge quickly fell into a death spiral.  On December 6, 2023, it filed another public disclosure stating that it had received an additional default letter from Arena and that it was ceasing certain operations to preserve its liquidity.  *See id.* ¶ 219.  Its stock price dropped another approximately 15% on the news.  *Id.* ¶ 220.  Then, on January 25, 2024, Charge disclosed that it had received a foreclosure notice from Arena, which would auction off certain of the company's assets to satisfy its debts.  *See id.* ¶ 221.  Charge's stock price fell another 8% on that disclosure. *Id.* ¶ 222.  Finally, on February 28, 2024, Charge notified its shareholders that it had signed a restructuring agreement with Arena and would be entering Chapter 11 bankruptcy, leading its stock price to fall another 50%.  *See id.* ¶¶ 225-26.  The next day, NASDAQ suspended trading of Charge's common stock, *see id.* ¶ 227, and, one week later, Charge officially filed a petition for bankruptcy, *see id.* ¶ 229.[3]

The bankruptcy proceedings publicly revealed the existence of the Side Letter and Charge's retention of Cravath for the first time.  *See id.* ¶¶ 20, 354.  They also permitted Orr — through KORR Acquisitions — to file a proof of claim for approximately $25 million against Charge for the value of the reimbursement he claimed he was owed for fulfilling Fox's obligations under the Side Letter.  *See id.* ¶ 88.  Additionally, through the bankruptcy process,

---

[3]     In light of the bankruptcy proceedings, which are ongoing, Charge is not named as a Defendant in this lawsuit.  *See* FAC ¶ 59.

Arena acquired control of Charge, and Charge, the KORR Defendants, and Arena resolved all claims against one another. *See id.* ¶ 25.[4]

## E. Procedural Background

On May 28, 2024, Plaintiffs filed this putative class action, naming as Defendants Denson, Fox, and Schweller and challenging the legality of several statements they had made and signed off on while leading Charge. *See* ECF No. 1. After several amendments, *see* ECF Nos. 51, 66, 85, 119, adding additional Defendants and causes of action, the operative Complaint now alleges that the Arena Defendants, the KORR Defendants, the Director Defendants, and the Management Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by making false and misleading statements and/or omitting material information in dozens of filings and public statements, relating to: (1) the existence of the Side Letter; (2) the existence of the KORR Value LPA; (3) Charge's liquidity problems; (4) Orr's continuing involvement in Charge through the Trust; (5) the dispute between Arena and Charge; and (6) certain certifications made pursuant to the Sarbanes-Oxley ("SOX") Act. *See* FAC ¶¶ 386-410.[5] It further alleges that all Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by controlling the violations of Section 10(b) and Rule 10b-5. *See id.* ¶¶ 411-19. And finally, it asserts common law fraud

---

[4]    Separately, Arena has filed suit against several of Charge's former officers and directors, alleging they committed fraud, negligent misrepresentation, and breached their fiduciary duties. *See AI Amped I, LLC v. Hanson*, No. 653261/2024, Dkt. No. 2 (N.Y. Sup. Ct. June 26, 2024). That case is currently pending in New York state court.

[5]    For convenience, attached as an Appendix is a table listing all of the public filings alleged to contain misstatements and/or material omissions and the people or entities who signed them. *See* FAC ¶ 247, Table 3: Misstatements by Date and Signatory ("Table 3").

claims against the Management Defendants, *see id.* ¶¶ 420-26, and aiding-and-abetting claims against the KORR and Arena Defendants, *see id.* ¶¶ 427-33.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012). The court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

To the extent that Plaintiffs here allege fraud, they must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. That Rule generally requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co., Inc.,* 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted). To the extent that Plaintiffs here allege securities fraud, they must *also* satisfy the requirements of the Private Securities Litigation

14

Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (internal quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff "must allege facts supporting a strong inference with respect to each defendant").  The "strong inference" must be "more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

## DISCUSSION

As noted, Plaintiffs' claims are based on (1) the existence of the Side Letter; (2) the existence of the KORR Value LPA; (3) Charge's liquidity problems; (4) Orr's continuing involvement in Charge through the Trust; (5) the ongoing dispute between Arena and Charge; and (6) certain certifications made pursuant to the SOX Act.  Given that Plaintiffs' Section 20(a) and common-law fraud claims largely rise and fall with their Section 10(b) claims, the Court will address the Section 10(b) claims first, taking each incident in turn.

### A.  Section 10(b) Claims

Plaintiffs bring two flavors of Section 10(b) claims: (1) material misrepresentation or omission claims and (2) scheme liability claims.  To state a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

15

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).  By contrast, to state a scheme liability claim, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *ATSI*, 493 F.3d at 101.  "Unlike a misrepresentation or omission claim under Rule 10b-5(b), [a] scheme liability claim is aimed at inherently deceptive conduct and does not require a misleading statement or omission."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 534 (S.D.N.Y. 2020) (internal quotation marks omitted), *aff'd sub nom.*, *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order).  Instead, "scheme liability is triggered where the defendant performed an inherently deceptive act that was distinct from an alleged misstatement: i.e., sham agreements, sham transactions, sham companies."  *Sec. & Exch. Comm'n v. Farnsworth*, 692 F. Supp. 3d 157, 189 (S.D.N.Y. 2023) (internal quotation marks omitted).  Accordingly, while "misstatements and omissions can form *part of* a scheme liability claim, . . . an actionable scheme liability claim also requires something *beyond* misstatements and omissions."  *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).

As noted, the PSLRA requires a plaintiff to plead scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity.  *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted).  To meet that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  Additionally, a plaintiff must "allege facts

16

supporting a strong inference with respect to *each* defendant." *Lions Gate*, 165 F. Supp. at 22

(emphasis added). A complaint sufficiently alleges scienter when "a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. A plaintiff may satisfy that

requirement "by alleging facts . . . constituting strong circumstantial evidence of conscious

misbehavior or recklessness." *ATSI*, 493 F.3d at 99.[6] That, in turn, requires allegations of either

actual intent or "conscious recklessness — i.e., a state of mind approximating actual intent, and

not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94,

106 (2d Cir. 2015) (cleaned up). More specifically, recklessness requires allegations of conduct,

"which is at the least, . . . highly unreasonable and which represents an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142

(2d Cir. 2001) (internal quotation marks omitted). Accordingly, securities fraud claims premised

on recklessness generally survive motions to dismiss only when plaintiffs "have specifically

alleged defendants' knowledge of facts or access to information contradicting their public

statements" because, "[u]nder such circumstances, defendants knew or, more importantly, should

---

[6] Alternatively, a plaintiff may satisfy the requirement "by alleging facts . . . showing that the defendants had both motive and opportunity to commit the fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs disclaim reliance on that theory here. *See* ECF No. 176 ("Pls.' Combined Opp'n"), at 41.

have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

### 1.  Omissions Relating to the Side Letter

Plaintiffs allege first that all Defendants violated Section 10(b) by failing to disclose the existence and terms of the Side Letter entered into by Fox, Korr Value L.P. (and thus Orr), and the Arena Defendants.  FAC ¶¶ 253, 388, 402-03.  As noted, that Side Letter was signed on December 17, 2021, the very same day as Arena and Charge's publicly disclosed $20 million SPA, and committed Orr and Fox to each transfer 4.5 million shares of Charge common stock to Arena for $2 million.  *See id.* ¶¶ 77, 80-82.  Invoking the scheme liability provisions of Rule 10b-5, Plaintiffs assert that the Arena and Management Defendants engaged in a "scheme to conceal from the investing public the existence of the Side Letter agreement," *id.* ¶ 402, which they maintain was a "deceptive and manipulative act," *id.* ¶ 404.  They also bring misrepresentation and omission claims against the KORR, Director, and Management Defendants, arguing that these Defendants' failure to disclose the existence and terms of the Side Letter in any of the public filings that referenced the SPA was a material omission because, without that information, the description of the terms of the SPA in these filings was materially misleading.  *See id.* ¶¶ 81, 253.

For starters, the scheme liability claims against the Arena and Management Defendants are easily dismissed.  The essence of these claims is that Defendants "knowingly and with agreement chose not to disclose the terms of the Side Letter agreement to the investing public." *Id.* ¶ 403.  But "an actionable scheme liability claim . . . requires something *beyond* misstatements and omissions." *Rio Tinto*, 41 F.4th at 49.  Plaintiffs fail to identify any misleading or deceptive conduct in which these Defendants allegedly engaged that is

18

independent of the alleged omission.  They do not, for example, allege that entry into the Side

Letter was itself misleading or deceptive.[7]  Accordingly, their attempt to repackage garden-

variety misrepresentation or omission claims as scheme liability claims fails as a matter of law.

Plaintiffs' misrepresentation and omission claims, however, require more individualized

analysis for each set of Defendants.  The Court begins with the claims against the KORR

Defendants, which fail for the simple reason that the KORR Defendants did not sign or issue any

of the public filings that Plaintiffs identify as materially misleading due to the omission of the

Side Letter.  *Compare* FAC ¶ 253 (identifying those documents), *with id.* ¶ 247, Table 3 ("Table

3") (listing only one filing signed by the KORR Defendants after the execution of the Side

Letter); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) ("[A] defendant can

be held liable only for specific false statements to the extent that it can be said to have made

those statements under Rule 10b-5(b)." (internal quotation marks omitted)).  By contrast, it is

undisputed that nearly all of the Director Defendants signed the publicly disclosed documents

describing the terms of the SPA.  *See* Table 3.[8]  Instead, those Defendants argue that they cannot

---

[7]    In their opposition papers, Plaintiffs argue for the first time that the Arena Defendants gave their express "consent and approval" to Charge's press release disclosing the material terms of the SPA and, therefore, "participated in the decision-making process by which Arena and Charge agreed to conceal the Side Letter."  ECF No. 147 ("Pls.' Arena Opp'n"), at 13-14 (cleaned up).  But Plaintiffs "cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."  *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013).  And even if they could, the Arena Defendants' "participation" is, again, just another way of characterizing the decision to omit the relevant information from public filings and is thus not actionable under the scheme liability provisions of Rule 10b-5.  *See Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).

[8]    The only exception, as Plaintiffs note, is Jacky Wu, who did not sign any of the documents in question.  *See* Pls.' Combined Opp'n 27.  Accordingly, regardless of the merits of the claims against the other Director Defendants, the claims relating to the Side Letter against Wu must be and are dismissed.

be held liable because: (1) omission of the terms of the Side Letter did not render the terms of the SPA misleading and was otherwise immaterial; and (2) they were not aware of the existence of the Side Letter at the time they issued the relevant disclosures and therefore could not have acted with the requisite scienter. *See* ECF No. 164 ("Directors' Mem."), at 11-12, 17-18.

The first argument is almost certainly unavailing, but the Court need not and does not address it because the Complaint plainly fails to plead scienter with respect to the Director Defendants. In particular, Plaintiffs allege no facts supporting an inference that any of the Director Defendants knew of the Side Letter's existence until it was revealed years later in bankruptcy proceedings. Instead, Plaintiffs assert that they "knew, or should have known about the Side Letter, as the . . . SPA was a major financing agreement for the company," that "required Board approval." ECF No. 176 ("Pls.' Combined Opp'n"), at 29. But the Directors' knowledge and approval of the SPA says nothing about their knowledge of the Side Letter, which was not referenced in the SPA and not signed by any Director Defendant. Trying a slightly different tack, Plaintiffs insist that the Director Defendants had to know about the Side Letter because "Charge received Representation Letters regarding [it]." *Id.* at 30 (citing FAC ¶ 83). But the Complaint does not specifically allege that the *Directors* received those representation letters, which were signed only by representatives of the Arena Defendants and third-party entities and do not contain any express references to Fox or the Korr Value L.P. *See* Rep. Ltrs.; *see also Lions Gate*, 165 F. Supp. 3d at 22 (noting that "plaintiffs must allege facts supporting a strong inference [of scienter] with respect to *each* defendant" (emphasis added)). Thus, there is nothing in the Complaint indicating that the Director Defendants had knowledge of facts or access to information contradicting the public filings they signed disclosing the terms of

20

the SPA. Accordingly, the claims against them regarding the Side Letter must be and are dismissed.

The Management Defendants — Denson, Schweller, and Fox — also signed the relevant disclosures and press substantially the same arguments as the Director Defendants. *See* ECF No. 171-1 ("D&S Mem."), at 23-25; ECF No. 170 ("Fox Mem."), at 15-16. The claims against Denson and Schweller do suffer from the same fatal flaw: There are no allegations in the Complaint suggesting that they were even aware of the Side Letter's existence. Fox, however, was indisputably aware of the terms of the Side Letter because he was — at least initially — a party to it. Nevertheless, the claim against Fox relating to the Side Letter fails for an independent reason: The Complaint fails to adequately allege loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (defining loss causation as "a causal connection between the material misrepresentation and the loss"). The loss causation requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura Pharm.*, 544 U.S. at 345). "A complaint may establish loss causation by demonstrating, *inter alia*, '(1) a corrective disclosure or (2) a materialization of a concealed risk.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 356 (S.D.N.Y. 2023) (quoting *Omnicom Grp.*, 597 F.3d at 511). Given that the Side Letter was revealed to the public only after Charge's shares had stopped trading, *see* FAC ¶ 89, Plaintiffs

21

wisely disclaim any reliance on the former prong. *See* Pls.' Combined Opp'n 47. Thus, the question is whether Plaintiffs plausibly allege the materialization of a concealed risk.

They do not. "To establish the latter [prong], a plaintiff must make a factual allegation showing that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Altimeo*, 663 F. Supp. 3d at 356 (internal quotation marks omitted). But "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* Here, Plaintiffs fail to allege that any of the risks implied by the undisclosed Side Letter ultimately materialized or led to their losses. They do not allege, for example, that the transfer of Charge's shares pursuant to the Side Letter led to any decline in the share price of the firm, or even that it ultimately affected Charge's operations or financial situation. Instead, they maintain that Orr and Fox's transfer of shares to Arena at a price "approximately 25 times less than market price," demonstrates that "Arena was aware that Charge's common stock was substantially overvalued and . . . had serious concerns about Charge's creditworthiness," and that Fox and Orr "clearly shared those concerns." Pls.' Combined Opp'n 47 (emphasis omitted). And they argue those risks eventually materialized when Charge's stock price collapsed and it defaulted on its loans. *See id.*

But that theory suffers from two fatal flaws. First, the causal chain between the June 24, 2022 transfer of the shares pursuant to the Side Letter, FAC ¶ 354, and the collapse in Charge's share price over a year later in 2023 that occurred primarily in response to disclosure of Charge's liquidity problems, *see id.* ¶¶ 214-27, is too attenuated to demonstrate causation. *Cf. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (finding no loss causation because the plaintiffs had failed to allege that the "subject" of misstatements "is the cause of the decline in

22

stock value that plaintiffs claim as their loss" (emphasis omitted)).  Put differently, there is nothing in the Side Letter that, if disclosed, would have indicated to a reasonable investor that Charge's default and bankruptcy were foreseeable.  Second, Plaintiffs' assertion that the terms of the Side Letter indicated that all parties agreed that Charge's stock was overvalued and that the company itself was not creditworthy is implausible.  If Arena truly had serious concerns about the company's creditworthiness, why would it want to purchase even more shares of Charge than were publicly disclosed in the SPA, as opposed to taking cash or other secured assets?  By the same token, Plaintiffs do not explain why Fox and Orr would agree to sell their shares to Arena at below-market prices to induce its investment if they doubted Charge's ability to continue operations.  Presumably, they could instead have just sold their shares on the public market and pocketed the difference.  Accordingly, the Court concludes that Plaintiffs fail to plausibly plead loss causation with respect to the Side Letter.  For that reason and those stated above, the claims against all Defendants relating to the nondisclosure of the Side Letter must be and are dismissed.

## 2.  Omissions Relating to the KORR Value LPA

Next up, Plaintiffs allege that the Director, Management, and KORR Defendants violated Section 10(b) by failing to disclose the existence and terms of the KORR Value LPA.  As noted, on May 9, 2020, while acting as interim CEO, Phillip P. Scala signed the KORR Value LPA giving KORR Acquisitions (and thus Orr) the unfettered power "to deny requests by [Charge] to withdraw its invested capital."  FAC ¶ 65.  Plaintiffs assert that the omission of the LPA from many of Charge's public filings was misleading in at least two ways.  First, it rendered statements the firm made in those filings regarding the extent of its liquid assets false and misleading because a significant portion of those assets were not actually liquid; instead, they were locked up in Charge's limited partnership interest in KORR Value, L.P.  *See id.* ¶¶ 247-49.

Second, it rendered Charge's subsequent disclosures about the nature of its relationship with Orr — codified in the Informal Arrangement and Special Advisor Arrangement — misleading because it meant those disclosures failed to alert investors to the real nature of their relationship. *See id.* ¶¶ 143, 148, 280.[9] Given Charge's repeated public statements regarding its liquidity and the centrality of the liquidity crisis to its eventual bankruptcy, no Defendant seriously disputes — nor could they — that the failure to disclose the existence of the KORR Value LPA was a material omission. Instead, they primarily argue that they could not have acted with the requisite scienter. The Court will analyze the allegations against each set of Defendants in turn.

First, the Court concludes that the claims against the Management Defendants fail because the Complaint does not allege that they had knowledge of the existence of the KORR Value LPA. The Complaint itself makes clear that the KORR Value LPA was signed before any of the Management Defendants joined the firm, *see id.* ¶¶ 65-69, and there are no allegations that its terms were shared with them after they took on their roles. Instead, Plaintiffs rely on two pieces of circumstantial evidence to show knowledge: (1) monthly brokerage account statements apparently received by the Management Defendants for the "Charge Investments . . . Account," which listed the name of the owner of the account as "Korr Value, LP" and described the "Customer Type" as "Partnership," *see id.* ¶¶ 145-46; and (2) a May 22, 2023 email from Denson to Orr, Fox, and Schweller stating that Charge would not send Orr any further "excess cash" and would "look at safe / liquid places for these funds," *id.* ¶ 166. But those allegations

---

[9]     Plaintiffs also argue in passing that these Defendants' failure to disclose the material terms of the Special Advisor Agreement was, in itself, a material omission because it misled investors into thinking that the Special Advisor Agreement did not alter the Informal Agreement, which, they argue, was itself false and misleading. *See* Pls.' Combined Opp'n 20. But the Complaint fails to allege how the narrative description of the Special Advisor Agreement contained in Charge's disclosures was misleading and thus why disclosure of the Agreement itself was required. *See* ECF No. 164 ("Directors' Mem."), at 14. It is therefore inactionable.

are far too slender a reed to support the inference that the Management Defendants knew about the existence of the KORR Value LPA. The descriptions on the monthly account statements are entirely consistent with the terms of the Informal Agreement and Special Advisor Agreement, through which Charge contracted with "KORR Acquistions . . . to buy, sell, trade . . . stocks, bonds and other securities." Fox Mem. 9 (cleaned up). Given that KORR Acquisitions is the general partner of KORR Value L.P., FAC ¶ 210, which, in turn, is a partnership, nothing in the descriptions provided would necessarily tip off the Management Defendants that their funds had been *invested* in KORR Value L.P., as opposed to simply being *managed* by the entity. Likewise, Denson's email about finding a "safe / liquid" place for funds provides little support for the inference that he and the other Management Defendants knew that their funds were being invested pursuant to the terms of the KORR Value LPA. Instead, given Denson and Schweller's contemporaneous statements that Charge was "continu[ing] to lose money," and that things were "only get[ting] worse," *id.* ¶¶ 167-78, the far more compelling inference is that the Management Defendants thought that the money was no longer safe with Orr because his investments had been performing poorly. Thus, the claims against the Management Defendants regarding the nondisclosure of the KORR Value LPA must be and are dismissed.[10]

For similar reasons, the claims against the Director Defendants other than Scala must be dismissed.[11] Specifically, the Complaint does not allege any facts sufficient to raise an inference

---

[10]    In light of that conclusion, the Court need not and does not address the question of whether the Special Advisor Agreement or the KORR Value LPA properly governed the relationship between Charge and Orr. *See* ECF No. 171-1 ("D&S Mem."), at 20. It is enough to say that the Management Defendants lacked any awareness of the latter.

[11]    Plaintiffs also make the somewhat bizarre argument that the Director Defendants' purchase of shares during the Class Period "suggests an agreement among them . . . to influence the market or to rebut a scienter inference." Pls.' Combined Opp'n 41-42. But even so, that does not bear on whether they had knowledge of the KORR Value LPA.

that any of the Director Defendants other than Scala had knowledge of the existence of the KORR Value LPA.  They therefore could not, as a matter of law, have "kn[own] . . . that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308.  Plaintiffs argue that the Director Defendants' approval and "actual knowledge of the Informal Arrangement and [Special] Advisor Agreement," Pls.' Combined Opp'n 21-22, somehow demonstrates their knowledge of the KORR Value LPA.[12]  But the fact that they knew and approved of *those* agreements says nothing about their knowledge of the KORR Value LPA, which was signed before any of them had joined the Board of Directors and is not referenced in any of the publicly disclosed agreements.  *See* FAC ¶¶ 38-45.

By contrast, the Complaint does allege that Scala signed the KORR Value LPA, *see id.* ¶ 210, an allegation that — notwithstanding Scala's contentions, *see* ECF No. 165-10, ¶ 7; Directors' Mem. 25-26 — the Court must assume to be true.  Plaintiffs therefore adequately allege that he "had knowledge of facts . . . contradicting" the various public disclosures he signed regarding Charge's liquidity and relationship with Orr, thus permitting the inference that he "knew or, more importantly, should have known that [he was] misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308.  Furthermore, Scala wisely does not dispute that the other elements of a Section 10(b) claim are plausibly alleged.  As to reliance, for example, Plaintiffs may avail themselves of the fraud-on-the-market theory.  Under that theory, reliance may be presumed if certain requirements are satisfied — namely, "(1) that the alleged

[12]    The Complaint also alleges that the subset of Director Defendants who served as members of the Board's Audit Committee "had access to . . . monthly account statements . . . that plainly indicated the true nature of Charge's interest in the KORR Value limited partnership." FAC ¶ 329.  But for the reasons already explained with respect to the Management Defendants, knowledge of the contents of the monthly account statements is not sufficient to infer scienter with respect to the nondisclosure of the Korr Value LPA.

misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). Each requirement is met here: Charge's statement regarding the extent of its liquidity and its assertion that it could get its investments back "at-will," FAC ¶ 274, was public knowledge. As already noted, those assurances were likely material to a reasonable investor because they directly bore on Charge's ability to satisfy its liabilities. And there is no dispute that Charge's stock traded in an efficient market and that Plaintiffs traded them during the Class Period. Finally, the Complaint also sufficiently alleges loss causation by pointing to the sharp decline in Charge's share price once the company issued a corrective disclosure notifying the public about the existence of the KORR Value LPA. *See id.* ¶¶ 361-62. Accordingly, the claims against all Director Defendants except Scala relating to the KORR Value LPA must be and are dismissed. The claims against Scala, however, survive the motion to dismiss.

Finally, as to the KORR Defendants, the Complaint alleges that Orr failed to disclose the existence of the KORR Value LPA in several DRSs that he signed while acting as Chairman of the Board of Charge, thus rendering the DRSs' descriptions of the relationship between Charge and himself materially misleading. *See id.* ¶¶ 138, 141, 144, 272, 273, 275. That said, "a defendant . . . is liable only for those statements made during the class period," *Lattanzio*, 476 F.3d at 154 (cleaned up), and the DRSs in question were filed between February 12, 2021, and August 25, 2021, *see* Table 3 — two months *before* the Class Period in this case began, *see* FAC ¶ 1. Plaintiffs do not point to any statements made or signed by Orr or any of the other KORR Defendants after the start of the Class Period that were rendered misleading by the omission of

27

the KORR Value LPA.  Accordingly, the claims against the KORR Defendants in that regard must be and are dismissed.  *See, e.g.*, *Wilder v. News Corp.*, No. 11-CV-4947 (PGG), 2015 WL 5853763, at *3 (S.D.N.Y. Oct. 7, 2015) ("Lower courts in this District have interpreted *Lattanzio* as barring securities fraud claims where, as here, they are premised on knowingly false statements made prior to the Class Period.").

### 3.  Omissions Relating to Charge's Liquidity Problems

The next set of misrepresentations and omissions relate to Charge's mounting liquidity problems as it proved unable to claw back the funds it had invested with Orr that it needed to pay back Arena.  As noted, Charge's management team and Orr negotiated several undisclosed "drawdown schedules" for returning those funds over the course of 2023, but Orr failed to comply with all of them and Charge never disclosed his repeated failures until after it had received a notice of default from Arena.  *See* FAC ¶¶ 157-171, 210.  Plaintiffs allege that the Director and Management Defendants violated Section 10(b) by failing to disclose Charge's liquidity issues and Orr's refusal to return the funds in various public filings and statements, which necessarily made its assurances in those same filings to investors that it had sufficient liquidity to service its debts and continue operations materially misleading.  *See* Pls.' Combined Opp'n 30-33.  The Court will analyze the allegations against each set of Defendants in turn.

First, the Court concludes that the Director Defendants cannot be held liable for any omissions regarding Charge's liquidity problems or Orr's refusal to return the funds because they became aware of those issues only *after* they signed the relevant actionable statements and, thus, lacked the requisite scienter.  The only allegation in the Complaint suggesting that the Director Defendants were even aware of these problems is Denson's November 1, 2023 email to Orr telling him that management "ha[d] communicated to . . . our board the [drawdown] schedule

28

which was agreed to in August 2023." FAC ¶ 196 (cleaned up). But that email was sent nearly a month and a half after Charge had issued its August 15, 2023 Registration Statement, which is the last public document signed by any of the Director Defendants. *See* Table 3. It therefore does not support the inference that the Director Defendants "knew . . . that they were misrepresenting material facts related to the corporation," *Novak*, 216 F.3d at 308, when they issued the earlier disclosures. Plaintiffs attempt to resist that conclusion by expanding the scope of the timeline: They argue that the Director Defendants knew about the firm's liquidity issues beginning in December 2022 and that they therefore acted with scienter when they failed to disclose those issues in the 2022 10-K they signed that issued on March 15, 2023. *See* Pls.' Combined Opp'n 31 & n.11. But that argument contradicts the allegations in the Complaint, which says that the *earliest* the Director Defendants knew about firm's liquidity problems was by "the summer of 2023." FAC ¶ 202; *see also K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."). Accordingly, the claims against the Director Defendants regarding Charge's liquidity issues must be and are dismissed.

By contrast, the liquidity-related claims against the Management Defendants rest on stronger grounds. Denson and Schweller both signed Charge's 3Q 2023 10-Q, which issued on November 8, 2023, and: (1) stated that Charge had more than $57.2 million in liquid assets on hand, FAC ¶ 294; (2) stated that Charge "expects to have sufficient resources to meet [its] current operating liquidity . . . , including after accounting for the repayment of the $27.8 million" coming due to Arena on November 19, 2023, *id.* ¶ 296; and (3) reassured investors that Charge did not have "material exposure" with respect to its liquid assets, *id.* And on an earnings

call held the next day, Schweller reiterated the same assurances to investors, while Denson explicitly stated that Charge was "on track to fully pay the outstanding [Arena] notes . . . on or before the maturity date of November 19, 2023." *Id.* ¶ 297.  Denson and Schweller do not seriously dispute the materiality of their omissions in those filings or that statements regarding Orr's repeated failure to return funds were misleading, protesting only that "Charge's ability to timely pay its debts was never in question as long as it could access its funds invested with KORR." D&S Mem. 7-8.  But that was precisely the problem with their omissions: Orr's repeated refusal to return the invested funds raised a significant risk that Charge could not access the funds and would default on its loans.  Any reasonable investor would thus have viewed that information as "significantly alter[ing] the total mix of information made available." *Siracusano*, 563 U.S. at 38 (internal quotation marks omitted).

Instead, Denson and Schweller claim they lacked the requisite scienter when they made these statements because, "as of . . . November 8, 2023, Orr had not yet indicated to Charge that KORR would not return its capital," and "default on the Arena notes was not yet a 'virtual certainty.'" D&S Mem. 27.  But Plaintiffs need not allege that Denson and Schweller knew with "virtual certainty" that Orr would not return the money or that Charge would default on its loans when they made the statements in question.  Instead, they are required only to allege conduct that is "highly unreasonable" and that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (2d Cir. 2001) (internal quotation marks omitted).  That can be a daunting standard, but the Court finds that it is met here.  As early as April 2023, Denson and Schweller knew that the return of the funds invested with Orr was critical to continue operations and pay off the outstanding debt to Arena.  *See* FAC

¶ 162.  In the months leading up to their November 8, 2023 statements, they agreed to *four* different drawdown schedules with Orr, with all of which he failed to comply.  *See id.* ¶¶ 165, 171, 197, 200.  Indeed, despite agreeing to return all $12 million of Charge's funds by the end of October, Orr returned only $4 million by that date.  *See id.* ¶ 195.  That refusal had already led to "issues / difficult conversations" with Charge's auditor and Board.  *Id.* ¶ 196.  And just two days before the November 8, 2023 10-Q issued, Orr again reneged on his commitments, returning only $1 million dollars when he had agreed to return $4 million.  *See id.* ¶¶ 200-01.  Thus, even if Denson and Schweller did not know that Orr intended to refuse to return the remaining funds needed to pay back Arena, the risk that he would not do so was sufficiently clear that they must have been aware of it.  Their failure to disclose that risk in subsequent filings and public statements was thus a departure from the duty of care they owed to investors, permitting the inference that they acted with the requisite scienter in failing to do so.

Denson and Schweller do not dispute that the remaining elements of a Section 10(b) claim are met, and the Court finds they are, substantially for the same reasons as the claim against Scala.  Denson and Schweller's motion to dismiss the Section 10(b) claims against them relating to Charge's liquidity problems therefore must be and is denied.

The claims against Fox, however, present a closer call, but they ultimately fall short.  As noted, he resigned as CEO of Charge on August 29, 2023, and thus, unlike Denson and Schweller, cannot be held liable for the most egregious statements made in the Q3 2023 10-Q and subsequent earnings call.  *See* FAC ¶ 181.  And when the earlier statements regarding Charge's liquidity — e.g., the 2022 10-K (issued March 15, 2023), the 1Q 2023 10-Q (issued May 10, 2023), and the 2Q 2023 10-Qs (issued August 14, 2023), *see* Table 3 — were made, Orr had not yet repeatedly failed to return Charge's funds.  At the time Fox resigned as CEO, the

31

Complaint alleges that Orr had failed to abide by the terms of only the first drawdown schedule established in May, having returned only $5 million rather than the $10 million dollars to which he had agreed. *See* FAC ¶¶ 165, 169. The other failures by Orr occurred after Fox's resignation. *See id.* ¶ 171 (requiring the first return by the first week of September); *id.* ¶ 197 (requiring the first return by November 2, 2023); *id.* ¶ 200 (requiring the first return by November 3, 2023).

To be sure, Fox was clearly aware of the risks of investing with Orr well before his resignation, having apparently agreed to a plan as early as May 2023 that involved not sending Orr any more "excess cash" and instead "look[ing for] for safe/liquid places for these funds." *Id.* ¶ 166. Moreover, he had agreed to that plan against the express advice of Denson and Schweller, who recommended pulling everything from the brokerage account managed by Orr because Charge "continue[d] to lose money." *Id.* ¶ 167. But it was far less clear at that point that the risk would metastasize into a company-ending liquidity problem and result in default, especially since $5 million had been returned and further negotiations regarding a new drawdown schedule had just begun. *See id.* ¶¶ 169-70. Accordingly, and taking into account the totality of the circumstances, the Court cannot say that Fox's failure to disclose the liquidity issues in those earlier filings rose to the level of recklessness — which must "approximat[e] actual intent," *Stratte-McClure*, 776 F.3d at 106 — as opposed to mere negligence.[13] Accordingly, the Section 10(b) claim relating to Charge's liquidity problems against Fox must be and is dismissed for failure to state a claim.

---

[13] To the extent Plaintiffs argue that the timing of Fox's abrupt resignation from the CEO role supports an inference of scienter, *see* Pls.' Combined Opp'n 3, they do not even attempt to explain why that timing was suspicious when Orr had not yet refused to abide by the terms of the second drawdown agreement. Moreover, the argument is at odds with the theory Plaintiffs advance elsewhere that Fox's resignation was a result of pressure from Arena regarding Charge's performance. *See* Pls.' Arena Opp'n 23.

### 4. Omissions and Statements Relating to Orr's Continued Involvement with Charge

Yet another set of misrepresentations and omissions relates to Orr's undisclosed continued involvement in Charge through the Trust.  As noted, in September 2021, in response to SEC and NASDAQ scrutiny, Orr stepped down as Chairman of Charge's Board and divested a large portion of his holdings in Charge, reducing his share of the Company's outstanding public stock from approximately 40% to 10%.  *See* FAC ¶¶ 102-03, 105.  But a year later, Orr apparently directed the transfer of shares from the Trust to fulfill Fox's obligations under the Side Letter, even as he disclaimed any beneficial ownership of its shares.  *See* FAC ¶ 260.  According to Plaintiffs, Orr's "divestment from Charge . . . was a mirage created by Orr to placate regulators, conceal the extent to which he controlled the Company, and artificially inflate the value of Charge common stock."  *Id.* ¶ 120.  Thus, they allege that the Director, Management, and KORR Defendants each violated Section 10(b) by failing to disclose the true nature of Orr's continuing involvement in Charge via the Trust in various public disclosures and by making false and misleading statements in those disclosures to the effect that Orr disclaimed any beneficial ownership in shares owned by the Trust.  Once more unto the breach, the Court will proceed by analyzing the allegations against each set of Defendants in turn.

Beginning with the Director Defendants, the Court notes at the outset that only a small subset of them — Scala, Deutsch, Murphy, Davis, and Carson — signed the draft DRSs that the Complaint alleges were misleading by virtue of the omissions regarding the relationship between Orr and the Trust.  *See* Pls.' Combined Opp'n 6-7 (listing the DRSs dated October 28, 2021, November 9, 2021, November 26, 2021, and December 10, 2021); *see also* Table 3.  For that reason alone, these claims fail against Lenard, Jacobs, Hanson, and Wu, who had not even joined the Board at that point.  But the claims against the remaining Director Defendants fare no better

33

because the Complaint is bereft of allegations supporting the inference of scienter as to them. There are no facts alleged indicating that these Director Defendants knew about any connection between Orr and the Trust before Orr disclosed it in his Schedule 13G filing on June 22, 2022, let alone that they knew he was secretly directing the trust.  Plaintiffs argue that the Director Defendants would have had such knowledge "[w]hen it was reported in the July 13, 2022 Preliminary Proxy Statement that Gabriel 613 Trust's shares had decreased by 4.5 million," which was the precise number of shares promised to Arena pursuant to the Side Letter.  *See* Pls.' Combined Opp'n 26-27.  But that argument fails for two reasons.  First,  it relies on the false assumption that the Director Defendants were aware of the terms of the Side Letter.  *See supra* Section A.1.  And second, even if the July 13, 2022 disclosure had somehow tipped them off, knowledge gained from a disclosure at that point could not retroactively support an inference of scienter with respect to disclosures they had made between October 2021 and December 2021. Thus, the claims against the Director Defendants relating to Orr's continued involvement with Charge must be and are dismissed for failure to state a claim.

As for the Management Defendants, the claims against Denson and Schweller are easily dismissed for the same reason: They lacked scienter.  As the Court has already found, there are no allegations to support the inference that Denson and Schweller were aware of the Side Letter. *See supra* Section A.1.  Thus, there is no support for the further inference that learning about the transfer of 4.5 million shares by the Trust pursuant to the Side Letter's terms put them on notice as to the true nature of Orr's relationship with the Trust.  By contrast, the claims against Fox are slightly stronger because, as noted, he was party to the Side Letter and thus aware of its terms. *See* FAC ¶ 82.  That makes it at least plausible that he would have known about Orr's control of the Trust once he saw that it had transferred the precise number of shares he had apparently

requested Orr transfer to Arena to fulfill his Side Letter obligation. *See id.* ¶¶ 115-16. But that knowledge came too late to support scienter as to the relevant filings. Plaintiffs concede that the earliest Fox could have known about Orr's control of the Trust was June 2, 2022, when the transfer occurred. *See* Pls.' Combined Opp'n 26-27 ("Once the trust [covered Fox's obligations], Fox had knowledge of Orr's control of the trust's shares."). But the Complaint identifies no statements made or signed by Fox that are dated *after* June 2, 2022, that were misleading as a result of omitting that information. Instead, all of the relevant filings were made in 2021. *See id.* at 6-7. Accordingly, the claims against Fox fail as well.

Finally, this set of claims against the Korr Defendants also falls short, albeit for a different reason: failure to sufficiently allege loss causation. Again, "[a] complaint may establish loss causation by demonstrating, *inter alia*, (1) a corrective disclosure or (2) a materialization of a concealed risk." *Altimeo*, 663 F. Supp. 3d at 356 (internal quotation marks omitted). In this instance, Plaintiffs disclaim the latter route. Instead, they rely on Orr's June 22, 2022 disclosure that the beneficiaries of the Trust were his children and that its trustee, Goldberg, was a limited partner in KORR Value. *See* FAC ¶ 261. They reason that because that disclosure resulted in an approximately 4% reduction in Charge's share price, *see id.* ¶ 359, full disclosure of his control of the trust would necessarily have led to a further decline, *see* Pls.' Combined Opp'n 45-46. It is true that "loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *In re Take-Two Interactive Securities Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008). But that is only if the partial corrective "somehow reveals to the market that a defendant's prior statements were not entirely true or accurate." *Id.* The problem here is that the Complaint does not identify any prior statement by the KORR Defendants that the July 24, 2022 disclosure made inaccurate. Nor could it as that

disclosure was the first and only statement signed by any of the KORR Defendants after Orr

stepped down from his position as CEO.  *See* Table 3.  Indeed, it arguably did not even make

*Charge's* prior statements — which Orr did not sign — regarding the Trust inaccurate.  Those

disclosures stated only that Goldberg was the trustee and had "sole voting and dispositive power"

over its shares.  FAC ¶ 109.  Disclosure of the identity of the trust's beneficiaries and Goldberg's

relationship with KORR Value L.P. did not make them false.  Accordingly, the claim against the

KORR Defendants regarding Orr's relationship with the Trust must be and is dismissed as well.

### 5.  Omissions and Statements Relating to Charge's Dispute with Arena

The penultimate set of omissions and misrepresentations is related to the conflict between

Charge and Arena that began late in 2023 as Charge's performance flagged; Arena refused to

allow refinancing and demanded changes to Charge's management and operations in the hope of

improving its outlook.  *See id.* ¶¶ 177-86, 234-42.  Plaintiffs allege that the Director and

Management Defendants violated Section 10(b) by failing to disclose in public statements made

between November of 2023 through the end of the Class Period on February 28, 2024, "that

Arena was thwarting Charge's efforts to obtain new financing," thereby "forcing Charge into

bankruptcy."  *Id.* ¶ 254.  But this fails to state a claim for several reasons.  First, it plainly fails

with respect to Fox and the Director Defendants because, as noted, they did not sign or make any

statements during the period in question.  *See id.* ¶ 33; Table 3.  As to Denson and Schweller, it

fails because they *had* disclosed in the August 14, 2023 10-Q that Arena viewed provisions of its

SPAs as "prohibit[ing] Charge from refinancing . . . and from incurring additional indebtedness

following repayment of the Notes without [Arena's consent]."  *See* 2Q 2023 10-Q 3.  And in that

same filing, they noted that Charge disagreed with that position and planned to "take appropriate

action to preserve the Company's rights," including "litigation with [Arena], whether brought by

36

us or against us." *Id.* Plaintiffs characterize that disclosure as "vague and incomplete," Pls.'
Combined Opp'n 36, but it is difficult to see how it could have been any clearer as to the nature
of Charge's dispute with Arena and the potential avenues for resolution. Disclosing that the firm
had retained Cravath, for instance, would not have significantly altered the total mix of
information available to investors beyond its disclosure of the dispute and that it was considering
litigation. *Cf. In re Bank of Am. AIG Disclosure Securities Litig.*, 980 F. Supp. 2d 564, 582
(S.D.N.Y. 2013) (holding that there was no duty to disclose that one is the target of potential
lawsuit because "[t]here is an obvious difference between an actual lawsuit and threatened
litigation that has not been brought"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (summary order).
Accordingly, the claims against all Defendants regarding Charge's purported failure to disclose
its conflict with Arena are dismissed for failure to state a claim.

**6. Statements Relating to SOX Certifications**

Finally, Section 404 of the Sarbanes-Oxley ("SOX") Act requires the CEO and CFO of a
public company to make certain certifications concerning their review and disclosure of
information about the company's internal controls over financial reporting. *See* 15 U.S.C.
§§ 78m, 78o(d); 17 C.F.R. § 240.13a–14(b)(2). Fox and Schweller made materially identical
certifications in Charge's 2021 10-K, 1Q2022 10-Q, 2Q2022 10-Q, 3Q2022 10-Q, 2022 10-K,
1Q2023 10-Q, 2Q2023 10-Q, and Denson also made one in his capacity as interim CEO in the
3Q2023 10-Q. *See* FAC ¶ 313; Table 3. Additionally, Fox and Schweller made several public
statements concerning the importance of internal controls over financial reporting. As noted,
Schweller stated that, upon joining Charge, her "immediate focus [would] be on ensuring
resilience in accounting and robust internal controls over financial reporting"; several months
later, Fox told a room of investors that he had "hammered home to [the Charge] compliance

37

department, our SOX team, [and] our CFO" that he had a "zero tolerance policy" for cover-ups. FAC ¶ 315.

Plaintiffs allege that these certifications and statements were materially misleading because Charge's internal disclosure controls and procedures were, in fact, not effective during the relevant period and that several Defendants evaded them. *See id.* ¶ 314. The problem with that theory is that Plaintiffs do "not allege[] any facts pertaining to [Charge's] internal structure for financial reporting, much less that [Charge] lacked adequate internal controls." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (internal quotation marks omitted). Instead, they merely restate the litany of other problems that plagued Charge — its liquidity issues, the purported existence of the LPA, and Orr's unwillingness to return funds — without explaining (1) what internal controls were in place; (2) how, if at all, those issues should have been caught by Charge's controls; and (3) most significantly, "how [the internal controls] were deficient, when and why." *Janbay v. Canadian Solar*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012). Such conclusory assertions regarding a company's internal controls are not sufficient to plausibly allege a misrepresentation or material omission claim. *See La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010). Accordingly, the claims against the Management Defendants regarding the SOX certifications and related statements must be and are dismissed for failure to state a claim.

*          *          *          *

In sum, Plaintiffs' Section 10(b) claims survive against Scala with respect to the nondisclosure of the KORR Value LPA and against Denson and Schweller with respect to the nondisclosure of Charge's liquidity problems and Orr's refusal to return Charge's funds. They are otherwise DISMISSED for failure to state a claim.

**B. Section 20(a) Claims**

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person," unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  Thus, to successfully plead a Section 20(a) claim, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St, Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Here, Defendants' sole argument for dismissal is that Plaintiffs fail to show a "primary violation."  *See* D&S Mem. 29 n.6; Directors' Mem. 28.  In light of the discussion above, that argument fails as to Scala, Denson, and Schweller, but it otherwise succeeds.  *See, e.g.*, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356-57 (2d Cir. 2022).  Accordingly, Plaintiffs' Section 20(a) claims as to all Defendants other than Scala, Denson, and Schweller must be and are dismissed for failure to state a claim.

**C. Common-Law Claims**

Finally, Plaintiffs also bring common-law fraud claims against the Management Defendants as well as aiding-and-abetting claims against the KORR Defendants and Arena Defendants.  To prevail on a fraudulent misrepresentation claim under New York law, a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity*

*Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004). The Second Circuit has repeatedly observed that "the elements of claims for federal securities fraud and New York common law fraud are nearly identical." *Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 38 n.2 (2d Cir. 2020) (summary order); *see also Newman v. Family Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013) (summary order). Not surprisingly therefore, the parties appear to take the view that the common-law claims rise and fall with the federal securities law claims. *See* Fox Mem. 24-25 (relying on the same Section 10(b) arguments to argue for dismissal of the common law fraud claim); D&S Mem. 29 (doing the same).[14] Accordingly, Plaintiffs' common-law claims against Fox, the KORR Defendants, and the Arena Defendants must be and are dismissed, while those against Denson and Schweller survive.

## CONCLUSION

For the foregoing reasons, the motions to dismiss filed by the Arena Defendants, the KORR Defendants, and Fox are GRANTED. The Director Defendants' motion to dismiss is also GRANTED, except as to Scala with respect to his alleged omissions regarding the existence of the KORR Value LPA. Finally, Denson and Schweller's motion to dismiss is also GRANTED, except as to their alleged omissions and misstatements regarding Charge's liquidity or lack thereof. That leaves only the question of whether Plaintiffs should be granted leave to amend. Although leave to amend should be freely given "when justice so requires," FED. R. CIV. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend,"

---

[14]    Fox invokes the corporate veil as an additional ground for dismissing the common-law fraud claim against him, *see* Fox Mem. 23-24, but that doctrine does not apply to a corporate officer's fraudulent activity, even when conducted in furtherance of corporate business, *see, e.g.*, *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (collecting cases). Here, as in *Cohen*, the "complaint allege[s] that [Fox himself] made misrepresentations" and omissions, so his position as an officer and/or director "afford[s] no basis for dismissal." *Id.*

*Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019).  First, the problems with Plaintiffs' dismissed claims are substantive, so amendment would be futile.  *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).  Second, Plaintiffs neither request further leave to amend nor suggest that they are in possession of facts that would cure the problems with their dismissed claims.  *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Finally, Plaintiffs were previously warned that they "will not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 107.  "Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend . . . ." *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (collecting cases).  Accordingly, the Court will not grant Plaintiffs leave to amend the dismissed claims.

By separate Order entered today, the Court will schedule an initial pretrial conference. The Clerk of Court is directed to terminate all Defendants except Leah Schweller, Craig Denson, and Phillip P. Scala as defendants in this case and to terminate ECF Nos. 125, 163, 166, 168, 171.

SO ORDERED.

Dated: June 23, 2026
New York, New York

JESSE M. FURMAN
UNITED STATES DISTRICT JUDGE

41

**APPENDIX**

| Description of the Filing | Date of the Filing | Defendant Signatory to the Filing | Defendant Signatory to the Accompanying SOX Certifications | Abbreviation |
|---|---|---|---|---|
| Table 3: Misstatements by Date and Signatory | | | | |
| 2019 Annual Report | June 19, 2020 | Orr | N/A | "2019 Annual Report"[7] |
| S-1 Draft Registration Statement | August 7, 2020 | | N/A | "August 7, 2020 DRS" |
| S-1 Draft Registration Statement | February 12, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy | N/A | "February 12, 2021 DRS" |
| S-1 Draft Registration Statement | May 14, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy; Davis; Carson | N/A | "May 14, 2021 DRS" |
| S-1 Draft Registration Statement | June 11, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy; Davis; Carson | N/A | "June 11, 2021 DRS" |
| S-1 Draft Registration Statement | July 20, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy; Davis; Carson | N/A | "July 20, 2021 DRS" |
| S-1 Draft Registration Statement | August 4, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy; Davis; Carson | N/A | "August 4, 2021 DRS" |
| S-1 Draft Registration Statement | August 25, 2021 | Fox; Denson; Orr; Scala; Deutsch; Murphy; Davis; Carson | N/A | "August 25, 2021 DRS" |

42

| S-1 Draft Registration Statement | October 28, 2021 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson | N/A | "October 28, 2021 DRS" |
|---|---|---|---|---|
| S-1 Draft Registration Statement | November 9, 2021 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson | N/A | "November 9, 2021 DRS" |
| S-1 Draft Registration Statement | November 26, 2021 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson | N/A | "November 26, 2021 DRS" |
| S-1 Registration Statement | December 10, 2021 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson | N/A | "December 10, 2021 RS"[8] |
| Form 8-K | December 23, 2021 | Schweller | Schweller | "December 2021 Form 8-K" |
| Form 8-K | March 24, 2022 | Schweller | N/A | "March 24, 2022 8-K" |
| Form 10-K | March 29, 2022 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson; Jacobs; Hanson; Lenard | Fox; Schweller | "2021 10-K" |
| Form 10-Q | May 16, 2022 | Fox; Schweller | Fox; Schweller | "1Q2022 10-Q" |
| Schedule 14A Preliminary Proxy Statement | July 13, 2022 | Fox[9] | N/A | July 13, 2022 Preliminary Proxy Statement |
| Schedule 13G | June 22, 2022 | Orr; KORR Value; KORR Acquisitions | N/A | "June 22, 2022 Schedule 13G" |
| Form 10-Q | August 15, 2022 | Fox; Schweller | Fox; Schweller | "2Q2022 10-Q" |
| S-1 Registration Statement | August 24, 2022 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; | N/A | "August 24, 2022 RS" |

| | | Davis; Carson; Jacobs; Hanson; Lenard | | |
|---|---|---|---|---|
| S-1/A Registration Statement | August 30, 2022 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson; Jacobs; Hanson; Lenard | N/A | "August 30, 2022 RS" |
| Form 10-Q | November 14, 2022 | Fox; Schweller | Fox; Schweller | "3Q2022 10-Q" |
| Form 10-K | March 15, 2023 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson; Jacobs; Hanson; Lenard | Fox; Schweller | "2022 10-K" |
| Form 10-Q | May 10, 2023 | Fox; Schweller | Fox; Schweller | "1Q2023 10-Q" |
| Form 10-Q | August 14, 2023 | Fox; Schweller | Fox; Schweller | "2Q2023 10-Q" |
| S-3 Registration Statement | August 15, 2023 | Fox; Schweller; Denson; Scala; Deutsch; Murphy; Davis; Carson; Jacobs; Hanson; Lenard; Wu | N/A | "August 15, 2023 RS" |
| Form 10-Q | November 8, 2023 | Denson; Schweller | Denson; Schweller | "3Q2023 10-Q" |
| Form 8-K | November 8, 2023 | Schweller | N/A | "November 8, 2023 8-K" |
| Form 8-K | November 21, 2023 | Schweller | N/A | "November 21, 2023 8-K" |